IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, | : | |
| CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS, et al | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : | |
| Defendant | : | |

MEMORANDUM IN SUPPORT OF
THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Plaintiffs herein, by and through their undersigned counsel and, in

support of their Motion for Summary Judgment submit the following Memorandum of facts,

points and authorities.

I.    **INTRODUCTION**

Through this Motion, the Plaintiffs are seeking summary judgment on Counts I, II, IV, V

and VI of the Complaint[1].  The Motion will focus largely on the recovery of the Property at issue

---

[1]For purposes of this Motion for Summary Judgment and Memorandum, all references to
"Complaint" or "the Complaint" refer to the Amended Complaint filed herein on February 16,
2021 D-40.

here, located at 1610 Riggs Place, NW, Washington, DC ("The Property"), under the statutory

provisions of the United States Bankruptcy Code, 11 U.S.C. ("Bankruptcy Code" or "Code")

§550, asserting a right to recovery under Code § 548(A)(1)(B) and Code") and the D.C. Code §§

28-3104 and 28-3105 concerning recovery of fraudulent conveyances. The Defendant along with

the Debtor, Len, engaged in a scheme intended to remove the Property from Len's bankruptcy

while allowing Max to exempt the Property in his bankruptcy. As argued below, although this

scheme constitutes actual fraud, the constructive fraud which is spelled out in 11 U.S.C. § 548

(a)(1)(B) is clearly shown by the record in this case and those documents, filings and testimony

referenced in this Motion. Therefore, while the Plaintiffs assert the case for recovery based upon

actual fraud is unusually strong at this Summary Judgment stage, because of the element of

intent, although obvious here, and the need to explore a series of facts over a period of time, the

insolvency standard of Code § 548(a)(1)(B) is an easier target.

 As discussed below, none of the material facts necessary to show fraud or insolvency

under the standards of 11 U.S.C. § 548 (a)(1)(B) are in dispute. Because the Plaintiffs meet the

standardized test of the statute, they are entitled to judgment on their fraudulent conveyance

claim, Count IV, of the Complaint. Additionally, since the criteria for recovery of a fraudulent

conveyance under D.C. law tracks the language of 11 U.S.C. § 548, and the Plaintiffs have also

clearly met their burden under that statute, the Plaintiffs are also entitled to judgment on their

state law fraudulent conveyance claim, Count V.

 Furthermore, the Trustee's interests in the Property pursuant to 11 U.S.C. § 544 as a

judgment lien creditor and successor to the rights of creditors and purchasers as a bona fide

purchaser, without knowledge, are superior to those of the defendant, if any, and also allow the

-2-

Debtor's estate to recover the Property or its value for distribution to creditors pursuant to 11 U.S.C. § 550 (a).

The attempted conveyance of the Property in 2010 from the Debtor, Len Salas, to his father, Max Salas, was never completed and was, in fact abandoned by the parties. In order to attempt to avoid liability in the D.C. Superior Court, wrongful death, litigation commenced by the Plaintiffs in 2015, the Salas family including at least, the Defendant, Max Salas and his son Ron, with the assistance of the Debtor, Len Salas, concocted a scheme which involved using an abandoned, stale, and defective quitclaim deed to attempt to remove Len Salas from the Superior Court case and, by so doing, allowing Max to claim an exemption of the Property in his planned bankruptcy which was filed shortly after the Plaintiffs' obtained their judgments.

The scheme involved resurrecting an invalid trust ("the 1610 Riggs Place Trust") prepared by Ron on July 6, 2010, under Colorado law, accompanied by an equally infirm quitclaim deed ("the Quitclaim Deed") purporting to transfer the Property from Len to the trust. The Quitclaim Deed was never recorded and, according to communications between and among family members and local (D.C. area) counsel, Len Salas ("Len" or "the Debtor") and Max Salas ("Max" of "the Defendant") abandoned the Quitclaim Deed. While the reasons for this are not clear there are some obvious reasons which may have caused the family to abandon the Quitclaim Deed, as discussed below. Regardless, it is clear that as soon as June, 2011 Max and Ron had no inention of using or recording the Quitclaim Deed.

During the course of Max's bankruptcy case (Case no. 18-00260 in the United States Bankruptcy Court for the District of Columbia) and in preparation for the hearing on the Plaintiffs' objection to Max's claimed exemption of the the Plaintiffs conducted discovery which

-3-

consisted of the deposition of Ron Salas and Interrogatories and a Request for Production of Documents propounded to the Defendant, Max Salas. Neither Ron Salas, nor his father, Max, mentioned or referred to a series of email communications in 2011 and 2012, months following the July, 2010 quitclaim deeed, which clearly state that a deed needed to be created to transfer the Property from Len to Max.and that all family members, including, at at a minimum, Max, Len and Ron, were still attempting to obtain a deed or other means to remove Len's name from the title to the Property. It is clear from the emails that Ron and Max both knew that the quitclaim deed was ineffective and no longer valid or enforceable to transfer the Property. The eMails are attached to this Memorandum as Exhibit 7.

At the very least, these eMails show that Ron, Len and Max made significant misrepresentations to the D.C. bankruptcy court, and likely this court, regarding the existence and usefulness of the Quitclaim Deed.

These misrepresentations and the scheme concocted by the Salas family represent actual fraud within the meaning of 11 U.S.C. § 548. However, the Plaintiffs' claim for recovery under Code, § 548 (a)(1)(B) is much more straightforward.

NOTE: All references to Case No. 18-2662 refer to the Chapter 7 bankruptcy of Len Salas filed on April 18, 2018 in the United States Bankruptcy Court for the Middle District of Tennessee, Case No. 3:18-02662.

All references to Case No. 18-260 refer to the Chapter 11 case of Max Salas filed in the United States Bankruptcy Court for the District of Columbia on April 18, 2018, Case No. 18-00260.

All references to the Complaint refer to the Amended Complaint filed in Adversary Proceeding 3:20-90027 in the United States Bankruptcy Court for the Middle District of Tennessee on February 16, 2021.

All references to "Exhibit" or "Exh." refer to Exhibits to the Plaintiffs' Motion for Summary Judgment unless otherwise specified.

Referenced documents which are part of the docket entries in Case No. 18-2662 or this adversary proceeding are not attached but are incorporated in this Memorandum and into the Summary Judgment record by such reference.

For ease of reference to members of the Salas family, Max Salas, the Defendant will sometimes be referred to as "Max" or "the Defendant", Len Salas will sometimes be referred to as "Len" or "the Debtor" and Ron Salas will be referred to as "Ron."

II.  **BACKGROUND OF THE CASE**

1.  The Plaintiffs' Complaint was filed on behalf of the Estate of Len Salas in accordance with this Court's Order entered on February 11, 2021. The Complaint seeks a declaratory judgment that the under the Truste's avoiding powers, the Plaintiffs have a superior interest in the Property and are entitled to recovery of the Property, or its value, under Code §550.

2.  The Plaintiffs assert that they have a superior interest in the Property whether under the Trustee's avoiding powers, pursuant to 11 U.S.C. §§ 544, et seq, or as an actual creditor, pursuant to 11 U.S.C. §§ 548 and or 549.

3.  The Plaintiffs' Complaint seeks recovery of the Property, or its value. The Plaintiffs assert they are entitled to recovery under the Trustee's avoiding powers pursuant to a sale conducted by the Trustee under Court authority (Order of June 12, 2019 (D-179) in Case no. 18-2662) and a sale to the Plaintiffs approved by this Court and evidenced by the Trustee's Report of Sale dated August 14, 2019 in Case No. 18-2662 (D-191).

4.  Because the trustee, Mr. Gigandet declined to pursue the causes of action set forth in the Complaint despite Plaintiffs' request that he do so, facts admitted by the Defendant, the Plaintiffs have derivative standing to pursue each count of the Complaint as determined by this

-5-

Court's Order of February 11, 2021 in Adversary No. 20-90027(D-39). Because the effective date of transfer of the Property is April 17, 2018 under both bankruptcy and D.C. law, the Complaint was timely filed and is not subject to a claim of limitations.

5. The Plaintiffs reserve the right, under bankruptcy law and procedure and D.C. law to invoke remedies intended to protect the property and preserve its value for the Debtor's Estate.

6. The Plaintiffs' Complaint contains six counts, three seeking recovery under Code § 544, one under Code § 548, one under D.C. Code §§ 28-3104 and 28-3105 and one under Code §550. The Plaintiffs are seeking summary judgment on all counts except Count III.

7. As a result of this Court's Memorandum Opinion and Order of February 11, 2021 (D-38 and D-39, respectively), the Plaintiffs assert that the affirmative defenses of violation of the applicable statutes of limitations have been overruled and finally determined for purposes of the Complaint. There are no disputed facts which could change the Court's legal conclusions and the Court's conclusions are based upon well established and longstanding statutory language and supporting case law.

III.     **BACKGROUND FACTS FOR MOTION FOR SUMMARY JUDGMENT**

    **A.     Background Facts**

8. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans and Michael Patrick McLoughlin, respectively (collectively, "the Decedents' Estates"), creditors of the Estate of Len Salas and suing for the benefit of the Estate of Len Salas. Nina and Michael were tragically killed in a fire at a residence in Washington, DC ("the Fire") which residence was owned by the Debtor, Len Salas and occupied and managed by his father, the Defendant, Max Salas. The Plaintiffs herein, the Estates, were the successful

-6-

bidders at an auction sale of this bankruptcy estate's interest in the trustee's avoidance and recovery actions under Code, §§544, *et seq.* A copy of the Trustee's Report of Sale of those actions is attached to the Plaintiffs' Complaint as Exhibit A. For purposes of this Motion, all references to the Plaintiffs' Complaint refer to the Amended Complaint docketed at D-40, filed on February 16, 2021.

9. The Defendant Max Salas, is the Debtor in Case No. 18-00260, in the United States Bankruptcy Court for the District of Columbia (hereinafter "Max's Bankruptcy"). Max filed a voluntary petition, under Chapter 11 of the Code on April 18, 2018.

10. Len Salas (hereinafter "Len"), is the Debtor is Case No. 3:18-bk-02662, filed in the United States Bankruptcy Court for the Middle District of Tennessee (Nashville) ("Len's Bankruptcy") on or about April 18, 2018. Len's Bankruptcy was converted from a Chapter 11 to a Chapter 7 bankruptcy on or about December 12, 2018.

11. Michael Gigandet was appointed Chapter 7 Trustee and administered Len's Chapter 7 Estate.

12. The Complaint was timely filed.

13. The parties have completed their discovery and there are no disputed facts which bear on the issues presented in this Motion.

14. The Plaintiffs' Complaint seeks the recovery of property located at 1610 Riggs Place, NW, Washington, DC ("the Property") at which the Defendant, Max, presently resides. Alternatively, the Plaintiffs are seeking a fair market sale of the Property to recover its value, believed to be in excess of $1 Million above all prior and/or secured claims.

-7-

15. The Plaintiffs are pursuing this matter through, and on behalf of, Len's Estate. The Plaintiffs made requests to the Court appointed trustee, Michael Gigandet ("the Trustee"), in early April, 2019, to pursue the causes of action set forth herein. The Trustee declined to do so. See Memorandum Decision entered on February 15, 2021 in Adversary No. 20-90027 (D-38), p.6.

16. All relief sought through or by the Complaint, as amended, is sought on behalf of the Estate and its creditors. See Complaint at ¶ 9.

17. On or about September 18, 2020, the Plaintiffs again contacted the Trustee asking that the Trustee take over, or join, in the avoidance actions and other claims asserted herein, for the benefit of all creditors. The Trustee declined, once again, asserting that by selling the claims he intended that they and any benefit from them, would inure solely to the purchasers (the Plaintiffs). The Trustee also indicated that if the Actions benefitted Len's Estate, he would take appropriate action to receive and distribute any recovered property or proceeds.

18. In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). The Judgment resulted from a fire at the Property which, at the time, Max had rented rooms to renters including Nina Brekelmans and Michael McLoughlin. Through the gross negligence of Max and his deliberate failure to make safety improvements to the Property required by law, Nina and Michael tragically lost their lives in a horrific and traumatic manner from a fire in June, 2015. Len was named a Defendant since he was, at all times, the owner of the Property, including at the time of the fire.

-8-

19. The Estates filed separate lawsuits against Max and Len in 2015. After a lengthy period of discovery and pre-trial matters, the case was tried in late March, 2018 and early April, 2018, resulting in Judgments for the Plaintiffs in the amounts of $7.5 Million and $7.7 Million respectively ("the Judgments").

20. The Judgments are allowed claims in the bankruptcy cases of both Len and Max. Through Max's confirmed Chapter 11 Plan and distributions from Len's Estate, the Plaintiffs have received minor payments against their claims - payments of less than $700,000.

21. Shortly after the entry of the Judgments Max and Len filed separate bankruptcies, Max in the District of Columbia (Case No. 18-00260)("Max's Bankruptcy") and Len in this Court (Case No. 18-02662) ("Len's Bankruptcy").

22. The Defendant's approved Amended Disclosure Statement, December 5, 2019 (D-276) and his confirmed Plan of Reorganization (Max Salas's Third Amended Plan of Reorganization), (D-298), January 22, 2020, specifically reference the Plaintiffs as the purchasers of the avoidance actions which are included in the Complaint, as amended.

23. The Defendant's Confirmed Plan provides that the Plaintiffs "possess the right to prosecute the Tennessee Avoidance Actions regarding the Property purchased from the Len Salas Bankruptcy Case." Confirmed Plan, Section 3.6, p. 9.

24. At the time of the bankruptcy filings by Len and Max, Len was, and was, at the time of the Debtor's bankruptcy filing in April, 2018, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property").

25. According to Max and Len, in July, 2010, Max and Len traveled to Colorado in

July 2010 to visit Ron, one of Max's sons. Ron was a recent law school graduate and admitted to practice law in Colorado.

26. While in Colorado, Len and Max executed a very simple trust agreement which Ron stated he prepared using a Colorado form even though the alleged trust property, the Property, was located in D.C. Ron also prepared a form "Quitclaim Deed," which Len also signed ("the Quitclaim Deed").

27. Max asserts that Len, who is unsophisticated in business and legal transactions, deeded the Property to his father while Len remained the sole obligor on the Sun Trust Deed of Trust Note ("the Note").

28. Max and Ron convinced Len to deed the Property to his father despite the fact that by that deed, Len would have lost all collateral for his $870,000 loan obligation to Sun Trust.

29. The attempted transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust Bank. L Salas Depo Trans., Exhibit 13, 144:7 - 148:7.

30. At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant asset was the Property. At all relevant times, Len worked only part time and had limited income and assets. At all times following the transfer in 2010, Len was insolvent. His liabilities exceeded his assets and his income was insufficient to pay his obligations, including the Sun Trust Deed of Trust Note payments.

31. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July, 2010, did Max make any payments to Len and Len received no property or

-10-

other value from Max related to the Trust or Quitclaim Deed. Exemption Trans. Vol 2,

(attached hereto as Exhibit 3) 139:15 - 140:2; Len Salas testimony, Plan Confirmation

Hearing, United States Bankruptcy Court for the Middle District of Tennessee, December 13,

2018 ("L Salas Conf. Hrg. Trans."), 68:22 - 69:2. Those pages of Len's testimony in

December, 2018 are attached hereto as Exhibit 4.

32. Max asserts that he intended to record the Quitclaim Deed in 2010 but had no

money to pay the required recording and transfer taxes. The Quitclaim Deed has never been

recorded and Len remained the titled owner of the Property through the date of his

bankruptcy filing in April, 2018.

33. Max also testified at the Exemption Hearing that he delivered the original

Quitclaim Deed to Mr. Goldstein's office and did not recall that Mr. Goldstein mailed it back

to Mr. Salas. Exemption Trans. Vol. 3, 55:7 - 56:21.

34. Later in the same testimony Mr. Salas testified that he told his counsel, Mr. Albert

and his associate, Mr. Cox what he did with the Quitclaim Deed and left it up to them to

obtain the original from Mr. Goldstein's Office. Exemption Trans. Vol 3, 57:13 - 58:6

35. After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See

eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed.

Exemption Trans. Vol 3, 58:9-13

36. In his deposition Ron Salas testified, under oath, related to the Quitclaim Deed,

executed on July 6, 2010, as follows:

"Q And I believe you said, but I want to
clarify this, that between the time of 2012,
roughly, and I realize you said, I think, a year

or two after the transaction, so I'm not trying to
pin it down, but say roughly 2012, which would be
two years later, until today, are you aware of any
other reasons why the deed, the quitclaim deed
that you prepared would not have been or could not
have been recorded?

**A. I don't know of any reason and I did not
know that it was not recorded until the lawsuit
came in my brother's name.**

Q And what is it about the lawsuit that
came in your brother's name that made you believe
the quitclaim deed had not been recorded?

**A The only reason my brother would be
involved was because his name had to still be on
the title is the assumption I've made in my mind
I don't know that that is factually correct, but
that is my assumption, that it must not have been
filed or he wouldn't be in this situation.
He didn't live in the District, he
never- he didn't live in the house, and I- so
that's the only logical reason I could make that
he would be involved, that it was never done. And
until that point, I did not even know that it had
not been done. I assumed at some point that he
came up with the money and did it. But he didn't,
as we sit here today we all know.**

Transcript of the Deposition of Ron Salas in the United States Bankruptcy Court for the

District of Columbia, Case No. 18-00260, August 8, 2018, ("R Salas Trans"), 65:21 - 66:21

(emphasis in original).[2]  Attached hereto as Exhibit 8.

    37.  Toward the end of the Superior Court litigation with the Plaintiffs, which resulted

in the Judgment, Max, apparently with the cooperation and participation of Ron and Len,

concocted a scheme to attempt to keep the Property for himself in the face of a pending

substantial judgment award to the Plaintiffs.

    38.  In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson

LLP) ("Albert"), Max learned that if the Property was owned by Len, it could not be

---

    [2]Mr. Albert was acting as counsel for Max Salas in his bankruptcy and attended the
deposition on behalf of Max.  Ron Salas appeared without counsel.

exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments. See D.C. Code § 15-501 (a)(14) (exemption is available only to property in which the owner resides). These conversations took place in early 2018. See Exemption Trans. Vol. 3, 121:3 - 122:9; See also Albert-R Salas eMails, 2/14 - 3/7/18, attached hereto as Exhibit 19.

39. Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

40. Because Len was not residing in the Property, he could not claim the benefit of the D.C. homestead exemption.

41. In early 2018, less than a month prior to the Superior Court trial, Max and Len, for the first time, alleged and produced a copy of the 2010 trust ("the Trust") and quitclaim deed ("the Quitclaim Deed") and sought to exclude Len from the Superior Court litigation by asserting Max was the real owner of the Property. The Superior Court summarily denied Max's attempt and the trial continued, resulting in the Judgment.

42. The Judgment is now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries ("D- ") D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries ("D- ") D-209 (Trustee's Final Report) and 220, Trustee's Final Account, and 222 (Final Decree).

43. Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is, or if it even exists. Transcript of the Continued Deposition of Max Salas, March 8, 2022 ("M Salas Trans.") 51:2-12; 52:6-20

44. On June 16, 2011, Ron sent an email to the Defendant advising Max that the

-13-

Trust had been registered and that Max needed to have a Quitclaim Deed created to transfer the Property to Max. This was nearly a year after the Quitclaim Deed was created, the only deed relied upon by Max in asserting his ownership of the Property. A copy of Ron's email, dated June 17, 2011, less than a year after the purported Quitclaim Deed of July 6, 2010, was produced in discovery by Len Salas in 2022. These emails were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C. Max, Ron and Len all testified at that hearing and all asserted, or supported the lie that the Quitclaim Deed of July 6, 2010 was in effect in 2018.

45. Ron's email states, on June 17, 2011 that "The next step is for someone in D.C. to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward and will need to be signed by at least the grantor, Len." Exhibit 7, Bates Number: LenSalas000017.

46. On June 21, 2011 Max followed up with an email to his real estate attorney, Stan Goldstein. In that email, Max asserts to the attorney, Mr. Goldstein, that "We need to have done is have Lenny sign a quick (sic) claim deed into the trust..." Exhibit 7, Bates Number LenSalas000016.

47. In Max's email to attorney Lynn Boileau on January 17, 2012, he states : There are **two different** requests. One is **to get Lenny's name off of the property**. (Want to do this asap) The second request is to refinance the property under the name of the trust.." (Emphasis supllied) Exhibit 7, Bates Number LenSalas000023.

48. On February 24, 2012 Len sent an email to Max asking "Where are we on this?" Max's response is "Still working on this...,,I am in Miami will be back soon." Exhibit 7, Bates Number LenSalas000029.

49. Max Salas testified that he is unaware that the attorneys he contacted in the D.C. area respecting the Trust's ownership of the Property ever created a deed to convey the Property into the Trust. M Salas Trans. 65:1-15. He further testified that he does not recall

-14-

any further communications with counsel about the 1610 Riggs Place documents after February 27, 2012. M Salas Trans. 72:12-18. When asked whether he contacted the attorneys to determine if they had a copy of a deed for the Property, Max testified as follows:

> Q. Have you contacted Ms. Boileau or Mr. Goldstein to determine if they have a copy of any deed that might have been created?
>
> **A. I did try to contact them. I did try to contact them actually recently. And I -- but I didn't -- I mean, they were trying -- they were -- no. I mean, we worked on something and then they said it couldn't go any further and depends on what you were going to do. So I don't -- I guess -- I can't guess. I don't know.**

M Salas Trans. 73:13-23

50. There was some confusion in the Salas family testimony concerning whether there was more than one original of the Quitclaim Deed and whether Len may have had an original. That issue seems to be cleared up by an email string provided by Max Salas as part of the discovery and trial in the Exemption dispute. Regardless, the Defendant has produced no evidence that anyone other than Max Salas had an original of the deed after July 6, 2010 and Max does not know where the original is or when he last had it. See, for example, M Salas Trans., Exhibit 10, 77:20 - 82:23; Max speculated at the Exemption Hearing that the original of the Quitclaim Deed may be at the office of the title attorney, Stan Goldstein. Exemption Trans. Vol. 3, (August 24, 2018), Exhibit 6, 55:7 - 57:19. However, in his most recent testimony he testified that he recently contacted Mr. Goldstein's office and was unable to obtain the Quitclaim Deed. See above, Exhibit 10, M Salas Trans. 73:13-23.

51. In his testimony at the Exemption Hearing in August, 2018, Ron testified, under oath,

-15-

that he assumed the Quitclaim Deed had been recorded. He stated, in August, 2018 that "my assumption was that they were, but as of today I knew they, I know now that they were not." Testimony of Ron Salas, witness for the Debtor Max Salas, August 22, 2018, Exemption Trans. Vol 1, 211:7 - 212:14. Ron Salas's complete testimony at the Exemption Hearing, Exemption Trans. Vol. 1, 206:8 - 246:16, is attached as Exhibit 12.

52.     Ron Salas further testified that he did not know why neither his father, his brother, his brother's wife, or he did not think to produce the Quitclaim Deed during the Superior Court litigation. Based upon the 2011 email exchange between Ron Salas and his father, it is obvious that the Quitclaim Deed Ron prepared could not be recorded and was, likely defective. That is the only rational explanation for Ron stating to his father that a Deed needed to be prepared in 2011, a year after Ron's Quitclaim Deed. That is the only rational explanation for the continued efforts, through February, 2012 to obtain a Quitclaim Deed from Len. That is the only rational explanation for Ron, Len, Kendra (Len;s wife) and Max to conveniently forget about the Quitclaim Deed until the very eve of the Superior Court Trial, in February, 2018. Exemption Trans. Vol 3, 39:15-25.

53.     The only deed referenced by Max or his counsel, allegedly entitling Max to an ownership interest in the Property, is the 2010 Quitclaim Deed. No other deed has been proffered, or even mentioned by the Salas family or by Max, specifically.

54.     Unfortunately, it appears that Ron, his father and his brother hid the fact that the Quitclaim was defective, or otherwise unrecordable at the hearing in Max's case in 2018.

55.     The Plaintiffs are unaware of the reason why the Quitclaim Deed was abandoned. However, there are clues. For example, in the Exemption Hearing in D.C., Ron Salas testified

-16-

that he was unaware of the requirements of Quitclaim Deeds in D.C. See, Ron Salas's testimony, Exhibit 12, at pp.227-28.  He stated that he was unaware that Deeds made to trusts had to be made in the name of the trustee.  Id.    Even in 2018, Ron was unaware whether the trust documents he created were valid under D.C. law. See, Ron Salas's testimony, Exhibit 12, 243:8-

56.  Max testified that he did not have the funds to record the deed.  More importantly, it seems evident that he was unwilling to spend the money to record the deed.  He spent hundreds of thousands of dollars from retirement savings and other funds in his bankruptcy, funds, at least a substantial portion of which, would have been available to Max if he wanted to record the Deed in 2010, or thereafter.  See, for example, excerpts from Max Salas' schedules of assets, filed April 18, 2018 in his bankruptcy case (no. 18-00260) in the United States Bankruptcy Court (D-1), attached hereto as Exhibit 9.

57.  No deed was recorded prior to Len's bankruptcy filing.  See Max's Amended Disclosure Statement filed in his bankruptcy case in the District of Columbia, Case No. 18-00260, December 5, 2019, D-276, attached hereto as Exhibit 2, pp. 4, 22.

58.  Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas testimony at the Exemption Hearing, Exemption Trans. Vol 2, August 23, 2018 ("Exemption Trans. Vol. 2"), Exhibit 3,, Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), 42:18 - 43:2. Excerpts from the M Salas Sup Ct Depo are attached hereto as Exhibit 1.

-17-

59. Len Salas is not aware of the location of any of the wet ink signature originals of the July 2010 Quitclaim Deed (Transcript of the Deposition of Len Salas, August 27, 2021 ("L Salas Trans."), Exhibit 13, 15:4-9. Len testified in his deposition that he provided an original "wet ink" original of the Quitclaim Deed, or a copy, to his lawyer on the eve of the Superior Court trial in March, 2018. L Salas Trans, Exhibit 13, 16:6-24, 19:11-25 - 21:18. Regardless, Len testified that the document he produced on the eve of the Superior Court trial, which commenced on March 26, 2018, was kept in his possession at all known times between July, 2010 and March, 2018. Id. Len's wife, Kendra, testified that she "had a pdf of it (the July, 2010 Quitclaim Deed) and that she thought it was the same as what Len had " I thought it was the same thing as what Len had, but I'm not sure." K Rowe Trans. 30:13-20.

60. At all relevant times Len's liabilities exceeded his assets when the value of the Property is not included. The attempted transfer, or actual transfer, of the Property made Len insolvent.

61. On July 6, 2010, the date of the alleged Quitclaim Deed, Len's primary asset was the home at 1610 Riggs Place, the Property at issue here. His most substantial liability was his obligation to Sun Trust Bank in 2007 for which Len remained liable through October 2020. In November, 2020 Sun Trust entered into a new agreement with Max Salas which eliminated Len's obligation on the Property as part of Max's Chapter 11 Plan. Therefore, on July 6, 2010, and at all times after, through October, 2020, Len's most substantial liability, by far, except for the Plaintiffs' judgments, consisted of his obligation to Sun Trust Bank.

62. The obligation to Sun Trust Bank was $870,000 in 2007. No payments were made to reduce the principal owed to Sun Trust Bank through the date of Len's Bankruptcy in April,

-18-

2018.

63.  There were no agreements between Len and Max regarding responsibility for payment of the Sun Trust Note or any other obligations related to the Property.  L Salas Trans. 28:9 - 29:4; Exemption Trans. Vol I, 40:25 - 41:18.  Max's testimony at his most recent deposition in March, 2022 confirms that there was no note or other written document making Max primarily, or secondarily liable on the SunTrust Note:

Q. Okay. Let's go to number 19,
Mr. Salas. Request for admission in 19 asks you
to admit or deny that Max Salas did not notify
Sun Trust or the D.C. government that he was an
obligor under the Sun Trust deed of trust. Your
response was denied. Max Salas notified Sun
Trust that he was obligated under the deed of
trust. I read that correctly, didn't I?

**A. You read it correctly, yes, sir.**

Q. When you notified Sun Trust that you
were obligated, did you sign a note?

**A. No. I didn't sign.**

Q. Did you sign a guaranty?

**A. Huh?**

Q. Did you sign a guaranty?

**A. I was -- well, the loan was --
actually it was a modification. It was a
modification and a way to get -- to get
Lenny's -- Lenny wanted the house off of his
name, and I kept trying to do that. That's
what happened. I don't blame him. I promised
him I would do that right away back when he
first did it. Well, I'm just going on too
far. So I don't remember, sir.**

Q. Okay. I need to give you a timeframe
here, so I apologize.

-19-

Prior to your bankruptcy filing, okay,
prior to your bankruptcy filing, did you notify
Sun Trust that you were obligated under the deed
of trust?

**A. I don't remember.**

Q. Did you ever provide, again, prior to
your bankruptcy filing, did you ever provide Sun
Trust with a note that you signed as an obligor
under the deed of trust note?

**A. Same answer.**

Q. Do you have any documents that would
indicate that you did sign such a note?

**A. I can't remember. You know, I don't
know. It's just -- it's almost like -- I
don't know. I don't remember.**

Q. Do you remember if you provided Sun
Trust with a guaranty of the note obligation
that Len was obligated for?

**A. Did I provide them a guaranty to
what, sir?**

Q. Did you provide Sun Trust with a
guaranty of the deed of trust note obligation?

**A. Did I provide Sun Trust a deed?**

Q. A guaranty.

**A. A guaranty. You know, Mr. McNutt, I
may have. I don't remember. I just can't
remember right. It just doesn't -- it's not
there.**

Q. If there was a note obligation or a
guaranty, would those documents have been
provided to the plaintiff's in this case?

**A. I don't know what -- if there was
what would have happened. I don't know.**

-20-

Q. You haven't provided any documents
related to a note obligation or a guaranty that
you provided the Sun Trust Bank prior to your
bankruptcy filing though, correct?

**A. That's not correct. I don't know
what I've done. I don't know. I may have. I
may have. Maybe I didn't. I don't know.**

Transcript of the Deposition of Max Salas on March 22, 2022 ("M Salas Depo Trans"), Exhibit 10, 85:5 -

87:19.

   64.   While the Defendant seems to be confused or perhaps reluctant to testify directly on this

issue, it is undisputed that there are no documents indicating that Max was liable on the SunTrust loan at

any time and Max never entered into any agreement or understanding with Len that Max was liable or

responsible.  Moreover, and most importantly there is no document raised, proffered or produced by Max

indicating that Len was not the sole party responsible for the Deed of Trust payments until at least

November, 2019.[3]

   65.   Len Salas was fairly straightforward in his testimony.  However in response to the

question whether Len executed more than one Quitclaim Deed, he not only couldn't remember

whether he signed any other document but answered "I don't know" to the question "if you

would have executed any other agreement [quitclaim deed], you would have kept a copy of it;

correct?" L Salas Trans. Exhibit 13, 40:1-20.  Regardless of Len's faulty memory or evasiveness,

---

[3]When U.S. Bank obtained assignment of the SunTrust Note, sometime in 2019, it did
finally reach an agreement with Max for him to make the payments under the Deed of Trust from
and after November, 2019.  However, there is no indication in the agreement reached between
Max and U.S. Bank that the SunTrust Deed of Trust Note has been canceled or is otherwise not
in effect.  Therefore, Len is still liable for the entire balance under the SunTrust Note which, as
of September 29, 2019, was $1,208,720.40.  See Max Salas Stipulation with U.S. Bank
(Stipulation for Plan Treatment of First Lien Secured by Real Property at 1610 Riggs Place NW,
Washington, DC 20009), filed in Case No. 18000260 (D-266-1) on November 20, 2019, attached
hereto as Exhibit 15.

it is clear from his testimony that he is not aware of any documents related to the alleged

conveyance of the Property other than the trust and quitclaim deed both dated July 6, 2010.

66. Len had several conversations with his father regarding getting his name off the loan

and deed after 2010. L Salas Trans. 71:25 - 74:17; Transcript of Len Salas's testimony at the

hearing on Objections to the Claim of Exemption (of the Property) by the Debtor, Max Salas, in

case no. 18-00260 in the United States Bankruptcy Court for the District of Maryland, Trial

Transcript ("Exemption Trans."),Vol 1., Exhibit 20,158:13 - 163:8; Deposition Transcript of the

Deposition of Kendra Rowe Salas, August 27, 2021 ("K Rowe Trans."), Exhibit 14, 16:6-24.

67. Max Salas confirmed in his testimony at the Exemption Hearing that Len was

attempting to get Max to get Len "off of the deed to the property" shortly after the original deed

to Len in 2007 and **continuing all the way into 2018**.   Exemption Trans. Vol. 1,Exhibit 20,

42:20 - 43:8.  Later in his testimony Max claimed that Len only asked Max to take Len off the

loan, not off the title asserting that "he'd already taken his name off the property" in 2010.

Exemption Trans. Vol. 1, Exhibit 20,  44:1-10.  That was just another misrepresentation,

however.  During Len's deposition in the Superior Court litigation, Len testified in March, 2016,

that the last time Len talked to his father about **transferring ownership of the property, not the**

**loan**, out of Len's name, was the spring of 2015, the year of the tragic fire that took the lives of

Nina and Michael.  See Exemption Trans. Vol. 1, Exhibit 20,  47:11 - 49:11.  The emails

between Len and his father in the time frame of 2011 -2012, well after the July, 2010 Quitclaim

Deed, confirm and corroborate Len's testimony in his 2016 Deposition.  See Exhibit 7.

68. The emails of 2011 - 2012 among Ron, Len, Max and Max's counsel, produced, for

the first time, by Len in this litigation, show that Max's statements are direct contradictions of his

testimony in 2018 at the Exemption Hearing. Moreover, the testimony of both Ron and Max in 2018 directly contradicts their email communications in 2011 and 2012. Their testimony in 2018 was under oath and was used to try to support Max's claim that he was the owner of the Property in April, 2018 for purposes of his exemption claim. Now that testimony appears to be largely, if not completely, fabricated for the sole purpose of advancing the false claim that there was an effective Deed after 2010. See emails between and among Max, Ron, Len, Stan Goldstein and Lynn Boileau, between June 17, 2011 and February 27, 2012, Exhibit 7, Bates Nos. LenSalas 000016 - LenSalas000034.

69. The Sun Trust Note was in default during the period 2010 - 2018. L Salas Trans., Exhibit 13, 55:11-20.

70. Len Salas was involved in more than one attempt to refinance the Property in the time frame of 2010 through 2013 and all such attempts failed. L Salas Trans. 83:23 - 84:4. The clear inference from Len's emails to/from his father and the refinancing attempts is that Len was the recognized owner of the Property and was, therefore, necessary for any refinancing. Therefore, again, Despite the existence, in July, 2010 of a Quitclaim Deed, that deed was not recorded, likely could not be recorded, and was abandoned by Max and Len. See, for example, Ron's email of June 17, 2011, attached hereto as part of Exhibit 7.

71. Len did not have sufficient funds to pay his attorneys in the Superior Court litigation. He lives "paycheck to paycheck." L Salas Trans. Exhibit 13,76:20 - 77:2

72. At the time of his bankruptcy filing in April, 2018, Len was obligated for all payments due on the Sun Trust Note, as well as the judgments, totaling $15.2 Million, owed to the Plaintiffs. L Salas Trans. 61:1 - 63:2.

-23-

73. Len's brother, Ron, paid for Len's bankruptcy proceedings and the retention of counsel for the appeal of the Superior Court litigation. Disclosure of Compensation of Attorney for Debtor, April 18, 2018 (D-1) p. 46 of 56; Motion of Debtor in Possession to Employ Michael C. Forster and Forster Law Firm as Special Counsel, April 27, 2018, D-10, at page 3 of 10.

74. During the Superior Court litigation which ended with the 4 day trial held in late March and early April, 2018, Max paid certain expenses and legal fees owed by Len Salas because Len could not afford them. See, for example, Max Salas Statement of Financial Affairs, filed in his bankruptcy case, No. 18-00260 in the United States Bankruptcy Court for the District of Columbia on May 2, 2018 (D-13) ("M Salas SOFA"), p. 5 of 10, attached hereto as Exhibit 16.

75. On his bankruptcy schedules filed herein on April 18, 2018 (D-1), Len Salas lists total assets of $53,373.38 and total liabilities of $16,107,795.41. Len Salas Schedules of Assets and Liabilities, filed on April 18, 2018 in Case No. 18-2662, (D-1) pp. 12-36.

76. Other than the 1611 Riggs Place Trust executed on July 6, 2010, the only family related trust of which Len is aware is the "CLR Trust." Exemption Trans. Vol 1, Exhibit 20, 148:1-13.

77. Max told Len that he deposited the rent checks into "this account for 1610 [Salas Trust]. Exemption Trans., Vol 1, Exhibit 20, 149:2-24.

78. The fire occurred in June, 2015. From that time, until February or March, 2018, no one resided in the Property. During that time, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment of made by Max from the insurance proceeds he

-24-

received as a result of the fire damage.

79. Although Max claims he was the sole party responsible for all payments on the Sun Trust Loan, and made all loan payments, no payments have been made since prior to 2018 (with the exception of one payment from insurance proceeds) and the current balance was increasing at the rate of approximately $7770 month as of October, 2019. Sun Trust sold its Note, in 2019, to U.S. Bank National Association/Select Portfolio Servicing, Inc. ("U.S. Bank"). Pursuant to an agreement reached with U.S. Bank, Max is required to make monthly payments of approximately $8,300. Upon information and belief, Max has been making the required payments since approximately November, 2019. *See*, Exhibit B, Confirmed Plan, p. 8, ¶ 3.3.

80. Through October, 2019, Len remained solely responsible under the SunTrust Note, although Max asserts he was responsible and "made all payments." However, according to the SunTrust Motion for Relief from Stay, filed in Case No. 18-2662 on November 2, 2018, the arrearage owed to SunTrust under the Note, as of April, 2018 was $374,282.18. As the sole obligor on the Note, Len was responsible for payment of the arrearage.

81. On the effective date of the attempted transfer of the Property from Len to Max, April 17, 2018, Len's assets were approximately $53,000 plus the value of the Property. Len's liabilities at the same time included the Plaintiffs' Judgments, attorney fees owed ot his litigation counsel for the Superior Court Litigation, the SunTrust arrearage, the SunTrust Note balance of at least $1.03 Million and some taxes and credit card obligations.

82. On the effective date of the attempted transfer, Len was required to pay the credit cards, taxes, attorney fees, SunTrust arrearage and the Plaintiffs' Judgments.

B.     **Facts Related to the Plaintiffs' Acquisition of the Trustee's Avoiding and Recovery Actions**

83.   The Court held a hearing on the Trustee's Motion to sell in June, 2019.  Mr. Young, counsel for the Defendant, appeared at the hearing representing Mr. Ron Salas and the Defendant.  Mr. Young had entered his appearance in this case on behalf of the Defendant.  At all relevant times, Mr. Young represented both Ron Salas and the Defendant.  Mr. Young represented his clients' support for the sale at the Court hearing.

84.   After the hearing in June, 2019, this Court entered an order on June 12, 2019 authorizing the sale and also setting forth the bidding and sale procedures which the Trustee followed.   The Defendant supported the sale and requested that the Court authorize the sale, which it did pursuant to its order of June 12, 2019 (D- 179) ("the Sale Order").

85.   Thereafter, in accordance with the Sale Order, the Trustee conducted an auction sale.  The sale took place on July 23, 2019.  At the end of the auction, the Plaintiffs were the successful bidders.  The Trustee's Report of Sale was filed herein on August 14, 2019 (D-191) ("Report of Sale").

86.   The Defendant  filed no objections or opposition to the proposed sale, this Court's Order of June 12, 2019, or the Report of Sale.

87.   No party appealed the Sale Order and no party sought any additional review or modification of that Order, the Report of Sale or the accompanying Bill of Sale (D-191, pp. 3-4).

88.   In the Defendant's confirmed Plan of Reorganization in his Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Columbia, Case No. 18-00260 ("the D.C. Bankruptcy"), filed simultaneously with this case, the Defendant acknowledges that the Plaintiffs

were the successful bidders for the Trustee's avoidance and recovery actions. Although the Defendant's Plan and court approved Disclosure Statement specifically state that the Defendant has reserved all defenses and objections to the subject avoidance and recovery actions, at no time did the Defendant assert that the Plaintiffs were not the rightful owners of the causes of action set forth in this Complaint or lacked standing to pursue those causes of action. In fact, the Defendant's approved Disclosure Statement (the D.C. Bankruptcy, Case No. Docket No. 276) the Defendant states specifically that "...[the Plaintiffs] possess the right to prosecute the Tennessee Avoidance Actions regarding the Property purchased from the Len Salas Bankruptcy Case." *See*, D.C. Bankruptcy, Docket No. 276, at p. 17. The Plaintiffs reached agreement with the Defendant to withdraw their objections to the Defendant's proposed plan of reorganization based upon the representations made in the Disclosure Statement and proposed Plan of Reorganization, including the representation that the Plaintiffs were the rightful owners of the causes of action which form the bulk of this Complaint.

89. The Defendant filed his proposed Chapter 11 Plan of Reorganization on August 1, 2019. In response to objections and events unrelated to this Complaint, the Debtor filed an Amended Disclosure Statement and Plan, followed by a Third Amended Plan, which was eventually confirmed by the D.C. bankruptcy court. The Defendant's disclosure statements and proposed plans specifically referenced the sale of the avoidance actions at issue here, but did not raise any objections or deficiencies regarding the sale. While the Defendant reserved his right to defend the prospective avoidance actions, he did not raise any issues regarding the Plaintiffs rightful ownership of those actions. *See* above discussion.

C.     **Plaintiffs' List of Uncontested Facts**

-27-

90. In accordance with the local rules of this Court, the Plaintiffs have attached to this Memorandum a List of Undisputed Facts which support the Plaintiffs' Motion, along with citations to the documents, pleadings, filings, depositions and testimony which support those Facts.

IV. **ARGUMENT**

A. **The Plaintiffs are Entitled to Summary Judgment in Accordance with Fed. R. Civ. P. 56**

91. Summary Judgment in bankruptcy cases, adversary proceeding and contested matters, is governed by Fed. R. Civ. P. ("FRCP") 56 which is incorported into this adversary proceeding pursuant to Fed. R. Bankr. P. 7056 (with only minor changes)(unless stated specifically to the contrary, all references to summary judgment rules wqill refere to the language of FRCP 56.

92. This court should grant summary judgment to the Plaintiffs if the record before the court is sufficient to show that there is no genuine dispute as to any material fact and the Plaintiffs are entitled to judgment as a matter of law. *Beard v. Banks*, 548 U.S. 521, 529 (2006). Rule 56 mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's defense. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

93. In order to obtain summary judgment the Plaintiffs' burden is to show the absence of a genuine, material dispute and an entitlement to judgment under applicable law. *Id., at* 323.

94. Because this case is not a jury trial, most of the facts of the case are accepted and

-28-

not disputed and judgment is based upon the specific language of the Bankruptcy Code and

D.C. Code, the Plaintiffs, the facts to establish entitlement are straightforward.  Furthermore,

entitlement to a judgment at this stage, after completion of discovery, is governed by long

standing statutory provisions that are the subject of significant court review and approval.

Nevertheless, the Plaintiffs are required in this Motion to show that the evidence is not

subject to different interpretations or inferences by the trier of fact. ***Hunt v. Cromartie***, 526

U.S. 541, 553 (1999). ***See also, Limor v. Anderson (In re Scarbrough)*** , 2019 Bankr. LEXIS

933 (BAP 6th Cir. 2019) in which the 6th Circuit's Bankruptcy Appellate Panel explained:

> perhaps a better way to describe the summary judgment analysis in bankruptcy
> proceedings is to say that when the moving party bears the burden of proof at trial,
> she must make a prima facie case strong enough to justify depriving the other
> party of her day in court. Depending on who bears the burden of proof on a
> material issue, the moving party can make this showing by using deposition
> testimony and affidavits; offering documentary evidence that would be admissible
> at trial; and/or pointing the court to facts in the record that otherwise preclude
> judgment for the non-moving party.

***Id.*** at *4.

95. A genuine dispute exists, such that the Plaintiffs Motion should be denied, only when

a rational fact finder, considered the evidence in the summary judgment record could find in

favor of the non-moving party.  ***Ricci v. DeStefano***, 557 U.S. 557, 586 (2009); ***Anderson v.***

***Liberty Lobby, Inc.***, 477 U.S. 242 , 247-252 (1986).

96.  A genuine dispute is not created by a mere scintilla of evidence or evidence which is

only "colorable' or insufficiently probative.  ***Id.*** Additionally, summary judgment will not be

defeated if the claim or defense asserted by the non-moving party is based upon a factual scenario

that is plainly contradicted by the summary judgment record.  ***Scott v. Harris***, 550 U.S. 272, 280

(2007); ***Coble v. City of White House***, 634 F.3d 865, 868-9 (6th Cir. 2011) (the principle declared in ***Scott***, that is, that the court need not credit "visible fiction", applies to all types of objectively conflicting evidence).

97. According to the 6th Circuit, in ***Coble***, construing the facts on summary judgment in the light most favorable to the non-moving party usually means adopting the plaintiff's version of the facts. ***Id.***, at 868, citing ***Scott,*** 550 U.S. at 378. However, as the 6th Circuit acknowledged, the Supreme Court clarified in **Scott** that facts must be viewed in the light most favorable to the non-moving party "only if there is a 'genuine' dispute as to those facts." ***Coble, supra***, citing ***Scott,*** 550 U.S. at 380(quoting Fed. R. Civ. P. 56(c)).

98. In the context of a motion for summary judgment courts should not accept that which is so utterly discredited by the record that no reasonable trier of fact could have believed it. ***United States v. Hughes***, 606 F.3d 311, 319 (6th Cir.2010)(quoting ***Scott***, 550 U.S. at 379-81)(cited and quoted in ***Coble***, 634 F.3d, at 868.

99. In a trio of summary judgment cases all decided in 1986, the Supreme Court put its stamp of approval on summary judgment motions as a means to eliminate unnecessary trials.

> The Supreme Court has analogized a motion for summary judgment to a motion for directed verdict, because both remove the trial of factual questions from the finder of fact. If the movant under Rule 56 presents evidence that, if not controverted at trial, would entitle the movant to a Rule 50 judgment as a matter of law, that evidence must be accepted as true in a summary judgment motion, when the party opposing the motion does not offer counter-affidavits or other evidentiary material showing that a genuine issue remains to be tried, or that she is unable to present facts justifying opposition to the motion under Rule 56(d). Celotex, 477 U.S. at 323, 106 S. Ct. at 2552; Liberty Lobby, 477 U.S. at 250, 106 S. Ct. at 2511 (standard for granting summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a)).

***Limor, supra,*** 2019 Bankr. LEXIS 933, at *5.

100.  The Plaintiffs assert that they are entitled to Summary Judgment on Counts I, II, IV,

V, and VI of the Complaint because the Plaintiffs claims fit squarely with the language of 11

U.S.C. §§ 544 (a) and 548(a)(1)(A) and (B) and D.C. Code §§ 28-3104 and 28-3105 and there

are no disputed material facts, within the meaning of Rule 56, which would create a genuine, or

colorable issue preventing judgment at this time.

B.    **The Plaintiffs Have Standing to Pursue The Causes of Action Stated in the Complaint**

101.  Pursuant to the confirmed Plan in Max's case, which specifically recognizes the

Plaintiffs' standing to pursue the Complaint's causes of action for the benefit of Len's

bankruptcy estate, and the Trustee's sale of his avoidance and recovery actions to the Plaintiffs in

Case No. 18-2662, as confirmed by this court, the Plaintiffs the owners of the recovery and

avoidance claims set forth in this Complaint and have standing to pursue those claims.  ***See***

***Jefferson County Bd. Of County Comm'rs v. Voinovich (In re V Cos.)***, 292 B.R. 290, 294, 298

(B.A.P.  6th Cir. 2003) (following ***Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re***

***Gibson Group)***, 66 F.3d 1436, 1438 (6th Cir. 1995).

C.    **The Plaintiffs are Entitled to Recovery under Count IV of Their Complaint (Fraudulent Conveyance Under 11 U.SC. § 548)**

102.  The purpose of avoidance of preferential transfers under 11 USCS § 547 and

fraudulent transfers under 11 USCS § 548 is to prevent a debtor from diminishing, to the

detriment of some or all of his creditors, funds or property that would, except for the transfer, be

generally available for distribution to creditors.  Consequently, any funds or property under the

control of the debtor, regardless of source, are deemed property of debtor and cannot be

-31-

transferred if such transfer diminishes the estate. ***In re Chase & Sanborn Corp.***, Bankr. L. Rep. (CCH) ¶ 1753, 813 F.2d 1177 (11th Cir. 1987).

103.  Purpose of statute is to recover for estate assets that could be distributed to unsecured creditors, equity secured creditors, or to debtor as exempt property, and to rectify prepetition depletion of debtor's estate. ***Ryker v. Current (In re Ryker)***, 272 B.R. 602, Bankr. L. Rep. (CCH) P78605,  (Bankr. D.N.J. 2002), rev'd, remanded, 301 B.R. 156, 2003 U.S. Dist. LEXIS 20515 (D.N.J. 2003).

      1.  <u>Actual Fraud - 548 (a)(1)(A)</u>

104.    The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because it was made with the actual intent to defraud creditors and potential creditors of Len Salas, including Sun Trust Bank, the Plaintiffs and the other creditors of the bankruptcy estate of Len Salas by transferring the Property to Max without permission and by fabricating the facts and circumstances of the alleged Quitclaim .

105.  The Defendant and the Debtor executed a Trust and Quitclaim Deed in July, 2010 at the Colorado office of Ron Salas, the Debtor's brother and the Defendant's son. Ron was a fledging Colorado attorney at the time who, by his own admission,  had limited knowledge of trusts and no knowledge about creating an effective trust or deed to property in the District of Columbia.  He confirmed as much in his deposition on August 10, 2018 (Exhibit 8) and his testimony at the Exemption Hearing in August, 2018 in Case No. 18-260 (Exhibits 6 and 20).

106.  The purpose of the Deed was to "remove Len" from the title to the Property.  The Deed was never recorded and the location of the original deed is unknown.

107.  In 2011, by virtue of emails addressed from Ron to the defendant and the debtor,

-32-

and addressed from Max to his real estate attorneys at the time (Exhibit 7), it is clear that Len and Max had long since abandoned the Quitclaim Deed. Ron's direction to Max to have a D.C. attorney prepare a deed show that the deed Ron created must not have been defective and could not be recorded.

108. From 2011 through 2017 Len continually asked Max to remove him (Len) from the title to the Property, a clear indication that the deed was ineffective and not recordable.

109. In October, 2015, Max and Len were sued in the D.C. Superior Court by the Plaintiffs for damages resulted from the gross negligene of Len and Max and the horrific deaths of Nina Brekelmans and Michael McLoughlin from a fire at the Property in June, 2015.

110. In October, 2015, Len, Max, Ron and Len's wife, Kendra, all knew that the only reason Len was sued was because his name remained on the title to the Property. They also knew that if Len could be proven not to be the owner of the Property he could be dismissed from the lawsuit.

111. Ron Salas testified in 2018 that he knew that the July, 2010 Deed could not have been recorded because Len was named a defendant in the lawsuit. He testified as if the Deed was still in effect even though he knew it was not valid, could not have been recorded and no longer existed.

112. The Superior Court case eventually went to trial in late March, 2018. In early April, 2018 the Plaintiffs obtained their judgments.

113. From October, 2015 until February, 2018, a month before the Superior Court trial was to begin, none of the Salas' produced an original or copy of the Quitclaim Deed.

114. Max had the only original of the Deed. He testified that he gave the original to his

-33-

real estate counsel and was not sure if he ever got it back. Based upon the communications among the Salas's and Max's counsel in 2011 and 2012 it appears certain that the Deed was left at the offices of Max's counsel and likely thrown out as useless. Regardless, Max did not retain the original or, if he did, it may have been destroyed in the fire. It is likely that Max's real estate attorney knows the answer.

115. By late 2017, with the trial looming, it was obvious to Len and Max that they were facing substantial judgments from the Superior Court Litigation. Still no one produced the Deed or a copy.

116. It was only after Max learned from his bankruptcy counsel, just weeks before trial, that the long lost deed could give him an opportunity to exempt the Property from the judgments he was facing. Max and Len learned that Len could not exempt the Property because he was not residing in the Property which meant if Max could somehow be deemed the owner, then he could exempt the Property under D.C.'s very generous homestead exemption. D.C. Code § 15-501(a)(14).

117. Armed with the knowledge of what they needed to do, from Max's bankruptcy counsel, Ron, Len and Max concocted the scheme whereby they would now claim they forgot about the deed for all these years and magically produced it so that Max could claim the exemption he eventually got under, to say the least, false pretenses.

118. The schemers involved in this fraud include, at a minimum, Len, Max and Ron.

119. The purpose of the fraud was to transfer the Property from non-exempt to exempt status to thwart the Plaintiffs' collection of their judgments.

120. The fraud scheme was developed and initiated in or about February, 2018 and

-34-

continues to this day.

121. In February, 2018 Len (and Max) was facing a substantial judgment. On the effective date of the transfer, April 17, 2018, Len (and Max) owed more than $15 Million to creditors including Len's attorneys, the IRS and the Plaintiffs.

2. <u>Fraudulent Conveyance - § 548 (a)(1)(B)</u>

122. The transfer of July, 2010 was a fraudulent conveyance pursuant to Code § 548 because, by transferring the only major asset of Len to his father, the transfer was likely to, and did, make Len insolvent and unable to pay his mortgage obligations to Sun Trust Bank. Moreover, at the time of the transfer, and at all times from 2007 through 2018, Max gave no consideration, made no payments and gave or transferred no property to Len. Max has produced no evidence of consideration for the transfer and Len has testified repeatedly, that Max gave Len no money or property of value at any time from 2007 through 2018.

123. In addition, at the time of the transfer under 548(d)(1), April 17, 2018, Len was clearly insolvent since he was unable to pay his attorneys and the IRS, among other creditors, and he had a recent unsatisfied judgment recorded against him totaling in excess of $15 Million.

124. Len received no compensation or property of value and gave up property worth in excess of $2 Million while remaining solely obligated on a Deed of Trust Note to Sun Trust bank that was in default at the time of the alleged transfer. The arrearage alone, on the SunTrust Note was more than $374,000.

125. The transfer of the Property in 2010 by Quitclaim Deed was made after two years prior to Max's Bankruptcy because pursuant to Code § 548 (d)(1) the transfer of real property is deemed perfected when the deed is recorded or, if not recorded prior to the bankruptcy filing, the

-35-

date immediately prior to the bankruptcy filing, namely April 18, 2018. Therefore, the effective date of the transfer is April 17, 2018.

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition.

§548 (A)(1).

126. Section 548(d)(l) also provides:

> For purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

Accordingly, for purposes of 11 U.S.C. § 548, the transfer date would be April 1 7, 2018, because the Quitclaim Deed was not recorded at the time of Len's bankruptcy filing..

127. A transfer under Code §548 (a)(1)(B)(2) if:

> 2. The debtor received less than a reasonably equivalent value in exchange for such transfer or obligation; and

>> a. The Debtor was insolvent at the time of the transfer; or

>> b. the Debtor became insolvent as a result of such transfer or obligation; or

>> c. the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such Debts matured.

128. The Plaintiffs assert that there is no dispute regarding any facts relevant to the

-36-

Plaintiffs ability to recover the Property as a fraudulent conveyance under the provisions of 11 U.S.C. §548 (a)(1)(B)(2) and the documents and testimony of the Salas family members confirm that the "transfer" of the Property pursuant to the Quitclaim Deed was a fraudulent conveyance based upon the following:

a. The Salas family members hid the emails and communications between and among Ron, Len, Max, and the Goldstein firm (Stan Goldstein and Lynn Boileau), during the period 2011-2012 which clearly shows that the Quitclaim Deed was abandoned by Max and Len; and

b. Both Len and Max testified that Len was attempting to get his name off the Property, not the loan, in the period after 2010 at least through the year of the tragic fire at the Property (2015); and

c. None of the Salas family members could confirm the existence, or identify the location of the original Quitclaim Deed after 2012; and

d. The 1610 Riggs Place Trust filed no tax returns for any period; and

e. Len testified that Max made no payments to Len at the time of the alleged transfer in 2010; and

f. Max made no payments of any kind related to the Propery to Len in or after 2007; and

g. Max gave no consideration of a non-monetary kind to Len, at any time, 2007 through 2018; and

h. The obligation under the Sun Trust Deed of Trust increased from $870,000 in 2007 to at least $1,030,825.85 as of the filing of Max Salas's bankruptcy case on April 18, 2018. See Max Salas Schedules A/B-J, May 2, 2018 (D-12) Case No. 18-00260, United States Bankruptcy Court for the District of Columbia. A copy of the Schedules page (p. 19 of 37) of Docket Entry 12 is attached hereto as Exhibit 18. According to a Stipulation filed by the Defendant/Debtor and U.S. Bank (successor in interest to SunTrust) the balance of the Sun Trust Deed of Trust as of September 29, 2019 was $1,208,720.40. See Stipulation filed on November 20, 2019 (D-266-1) in Max Salas' bankruptcy, a copy of which is attached hereto as Exhibit 15; and

i. The Property represented, by far, the only major asset owned by Len; and

-37-

j. When the Property was transferred on April 17, 2018, Len was still obligated on the SunTrust loan for at least $1,030,825.85; and

k. When the Property was transferred, Len was obligated to the Estates in the amount of $15.2 Million, plus interest; and

l. According to Len's schedules his assets as of April 18 2018 totaled $53,373.38. His liabilities totaled $16,307,795.41. Len Salas Schedules, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, (D-1), p. 12 of 56; and

127. In an analogous case, *Rameker v. Peterson (In re Associated Enters., Inc)*, 234 B.R. 718, the Wisconsin bankrupt court held that an attempted transfer of real estate into a defective trust was a fraudulent conveyance recoverable for the benefit of the debtor's estate. The court entered judgment in favor of the bankruptcy trustee finding:

> Because the trust fails, so does this argument. The transfers were made to an insider within one year before the petition was filed. The defendant is the president of the debtor corporation and a consummate insider. All relevant transfers took place in 1998 and the petition was filed in October 1998. The debtor was insolvent at the time of the transfers or the transfers caused the debtor to become insolvent. The debtor's bankruptcy schedules list total assets of about $ 14,000 and liabilities of almost $ 23,000 less than six months after the transfers took place. Finally, the debtor received no consideration for the transfers. This is obviously less than reasonably equivalent value.

*Rameker v. Peterson (In re Associated Enters., Inc.)*, 234 B.R. 718, 724 (Bankr. W.D. Wis. 1999). Although the trust at issue here is defective for a different reason, it was, nonetheless, a defective trust, void ab initio, as in *Rameker*. Additionally, as here, in *Rameker* found that the debtor's liabilities exceeded its assets at the time of the transfer determining that the debtor was either insolvent at the time of the transfer or the transfer caused the debtor to become insolvent. The debtor, in *Rameker*, received no consideration for the transfer and neither did Len. And, finally, no deed of any kind was recorded to effect the attempted

-38-

transfer.

128.   In another case similar to this one, the bankruptcy court for the Middle District of Florida determined that the trustee could avoid, pursuant to 11 U.S.C.S. § 548, a transfer of real property which the Debtor deeded to her former husband and son and to recover the property for the benefit of the estate. The court found that the initial transfer of debtor's real property took place on the date that the deed was recorded, which was less than one year before the petition date (the limitations period prior to 2005). In addition, debtor was insolvent at the time of the initial transfer and the initial transfer was made without consideration. It was undisputed that debtor was not residing on the property at the time of the initial or subsequent transfers, and could not have claimed the property as her homestead. Thus, the necessary statutory elements were established and the transfers were subject to avoidance by the bankruptcy trustee under 11 U.S.C.S. § 548(a)(2).

*Cohen v. Bellamy (In re Shannis)*, 237 B.R. 862, 862 (Bankr. M.D. Fla. 1999).

129.   In its decision, the *Shannis* court noted that, "other then the effective date of the transfer, the facts are not in dispute." *Id.* Here, the material facts are not in dispute, except the effective date of the transfer (the Defendant continues to assert the transfer took place in July, 2010).  Max has consistently testified that he was the party responsible for paying the SunTrust loan, from 2007 through the commencement of Max's bankruptcy case.  He paid no consideration for the original SunTrust loan of 2007 and the loan balance increased from 2007 to September, 2019 by more than $300,000.  The Quitclaim Deed was not recorded as of the commencement of Max's bankruptcy case on April 18, 2018.  Len was insolvent on April 18, 2018 and the Property was Len's only asset of more than a few thousand dollars.  During the

-39-

period 2010 through 2018, Len's income was limited and he was unable to pay his obligation including the SunTrust Mortgage during that time.

130.  Applicable Florida law appears to be more restrictive than D.C. law regarding the rights of a subsequent purchaser for value. **See**, Fla. Stat. § 695.01. **Cohen v. Bellamy (In re Shannis)**, 229 B.R. 234, 237 (Bankr. M.D.Fla. 1999)( depends upon interpretation of Florida's provision which states "without notice"). However, under the analogous (to this case) facts of the **Shannis** decisions above, the court determined that the trustee can avoid the attempted transfer to relatives since that transfer occurred within 1 year (under pre-2005 language of § 548 (a)) even though the date of the deed was more than one year prior to the bankruptcy because the deed was not recorded until the period within one year of the bankruptcy filing.

131.  Standard of proof required under 11 USCS § 548 is preponderance of evidence. **Dahar v. Jackson (In re Jackson),** 2004 BNH 26, 318 B.R. 5, 2004 Bankr. LEXIS 1917 (Bankr. D.N.H. 2004).  By that standard, the record in this case and the plain language of the statute, § 548(a)(1)(B) the Plaintiffs are entitled to summary judgment under Count IV of the Complaint.

    D.    **<u>The Plaintiffs are Entitled to Recover Under Count V of Their Complaint</u>**
        **<u>(Fraudulent Conveyance Under D.C. Law)</u>**

132.  The Plaintiffs, as the holders of the rights and claims of the Trustee, may avoid any transfer that is voidable under applicable law pursuant to Code § 544 (b) (1).

133.  Under the law of the District of Columbia, the transfer of the Property alleged herein, is a fraudulent conveyance because the transfer was performed with fraudulent intent as to existing creditors, such as the IRS, other taxing authorities, Sun Trust Bank, and others, including the Plaintiffs, and was made for less than reasonably equivalent value, all as

-40-

specifically prohibited by D.C. Code § 28-3104, *et seq.*

134.  A transfer made is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. D.C. Code § 28-3105.

135.  Here the transfer was to the Debtor's father on the eve of bankruptcy less than two weeks after the entry of judgments against the Debtor in an amount in excess of $15,000,000. Moreover, the Defendant not only knew Len could not pay the judgment balances, he also knew that the Debtor was unable to pay his attorneys in the Superior Court case.  The Defendant's bankruptcy schedules show a payment of $2,000 from Madx to Len's attorneys prior to the Defendant's bankruptcy filing.

136.  A transfer made, or obligation incurred, by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> In the District of Columbia, a transfer of real property is made:
> (A) With respect to an asset that is real property other than a fixture, including the interest of a seller or purchaser under a contract for the sale of the asset, when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee.

D.C. Code § 28-3106.  Therefore, under D.C. law the alleged 2010 transfer, even if this Court determines that the Quitclaim Deed is valid, was not perfected at the time of Max's bankruptcy

filing and is recoverable under D.C. law.

137.  In an action for relief against a transfer or obligation under D.C. law, a creditor may

obtain:

> (1) Avoidance of the transfer or obligation to the extent necessary
> to satisfy the creditor's claim;
>
> (2) An attachment or other provisional remedy against the asset transferred
> or other property of the transferee...;
>
> (3) Subject to applicable principles of equity and in accordance
> with applicable rules of civil procedure:
>
>> (A) An injunction against further disposition by the
>> debtor or a transferee, or both, of the asset
>> transferred or of other property;
>>
>> (B) Appointment of a receiver to take charge of the
>> asset transferred or of other property of the
>> transferee; or
>>
>> (C) Any other relief the circumstances may require.

D.C. Code § 28-3107

138. The date of transfer according to the law in the District of Columbia, for purposes of

creditors and bona fide purchasers without notice, is the date the deed is recorded, in this case,

no earlier than April 17, 2018.

> Any deed conveying real property in the District, or interest therein, or declaring
> or limiting any use or trust thereof, executed and acknowledged and certified as
> provided in §§ *42-101*, *42-121* to 42-123 [repealed],*42-306*, and *42-602* and
> delivered to the person in whose favor the same is executed, shall be held to take
> effect from the date of the delivery thereof, except that as to creditors and
> subsequent bona fide purchasers and mortgagees without notice of said deed, and
> others interested in said property, it shall only take effect from the time of its
> delivery to the Recorder of Deeds for record.

D.C. Code §42-401.  ***Sovran Bank v. United States (In re: Aumiller)***, 168 B.R. 811 (Bankr.

-42-

D.D.C. 1994).

139.  As this court has already noted, because the underlying state law avoidance claim was not time-barred as of the commencement of Len Salas' case, this claim could have been brought by the Trustee provided the complaint was filed within the time periods prescribed in 11 U.S.C. § 546(a). *See UMB Bank , N.A. v. Sun Capital Partners V, LP (In re LSC Wind Down, LLC*), 610 B.R. 779, 785 (Bankr. D. Del. 2020).  (If "underlying state law avoidance claim is not time-barred as of the commencement of a bankruptcy case, a section 544(b)(l) claim may be brought provided that it is commenced within the time periods prescribed by section 546(a)."); *Tabor v. Davis*, No. 05-15794-L, 2016 WL 11696269, at *13 (Bankr. W.D. Tenn. June 15, 2016) ("The reachback period for avoiding fraudulent transfers that could have been avoided by a creditor but for the filing of a bankruptcy case is measured from the entry of the order for relief.").

140.  All of the arguments set forth in the section on recovery under §548(a)(1)(B)(2), particularly those involving the circumstances of the transfer of the Property and the insolvency of the Debtor apply here.  The Plaintiffs assert they are entitled to judgment under the D.C. fraudulent conveyance statute.

E.    **The Trustee's Status as a Bona Fida Purchaser Gives the Trustee a Superior Interest in the Property Than the Defendant's**

141.  *Aumiller, supra* explained that Section 544(a) of the Bankruptcy Code, the "strong arm" clause, bestows upon the trustee the rights of a hypothetical judgment lien creditor and the rights of a bona fide purchaser for value as of the date of the filing of the bankruptcy petition.

-43-

Although the trustee's strong arm powers arise under federal law, the scope of these powers is governed by the substantive laws of the state in which the property is located, in this case, the District of Columbia. *In re Bridge*, 18 F.3d 195, 200 (3d Cir. 1994). Therefore, the relevant inquiry in this case is whether the trustee, clothed with the rights bestowed upon him as a bona fide purchaser or judgment lien creditor pursuant to D.C. law, prevails over whatever equitable or legal rights the Defendant has.

142. Pursuant to District of Columbia law, a deed conveying an interest in real property is not effective against a subsequent bona fide purchaser or creditor without notice unless it is recorded. D.C. Code § 45-801 (1990); 3 *Manogue v. Bryant*, 15 App. D.C. 245 (1899) (purpose of statute is to protect judgment creditors as well as purchasers against claims of which they had no notice). Because the equitable lien in this case was not recorded, it would not be effective against a bona fide purchaser or judgment creditor who acquired an interest in the property without notice of that equitable lien.

143. Pursuant to 11 U.S.C. § 544 (a), the Trustee has as of the date of the Len Salas bankruptcy petition, namely, May 2, 2018, the status of a bona fide purchaser of real property from the debtor, without notice.

144. Under Code § 544 (a)(3) the trustee's bona fide purchaser status gives the Plaintiffs priority over subsequently recorded interests in the Property.

145. Under D.C. Code, § 42-401:

Any deed conveying real property in the District, or interest therein, ...shall be held to take effect from the date of the delivery thereof, except that **as to creditors and subsequent bona fide purchasers** and mortgagees without notice of said deed, and others interested in said property, it shall only take effect from the time of its delivery to the Recorder of Deeds for record.

-44-

146.  As a result, the Plaintiffs have a superior and priority interest in the Property ahead of any interest acquired by Max Salas and, therefore, the Property should be turned over to the Plaintiffs, or sold to recover the net equity for the benefit of the unsecured creditors of Len Salas' bankruptcy estate.

147.  Section 544 is known as the Trustee's "the 'strong arm' clause," *Aumiller, supra*, 168 B.R. at 817, and "'gives a bankruptcy trustee the rights and powers of a judicial lien creditor or a bona fide purchaser of real property and allows the trustee to avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a judicial lien creditor or a bona fide purchaser of real property.'" *Drown v. Wells Fargo Bank, N.A. (In re Scott)*, 424 B.R. 315,327 (Bankr. S.D. Ohio 2010) (quoting *Craig v. Seymour (In re Crabtree)*, 871 F.2d 36, 37 (6th Cir. 1989)).

148.  The scope of these powers is governed by the substantive laws of the state in which the property is located, in this case, the District of Columbia. *Midlantic Nat'l Bank v. Bridge (In re Bridge)*, 18 F.3d 195, 200 (3d Cir. 1994) (citations omitted).

149.  Historically, the bankruptcy code has been hostile to secret liens such as the Quitclaim Deed at issue here. *Bridges, supra*, at 199.

> "While an equitable lien . . . may be enforceable against . . . subsequent purchasers and incumbrancers with notice, it may not be enforced against prior incumbrancers or subsequent incumbrancers without notice. The trustee belongs to the latter class." *Hayes v. Gibson*, 279 F. 812, 814 (3d Cir. 1922) (internal citations omitted)

*In re Bridge, supra*,  18 F.3d at 199 n.3.

150.  The trustee's status under section 544(a) is governed by the state substantive law

defining that notice. See, e.g., *In re Probasco*, 839 F.2d 1352 (9th Cir. 1988) (debtor in possession could not avoid partner's interest in real property as a hypothetical bona fide purchaser under section 544(a)(3) because it had constructive notice under California law of the partner's interest in the property); *Angeles Real Estate Co. v. Kerxton*, 737 F.2d 416, 420 (4th Cir. 1984) (trustee's rights under section 544(a) as judgment lien creditor are subject to prior equitable interests under Maryland law); *McCannon v. Marston*, 679 F.2d 13 (3d Cir. 1982) (where possession of property by claimed purchaser put trustee on constructive notice of purchaser's interest under Pennsylvania law, trustee could not avoid purchase of the property under section 544(a)(3)); *In re Roman Crest Fruit, Inc.*, 35 Bankr. 939 (Bankr. S.D.N.Y. 1983) (where reasonable inquiry would have revealed existence of agreement between debtor and assignee for the sale of debtor's interest in store leases, and knowledge of such agreement was of sufficient magnitude to require hypothetical purchaser to inquire further, assignee's equitable lien could not be avoided by bankruptcy trustee under section 544(a)).

151.   Pursuant to District of Columbia law, a bona fide purchaser or judgment creditor is subject to actual, constructive or inquiry notice. *Clay Properties, Inc. v. The Washington Post*, 604 A.2d 890, 894 (D.C. App. 1992) (subsequent bona fide purchaser can be held to inquiry notice); *Kayfirst Corp. v. Washington Terminal Co.*, 813 F. Supp. 67, 72 (D.D.C. 1993) (same); *Manoque*, 15 App. D.C. at 261-62 (judgment lien creditor that was held to inquiry notice of the mortgagee's equitable rights took subject to those rights); *Hume*, 12 App. D.C. at 368-69 (failure to record or acknowledge deed does not deprive it of priority over judgment creditor having notice of its existence); *Groome*, 13 App. D.C. at 470 (equitable lien has priority over a subsequent judgment lien creditor who had notice of equitable claim). See also *Harris v.*

Case 3:20-ap-90027   Doc 73-1   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc
Supplement Memorandum in Support of Plaintiffs Motion for Summary Judgment   Page 46 of 53

*Maryland National Bank*, 165 B.R. 729 (Bankr. D.D.C. 1994) (recorded Deed of Trust is

sufficient notice, (despite misindexing at the Recorder of Deeds) under D.C. statute which states

that Deed is perfected when presented to the Recorder of Deeds for recording).

152.  Actual notice is not relevant in the context of section 544(a) as the trustee assumes

the role of a bona fide purchaser or judgment creditor without actual knowledge. *McCannon*,

679 F.2d at 16-17 (statute's language renders trustee's actual knowledge irrelevant but trustee

may be held to constructive or inquiry notice). *See also, In re Sandy Ridge Oil Co., 807 F.2d*

*1332 (7th Cir. 1986)*, *S. Bank and Trust Co. v. Alexander (In re Alexander)*, 524 B.R. 82 (E.D.

Va. 2014)(trustee took title to half-interest in property despite existence of an unrecorded deed);

*Hardesty v. Horn (In re Horn)*, 606 B.R. 747, 67 BCD 212 (Bankr. S.D. Ohio 2019). In

*Hardesty,* the debtors had transferred the subject property by an unrecorded deed to the father

prior to filing their petition and at the time of the filing the father was merely the holder of an

unrecorded deed. The bankruptcy court granted summary judgment in favor of the trustee. The

Court determined the fact that the father had previously transferred the title to the debtors so they

could obtain financing did not matter, nor did the fact that the county auditor's office had

approved the conveyance back to the father because such approval was insufficient under Ohio

Rev. Code Ann. § 5301.25 to put the trustee on constructive notice of the transfer.

*Id.*, 606 B.R. 747, 748 (Bankr. S.D.).

153.  Constructive notice, which has generally come to mean record notice, could not

exist in this case because the equitable lien was not recorded. *Clay*, 604 A.2d at 895 n.15.  See

also, *Sandy Ridge Oil* and  *Hardesty, supra.*  Compare *Treinish v. Norwest Bank Minn., N.A.*

*(In re Periandri)*, 266 B.R. 651 (B.A.P. 6th Cir. 2001)(Pending foreclosure, which operated as a

lis pendens under Ohio law was constructive notice which defeated the trustee's bona fide purchaser status). Here, the trustee had no notice of any recorded document which could defeat his interest as of Len's bankruptcy filing on April 18, 2018. *Sovran Bank v. United States (In re Aumiller*), 168 B.R. 811, 817-19 (Bankr. D.D.C. 1994)

154.  Under well established law interpreting the subject D.C. statute, and other, similar state statutes, the conveyance, for purposes of avoidance or recovery is the date the subject deed is recorded or, if unrecorded, the day before the Debtor's bankruptcy petition, here - April 17, 2018.  As a result,  the avoidance and recovery actions set forth in the Complaint are well within the limitations periods established by 11 U.S.C. §546 (a), or any other applicable limitations period.  *See, for example, Williams v. Marlar*, 252 B.R. 743, 758 (8th Cir BAP 2000)(Arkansas Law); *Southern Bank & Trust Co. v. Alexander (In re Alexander)*, 2014 Bankr. LEXIS 3048, *21(Bankr. E.D. Va. 2014) *Health Science Prods. v. Taylor (In re Health Science Prods.)*, 183 B.R. 903, 919 (Bankr. N.D. Ala. 1995);

155.  The record of an instrument that is not permitted by law to be recorded, or that is not proved for record as required by law, is constructive notice to no one.  *Clark v. Harmer*, 1895 U.S. App. LEXIS 3533 (D.C. Cir. 1895)

156.  Since the "transfer" at issue here, occurred, by statute, on April 17, 2018 and was an unrecorded transfer of real property, at best, the Trustee's status as a bona fide purchaser and judgment lien creditor, as of the date of the Debtor's bankruptcy filing, is superior to whatever interest the Defendant may have as of the same date.

-48-

F.    **The Trustee's Status as Hypothetical Judgment Lien Holder Gives the Trustee a Superior Interest in the Property**

157.   As of the commencement of this case, April 18, 2018, the trustee has, without regard to any knowledge of the trustee or any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien, whether or not such a creditor exists. Code §544 (a)(1).

158.   The Plaintiffs are the authorized representatives for prosecution of all of the Trustee's rights and powers under Code §§ 544, *et seq.*

159.   A judicial lien creditor, under the laws of the District of Columbia, has a superior interest in the Property than that of a competing creditor or owner who has not recorded an interest in the Property.  Thus, as discussed below, the Trustee's interest is superior to the unrecorded interest of the Defendant.

160.   Section 544( a)( 1) grants a trustee "the status of a hypothetical lien creditor who is deemed to have perfected his interest as of the date of the filing of the bankruptcy petition." *Rogan v. Bank One, N.S. (In re Cook)*, 457 F .3d 561, 564 ( 6th Cir. 2006).

161.   The difference between a bona fide purchaser and a judgment creditor, for purposes of the Trustee's Avoiding Powers, is explained as follows:

> a judgment creditor is not in the position of a bona fide purchaser, and his claim is subject to prior, undisclosed equities. "He is neither in fact nor in law a bona fide purchaser, and must stand or fall by the real, and not the apparent rights of the defendant in the judgment."' *Kolker v. Gorn*, 193 Md. 391, 398, and cases cited.

Case 3:20-ap-90027   Doc 73-1   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc
Supplement Memorandum in Support of Plaintiffs Motion for Summary Judgment   Page 49 of 53

*E. Shore Bldg. & Loan Corp. v. Bank of Somerset*, 253 Md. 525, 530, 253 A.2d 367, 370

(1969). Therefore, unlike a bona fide purchaser, a judgment creditor is subject to any

existing equitable claims, regardless of notice. Here, however, there are no equities that

could defeat the Trustee's lien since the Quitclaim Deed, at best, constituted a secret lien.

Moreover, the facts and circumstances of the resurrection of the Quitclaim Deed in February,

2018, as described above hardly favor the Defendant.

162. As the uncontested facts in this case show:

a. The Defendant failed to record the Quitclaim Deed despite his obligation to do so; and

b. Less than 6 months after the execution of the Quitclaim Deed Len and Max were instructed by Ron, the creator of the Quitclaim Deed, that a new Deed needed to be created by someone in D.C. See Exhibit 7.

c. Ron Salas acknowledged that he knew the only reason Len could be a defendant was if the Quitclaim Deed had not been recorded; and

d. Neither Max, Len, Ron or Kendra produced a copy of the Quitclaim Deed during the Superior Court litigation, until February, 2018, even though they all knew of its existence and they all also knew that the only reason Len was a defendant in the Superior Court litigation was if Len was a titled owner of the Property; and

e. As of February, 2018 no Salas family member had an original Quitclaim Deed; and

f. As of February, 2018 no Salas family member was aware of the existence of an original Quitclaim or, if it existed, its location.

g. Len produced a copy of the Quitclaim Deed in or about February, 2018 only after Max (and Len) learned from Marc Albert that the 1610 Riggs Property Trust and the Quitclaim Deed could be used to exempt the Property in Max's future bankruptcy.

h. Both Ron and Max testified that the Quitclaim Deed was still in effect in

-50-

2018, when their own email communications in 2011 and 2012 tell a complete contradictory story.

163.  A perfected mortgage is superior to a later-recorded judicial lien. *Id.* at 565. That would apply to the SunTrust Deed of Trust but not to the Quitclaim Deed, even if it is in effect as of April 17, 2018.

164.  Much of the argument in previous Section, applied to the Trustee's status as a bona fide purchaser for value and without notice, also applies to the Trustee's status as a hypothetical, judicial lien holder but is not repeated here to avoid unnecessary duplication.

165.  Based upon the undisputed facts of this case and the express provisions of Code, § 544(a)(1) the Plaintiffs are entitled to judgment on their supeiror claim to the Property due to the Trustee's status as a judgment lien creditor.

G.     **The Plaintiffs May Recover, for the Benefit of the Debtor's Estate, the Property or its Value**

166.  Under Code § 550 (a) the trustee may recover, for the benefit of the estate, the property transferred or, upon court order, the value of the property.  Here the Plaintiffs are seeking the equity in the Property, either through payment of the agreed amount of the equity (approximately $1.3 Million), or through the proceeds of a court ordered sale of the Property.  *See,* for example, *ASARCO LLC v. Americas Mining Corp*., 404 B.R. 150, 162 (S.D.Tex. 2009)(court has discretion); *In re Vedaa*, 49 B.R. 409, 411 (Bankr. N.D. 1985); *In re: Beck*, 25 B.R. 947 (Bankr. N.D.Ohio 1982).

V.     **CONCLUSION**

For the reasons set forth in the foregoing Memorandum, the Plaintiffs assert that they are

-51-

entitled to summary judgment on Counts I, II, IV, V, VI of their Complaint and seek a judgment

declaring and adjudging that the Plaintiffs, on behalf of the Debtor's Estate are the owners of the

Property and are entitled to recover the Property or its value for the benefit of the Debtor's Estate

and for such other and further relief as is consistent with the Plaintiffs' Complaint and the relief

sought therein.

Respectfully submitted,

BUTCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:  /s/ Philip J. McNutt
        Philip J. McNutt
        11921 Freedom Drive, Ste 584
        Reston, VA 20190
        703-904-4380
        202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

<u>Certificate of Service</u>

I HEREBY CERTIFY THAT a copy of the foregoing Motion, along with the Plaintiffs Memorandum and accompanying exhibits, was delivered electronically, on the 29th day of July, 2022 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park

-52-

6100 Tower Circle, Ste 200
Franklin, TN 37067
615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com


 /s/ Philip J McNutt
Philip J. McNutt