IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |

| | | |
|---|---|---|
| NICOLAAS BREKELMANS AND GAIL GREGORY BREKELMANS, CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF NINA BREKELMANS, et al | : | |
| | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| MAX SALAS | : | |
| Defendant | : | |

PLAINTIFFS' LIST OF UNDISPUTED FACTS,
PURSUANT TO LOCAL RULE 7056-1 IN SUPPORT OF
THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In accordance with Local Rule 7056-1 of the rules of this Court, the Plaintiffs submit the

following facts in support of their Motion for Summary Judgment. The Plaintiffs assert that

these facts are either stipulated by the parties, supported by the Summary Judgment Record

herein, or otherwise undisputed.

**PLAINTIFFS' LIST OF UNDISPUTED FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

NOTE: All references to Case No. 18-2662 refer to the Chapter 7 bankruptcy of Len Salas filed
on April 18, 2018 in the United States Bankruptcy Court for the Middle District of Tennessee,
Case No. 3:18-02662.

All references to Case No. 18-260 refer to the Chapter 11 case of Max Salas filed in the United States Bankruptcy Court for the District of Columbia on April 18, 2018, Case No. 18-00260.

All references to the Complaint refer to the Amended Complaint filed in Adversary Proceeding 3:20-90027 in the United States Bankruptcy Court for the Middle District of Tennessee on February 16, 2021.

All references to "Exhibit" or "Exh." refer to Exhibits to the Plaintiffs' Motion for Summary Judgment unless otherwise specified.

Referenced documents which are part of the docket entries in Case No. 18-2662 or this adversary proceeding are not attached but are incorporated in this Memorandum and into the Summary Judgment record by such reference.

1. The Plaintiffs are the personal representatives of the Estates of Nina Brekelmans and Michael Patrick McLoughlin, respectively. Joint Stipulation of Uncontested Facts, Joint Pretrial Statement, June 22, 2020 (D-14) ("Stip"), No. 1.

**RESPONSE:**

2. Nina Brekelmans and Michael Patrick McLoughlin were tragically killed in a fire at a residence in Washington, DC (the "Fire") located at 1610 Riggs Place, NW, Washington, DC (the "Property"). Stip. No. 2

**RESPONSE:**

3. Defendant resided in the Property from approximately 2007 through early June, 2015 and then commenced residing in the Property again in early 2018. Stip No. 3, Exemption Trans. Vol. 3, 62:11 - 63:17.

**RESPONSE:**

4. In 2007 Len Salas took out a loan for $870,000 in order to pay Max's ex-wife an agreed $500,000 in a divorce settlement.

-2-

5. Michael Gigandet, the Court appointed Trustee of the Estate, has declined to pursue the causes asserted herein and has also declined to join in this action. Court's Memorandum Opinion dated February 11, 2021 (D-38)("L Salas Memorandum Opinion"), at p. 6-7.

**RESPONSE:**

6. The Complaint is brought as a derivative action on behalf of the Estate of Len Salas. L Salas Memorandum Opinion dated February 11, 2021, in Case No. 20-90027 (D-38).

**RESPONSE:**

7. In April, 2018, the Plaintiffs obtained judgments against Len and Max totaling $15.2 Million (collectively, "the Judgment"). Joint Statement of Stipulated Facts, Joint Pre-trial Statement dated June 22, 2020 (D-14), Stipulation No. ("Stip. No.") 6.

**RESPONSE:**

8. The Defendant, Max Salas does not have the original of the Quitclaim Deed and the 1610 Riggs Property Trust, dated July 6, 2010. Defendant's Amended Responses to the Plaintiffs Request for Admissions, dated November 11, 2021 ("Amended Responses-RFP"), Exhibit 17, Resp No. 2, p.3. Amended Responses-RFA, Request No. 1., p. 2.

**RESPONSE:**

9. Len Salas does not remember seeing a "wet ink" original of the Quitclaim Deed after July 6, 2010. L Salas Trans. 140:13-23.

**RESPONSE:**

10. The Defendant does not have the original Quitclaim Deed created in July, 2010. Defendant's Amended Responses to the Plaintiffs' Request for Admissions ("RFA"), Req. 1

-3-

**RESPONSE:**

11. That the Defendant is unaware of the location of the original Quitclaim Deed after 2012.

**RESPONSE:**

12. Ron Salas gave original(s) of the Trust and Quitclaim Deed of July 6, 2010 to Max Salas and only kept a copy.

**RESPONSE:**

13. The Defendant did not attempt to record the Quitclaim Deed after 2010.     RFA, Req. 3.

**RESPONSE:**

14. That from 2007 through April 18, Len Salas was the sole obligor under the Sun Trust loan documents executed in 2007.  RFA 16.

**RESPONSE:**

15. Max Salas had no written agreement or understanding with Len Salas that Max was responsible for the Sun Trust Mortgage/Deed of Trust obligation. RFA 17.

**RESPONSE:**

16. Neither Len Salas nor Max Salas informed SunTrust in writing that Max was responsible for the SunTrust Deed of Trust Note payments.

**RESPONSE:**

17. Max Salas was not a listed or added obligor or guarantor under the SunTrust Deed of Trust obligation or Note. RFA 18.

**RESPONSE:**

-4-

18. Max Salas did not contact Ms. Sylvia Jones, a real estate broker acquaintance, regarding the location or existence of the original Quitclaim Deed since June, 2015. RFA 41

**RESPONSE:**

19. That the Note balance as of April, 2007 totaled approximately $870,000. RFA 44

**RESPONSE:**

20. That the Note balance as of the commencement of the Salas bankruptcy case (April 18, 2018) totaled more than $1,030,825.86. RFA 47

**RESPONSE:**


21. That the Note Balance as of September 29, 2019 totaled $1,208,720.40. Stipulation filed on November 20, 2019 (D-266-1) in Max Salas' bankruptcy, Motion to Approve Settlement with U.S. Bank, Exhibit 15.

**RESPONSE:**


22. That on or about July 6, 2010, Ron Salas, an attorney recently admitted to practice law in Colorado, prepared a Trust document for the 1610 Riggs Property Trust along with a Quitclaim Deed purporting to transfer the Property from Len to Max.

**RESPONSE:**


23. That the foresaid Trust and Deed were prepared and executed in Colorado.

**RESPONSE:**

24. That the Trust was registered in Colorado by Ron Salas in 2011 even though the

-5-

Property was located in D.C. Email dated June 17, 2011 from Ron to Max, Exhibit 7.

**RESPONSE:**

25. That the Defendant made at least two attempts to obtain a new or different Quitclaim Deed from the Law Firm of Stan Goldstein in 2011 and 2012. Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**


26. That on June 17, 2011, Ron Salas sent an email to his father, the Defendant, stating that the "next step" was for his father to obtain counsel to prepare a Quitclaim Deed for Len to sign. Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**


27. That on June 21, 2011 the Defendant forwarded Ron Salas's email of June 17, 2011 to Stanley Goldstein requesting Mr. Goldstein to assist the Defendant to transfer the Property from Len to Max. Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**


28. On January 17, 2012, more than six months later, the Defendant sent another email to Lynn Boileau, an associate of Mr. Goldstein requesting that she "get Lenny's name off of the property." Emails between Max Salas and the Goldstein Firm, June, 2011 through February,

2012, Exhibit 7.

**RESPONSE:**


29.  On February 24, 2012, Len sent his father an email asking for the status of removing Len from the property title.  Max responded on February 24, 2012 that he is "still working on this..." Emails between Max Salas and the Goldstein Firm, June, 2011 through February, 2012, Exhibit 7 .

**RESPONSE:**


30.  There were no further communications regarding the creation or recording of a Deed for the transfer of the Property from Len to Max after February, 2012. L Salas Trans. _____ .

**RESPONSE:**

31.  From 2010 through early 2015 Len had numerous communications with Max asking Max to remove his name from the Property. L Salas Trans. 70:18 - 74:16

**RESPONSE:**

32.  Len had several conversations with his father regarding getting his name off the loan and deed after 2010.  L Salas Trans. 71:25 - 74:17; Transcript of Len Salas's testimony at the hearing on Objections to the Claim of Exemption (of the Property) by the Debtor, Max Salas, in case no. 18-00260 in the United States Bankruptcy Court for the District of Maryland, Trial Transcript ("Exemption Trans."),Vol 1., Exhibit 3, 158:13 - 163:8; Deposition Transcript of the Deposition of Kendra Rowe Salas, August 27, 2021 ("K Rowe Trans."), Exhibit 14, 16:6-24.

**RESPONSE:**

-7-

Case 3:20-ap-90027   Doc 73-2   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc
Supplement Plaintiffs List of Undisputed Facts    Page 7 of 29

33. The Sun Trust Note was in default during the period 2010 - 2018. L Salas Trans., Exhibit 13, 55:11-20.

**RESPONSE:**

34. That from the period 2010 through 2018 the Defendant did not declare the income from the rentals of rooms at the Property as income on his Federal or D.C. Income Tax Returns.

**RESPONSE:**

35. The Plaintiffs are the holders of undisputed and accepted claims totaling $15.2 Million. Of that amount, the claim of the Brekelmans estate represents $7.5 Million and the claim of the McLoughlin Estate represents $7.7 Million. Stip. No. 6

**RESPONSE:**

36. According to the Debtor's schedules and the Trustee's Final Report (D-209), in Case No. 18-2662, the Plaintiffs represent 99.8% of all allowed unsecured claims of the estate.

**RESPONSE:**

37. The Plaintiffs' judgments were allowed claims in both bankruptcy estates (Len's and Max's).

**RESPONSE:**

38. The Plaintiffs received distributions on account of their claims from both estates.

**RESPONSE:**

39. The Superior Court Judgments were recorded in the D.C. judgment records on or about April 5, 2018.

**RESPONSE:**

40. On April 18, 2018 both Len and Max filed separate Chapter 11 bankruptcy cases in

-8-

the Middle District of Tennessee and the District of Columbia, respectively.

**RESPONSE:**

41. At the time of the bankruptcy filings by Len and Max, Len was, and continued to be, until May 3, 2022, the title owner of property located at 1610 Riggs Place, NW, Washington, D.C. ("the Property").

**RESPONSE:**

42. In 2007 Max deeded the Property to Len in 2007 after his father, Max, and Max's then wife, divorced.

**RESPONSE:**

43. Len then obtained a Deed of Trust from Sun Trust Bank for $870,000 ("the Sun Trust Loan").

**RESPONSE:**

44. The proceeds of the Sun Trust Loan were paid to Max's wife as part of the divorce settlement. Exemption Trans. Vol. 3, Exhibit 6, 70:2-17.

**RESPONSE:**

45. Len received no part of the $870,000.

**RESPONSE:**

46. From 2007 through January 27, 2020, Len remained the sole owner of the Property. Max's Confirmed Plan provides that the Confirmation Order constitutes "an Order conveying the Property to Max Salas". *See*, Complaint, Exhibit B, Confirmed Plan, Max's Bankruptcy (Case No. 18-00260) (D-298), p. 12, ¶ 4.4.

**RESPONSE:**

47.   At the time of Len's purchase of the Property in 2007, Max had tax liens and other obligations which made it impossible for Max to obtain a loan on the Property. Exemption Trans. Vol. 3, 71:9 - 72:23.

**RESPONSE:**


48.   At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed.  Exemption Trans. Vol 2, 139:15 - 140:2; Len Salas testimony, Plan Confirmation Hearing, United States Bankruptcy Court for the Middle District of Tennessee, December 13, 2018 ("L Salas Conf. Hrg. Trans."), 68:22 - 69:2. Exhibit 4.

**RESPONSE:**


49.   Max delivered the original Quitclaim Deed to Mr. Goldstein's office but did not recall whether Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**

50. According to Max, he tried to refinance the Property several times after 2007, all to no avail. In fact, at least through 2015 every attempt to refinance the Property required the participation of Len as a co-signer or co-obligor.

**RESPONSE:**

51.  There are no documents indicating that Max was liable on the SunTrust loan at any time and Max never entered into any agreement or understanding with Len that Max was liable

-10-

or responsible.

**RESPONSE:**

52. There is no document raised, proffered or produced by Max indicating that Len was not the sole party responsible for the Deed of Trust payments until at least November, 2019.[1]

**RESPONSE:**

53. Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust. He confirmed that, when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust. Max Salas testimony at the Exemption Hearing, Exemption Trans. Vol. 2, August 23, 2018 ("Exemption Trans. Vol. 2"), Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 1, 42:18 - 43:2.

**RESPONSE:**

54. From sometime after 2007 through the date of the fire, Max rented out rooms at the Property. The tenants, including Nina and Michael, signed leases under the name of "the CLR Trust" and Max signed each lease as Trustee.

**RESPONSE:**

---

[1]When U.S. Bank obtained assignment of the SunTrust Note, sometime in 2019, it did finally reach an agreement with Max for him to make the payments under the Deed of Trust from and after November, 2019. However, there is no indication in the agreement reached between Max and U.S. Bank that the SunTrust Deed of Trust Note has been canceled or is otherwise not in effect. Therefore, Len is still liable for the entire balance under the SunTrust Note which, as of September 29, 2019, was $1,208,720.40. See Max Salas Stipulation with U.S. Bank attached hereto as Exhibit 15.

55. According to Len, the CLR Trust, was a trust created by Max for the benefit of his three sons, Chase, Len and Ron.

**RESPONSE:**

56. Other than the 1611 Riggs Place Trust executed on July 6, 2010, the only family related trust of which Len is aware is the "CLR Trust." L Salas Trans. 148:1-13.

**RESPONSE:**

57. The lease payments were put into an account in the name of the CLR Trust and were used to pay for the Deed of Trust obligations and other expenses associated with the Property.

**RESPONSE:**

58. Max did not want the rents deposited into his personal account. Exemption Trans. Vol 3., Exhibit 6, 222:12 - 16

**RESPONSE:**

59. Max told Len that he deposited the rent checks into "this account for 1610 [Salas Trust]. Exemption Trans., Vol 1, Exhibit 20, 149:2-24.

**RESPONSE:**

60. During the period 2015 through 2018, and continuing after Max's Bankruptcy filing until November, 2019, no payments were made on the Sun Trust Deed of Trust Note ("the Sun Trust Note") with the exception of one payment of made by Max from the insurance proceeds he received as a result of the fire damage.

**RESPONSE:**

61. As of October, 2018, the deficiency on the SunTrust Note was $420,928.34. Sun

Trust Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

62. As of April, 2018, the deficiency on the SunTrust Note was $374,282.18. Sun Trust

Motion For Relief, filed November 2, 2018 in Case No. 18-2662 (D-79), pp. 2-3.

**RESPONSE:**

63. As of April, 2018, Len remained the sole obligor on the SunTrust Note.

**RESPONSE:**

64. The transfer in 2010 was a violation of Len's Deed of Trust and Note with Sun Trust

Bank. L Salas Depo Trans., Exhibit 13, 144:7 - 148:7, 152:3 - 153:10. See SunTrust Deed of

Trust, dated April 16, 2007, Exhibit A to SunTrust Motion for Relief from Stay ("SunTrust

Motion"), filed in Case No. 18-2662 on November 2, 2018 (D-79-1), Exhibit 15.

**RESPONSE:**


65. At the time of the attempted Quitclaim Deed, in July, 2010, Len's only significant

asset was the Property.

**RESPONSE:**

66. At all relevant times, Len worked only part time and had limited income and assets.

**RESPONSE:**

67. At all times following the transfer in 2010, Len was insolvent. His liabilities

exceeded his assets and his income was insufficient to pay his obligations, including the Sun

Trust Deed of Trust Note payments.

**RESPONSE:**

-13-

68. Len did not have sufficient funds to pay his attorneys in the Superior Court litigation. He lives "paycheck to paycheck." L Salas Trans. 76:20 - 77:2

**RESPONSE:**

69. At the time of his bankruptcy filing in April, 2018, Len was obligated for all payments due on the Sun Trust Note, as well as the judgments, totaling $15.2 Million, owed to the Plaintiffs. L Salas Trans. 61:1 - 63:2.

**RESPONSE:**

70. In 2016, Len's income was a total of $15,151. L Salas Statement of Financial Affairs, filed April 18, 2018 in Case No. 18-2662, (D-1), Exhibit 16, p 38.

**RESPONSE:**

71. In 2017 Len's total income was $30,408. Exhibit 16, p. 38.

**RESPONSE:**

72. In 2018, through April 17, 2018 Len's total income was $6,720. Exhibit 16, p. 38.

**RESPONSE:**

73. During the Superior Court litigation which ended with the 4 day trial held in late March and early April, 2018, Max paid certain expenses and legal fees owed by Len Salas because Len could not afford them. See, for example, Max Salas Statement of Financial Affairs, filed in his bankruptcy case, No. 18-00260 in the United States Bankruptcy Court for the District of Columbia on May 2, 2018 (D-13) ("M Salas SOFA"), p. 5 of 10, attached hereto as Exhibit 16.

**RESPONSE:**

74. Len's brother, Ron, paid for Len's bankruptcy proceedings and the retention of

-14-

counsel for the appeal of the Superior Court litigation. Disclosure of Compensation of Attorney for Debtor, April 18, 2018 (D-1) p. 46 of 56; Motion of Debtor in Possession to Employ Michael C. Forster and Forster Law Firm as Special Counsel, filed April 27, 2018 in Case No. 18-2662, D-10, at page 3 of 10.

**RESPONSE:**


75.  On his bankruptcy schedules filed herein on April 18, 2018 (D-1), Len Salas lists total assets of $53,373.38 and total liabilities of $16,107,795.41.  Len Salas Schedules of Assets and Liabilities, filed on April 18, 2018 in Case No. 18-2662, (D-1) pp. 12-36.

**RESPONSE:**


76.  Len received no income, payments or property from Max in 2007 or 2010. L Salas Mtg Trans., 4/1/19, Exhibit 5, 5:22 - 7:15.

**RESPONSE:**


77.  Len repeatedly attempted to get Max to remove Len's name from the Property after 2010. L Salas Depo. Testimony, Exhibit 13, 70:18 - 74:16

**RESPONSE:**


78.  Mr. Salas told his counsel, Mr. Albert and his associate, Mr. Cox, in 2018,  what Max did with the Quitclaim Deed and left it up to his counsel to obtain the original from Mr. Goldstein's Office. Exemption Trans. Vol 3, 57:13 - 58:6

**RESPONSE:**

79.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See

eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed.

Exemption Trans. Vol 3, 58:9-13.

**RESPONSE:**

80.  In his deposition Ron Salas testified, under oath, related to the Quitclaim Deed,

executed on July 6, 2010, as follows:

"Q And I believe you said, but I want to
clarify this, that between the time of 2012,
roughly, and I realize you said, I think, a year
or two after the transaction, so I'm not trying to
pin it down, but say roughly 2012, which would be
two years later, until today, are you aware of any
other reasons why the deed, the quitclaim deed
that you prepared would not have been or could not
have been recorded?

**A. I don't know of any reason and I did not
know that it was not recorded until the lawsuit
came in my brother's name.**

Q And what is it about the lawsuit that
came in your brother's name that made you believe
the quitclaim deed had not been recorded?

**A The only reason my brother would be
involved was because his name had to still be on
the title is the assumption I've made in my mind
I don't know that that is factually correct, but
that is my assumption, that it must not have been
filed or he wouldn't be in this situation.
He didn't live in the District, he
never- he didn't live in the house, and I- so
that's the only logical reason I could make that
he would be involved, that it was never done. And
until that point, I did not even know that it had
not been done. I assumed at some point that he
came up with the money and did it. But he didn't,**

-16-

**as we sit here today we all know.**

Transcript of the Deposition of Ron Salas in the United States Bankruptcy Court for the District of Columbia, Case No. 18-00260, August 8, 2018, excerpts attached hereto as Exhibit 8, ("R Salas Trans"), 65:21 - 66:21 (emphasis in original).[2]

**RESPONSE:**

81. The Plaintiffs Judgments are now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and D-222 (Final Decree).

**RESPONSE:**

82. Max has not produced, and is currently unaware of the location of, the original Quitclaim Deed is, or if it even exists. Transcript of the Continued Deposition of Max Salas, March 8, 2022 ("M Salas Trans.") 51:2-12; 52:6-20

**RESPONSE:**

83. On June 16, 2011, Ron sent an email to the Defendant advising Max that the Trust had been registered and that Max needed to have a Quitclaim Deed created to transfer the Property to Max. This was nearly a year after the Quitclaim Deed was created, the only deed relied upon by Max in asserting his ownership of the Property. A copy of Ron's email, dated

---

[2]Mr. Albert was acting as counsel for Max Salas in his bankruptcy and attended the deposition on behalf of Max. Ron Salas appeared without counsel.

-17-

June 17, 2011, less than a year after the purported Quitclaim Deed of July 6, 2010, was produced in discovery by Len Salas in 2022.

**RESPONSE:**

84. These emails attached as Exhibit 7 were within the scope of the document production requested from Max as part of the discovery requests in the Exemption Hearing adversary proceeding in Max's bankruptcy in D.C. Debtor's Responses to Movants' First Set Request for Production of Documents, served on August 6, 2018, in Case No. 18-260, Exhibit 21.

**RESPONSE:**

85. Max, Ron and Len all testified at that hearing and all asserted, or supported the claim that the Quitclaim Deed of July 6, 2010 was in effect in 2018.

**RESPONSE:**

86. Ron's email states, on June 17, 2011 that "The next step is for someone in D.C. to draft a Quitclaim Deed in order to move the property from the possession of Len to the Trust. The document should be straight forward and will need to be signed by at least the grantor, Len." Exhibit 7, Bates Number: LenSalas000017.

**RESPONSE:**

87. On June 21, 2011 Max followed up with an email to his real estate attorney, Stan Goldstein. In that email, Max asserts to the attorney, Mr. Goldstein, that "We need to have done is have Lenny sign a quick (sic) claim deed into the trust..." Exhibit 7, Bates Number LenSalas000016.

**RESPONSE:**

88. In Max's email to attorney Lynn Boileau on January 17, 2012, he states : There are

-18-

**two different** requests. One is **to get Lenny's name off of the property**. (Want to do this asap) The second request is to refinance the property under the name of the trust.." (Emphasis supllied) Exhibit 7, Bates Number LenSalas000023.

**RESPONSE:**


89. On February 24, 2012 Len sent an email to Max asking "Where are we on this?" Max's response is "Still working on this...,,I am in Miami will be back soon." Exhibit ___ , Bates Number LenSalas000029.

**RESPONSE:**


90. Max Salas testified that he is unaware that the attorneys he contacted in the D.C. area respecting the Trust's ownership of the Property ever created a deed to convey the Property into the Trust. M Salas Trans. 65:1-15.

**RESPONSE:**


91. Max also testified that he does not recall any further communications with counsel about the 1610 Riggs Place documents after February 27, 2012. M Salas Trans. 72:12-18.

**RESPONSE:**


92. When asked whether he contacted the attorneys to determine if they had a copy of a deed for the Property, Max testified as follows:

> **Q. Have you contacted Ms. Boileau or**
> Mr. Goldstein to determine if they
> have a copy of any deed that might
> have been created?
>
> **A. I did try to contact them. I
> did try to contact them actually
> recently. And I -- but I didn't -- I
> mean, they were trying -- they
> were -- no. I mean, we worked on**

-19-

> **something and then they said it couldn't go**
> **any further and depends on what you**
> **were going to do. So I don't -- I guess --**
> **I can't guess. I don't know.**

M Salas Trans. 73:13-23

**RESPONSE:**

93.  Only Max Salas had an original of the Quitclaim Deed after July 6, 2010 and Max does not know where the original is or when he last had it.  Exhibit 10, M Salas Trans. 73:13-23, 77:20 - 82:23.

**RESPONSE:**

94.  Max testified in his deposition in the Superior Court case in February, 2016 that there was one trust, the CLR Trust.  He confirmed that when he mentioned "the 1610 Salas Trust" he was referring to the same trust, namely, the CLR Trust.  Max Salas Deposition in Superior Court Case, Case Nos. 2015 CA 8054 B and 2015 CA 8061 B, Consolidated)(referred to herein as the "Superior Court Litigation'), February 24, 2016 ("M Salas Sup Ct Depo"), Exhibit 19, 42:18 - 43:2.

**RESPONSE:**

95.  Len Salas is not aware of the location of any of the wet ink signature originals of the July 2010 Quitclaim Deed (Transcript of the Deposition of Len Salas, August 27, 2021 ("L Salas Trans."), 15:4-9.  Len testified in his deposition that he provided an original"wet ink" original of the Quitclaim Deed, or a copy,  to his lawyer on the eve of the Superior Court trial which resulted in the judgment against Len and his father. L Salas Trans, 16:6-24, 19:11-25 - 21:18.  Regardless,

-20-

Len testified that the document he produced on the eve of the Superior Court trial, which commenced on March 26, 2018, was kept in his possession at all known times between July, 2010 and March, 2018.  Id. Len's wife, Kendra, testified that she "had a pdf of it (the July, 2010 Quitclaim Deed) and that she thought it was the same as what Len had " I thought it was the same thing as what Len had, but I'm not sure."  K Rowe Trans. 30:13-20.

**RESPONSE:**


96.   Ron Salas stated that he was unaware the Quitclaim Deed had not been recorded until he found out that Len had been sued in the Superior Court (in October, 2015. Transcript of the Deposition of Ron Salas, August 8, 2018, Exhibit 8, 65:21 - 66:21

**RESPONSE:**


97.   Ron Salas was unaware of the requirements of Quitclaim Deeds in D.C. Ron Salas's testimony, Exhibit 12, at pp.227-28.

**RESPONSE:**


98.   Ron stated he was unaware whether the trust documents he created were valid under D.C. law in August, 2018. Ron Salas's testimony, Exhibit 12, 243:8-15.

**RESPONSE:**

99.      The only deed referenced by Max or his counsel, allegedly entitling Max to an ownership interest in the Property, is the 2010 Quitclaim Deed.  No other deed has been proffered, or even mentioned by the Salas family or by Max, specifically.

-21-

**RESPONSE:**

100. As of the filing of Len's bankruptcy case in 2018, Len was obligated to pay over $15 Million in damages to the Plaintiffs as a result of their judgments. Neither Len, nor the Trustee filed objections to the Plaintiffs' claims filed in Len's bankruptcy.

**RESPONSE:**

101. In Len's Schedule J, filed on April 18, 2018 in Case No. 18-2662 (D-1), p. 35, Len listed total monthly income of $4977.75 and total monthly expenses of $4,407.14.

On April 5, 2018 Max was a creditor of Len's. He owed Len, at the very least, his contribution for the Plaintiffs' Judgment and the balance of the SunTrust Deed of Trust Note (at least $1,035,000 approx) per his consistent promise that he would pay that amount and his consistent assertion that he was responsible for payment of the SunTrust Note which was, at all relevant times, in Len's name.

**RESPONSE:**

102. The Judgment is now final and binding on all parties as a result of the final distribution and closing of Len's Estate in this Court and the Confirmed Plan in Max's Bankruptcy. M Salas Chapter 11, Case No. 18-00260 in the United States Bankruptcy Court for the District of Columbia, Docket Entries ("D- ") D-298 and 303; L Salas Chapter 7, Case No. 18-002662 in the United States Bankruptcy Court for the Middle District of Tennessee, Docket Entries ("D- ") D-209 (Trustee's Final Report) and D-220, Trustee's Final Account, and 222

-22-

(Final Decree).

**RESPONSE:**

103.  Len was solely obligated on the Sun Trust Deed of Trust on the Property which, according to the Defendant's bankruptcy schedules was over $1 Million in April, 2018. M Salas Schedules, Case No. 18-260 (D-12), p. 19 of 37, attached as Exhibit ___ .

30. At no time, since 2007, including, but not limited to, the time of the Quitclaim Deed in July, 2010, did Max make any payments to Len and Len received no property or other value from Max related to the Trust or Quitclaim Deed. Transcript of Confirmation Hearing in Case No. 18-02662, December 13, 2018 at pp. 68-69, excerpts attached as Exhibit 4.  See also, Transcript of the Chapter 7 Meeting of Creditors of Len Salas, April 1, 2019 (L Salas Mtg. Trans.), Exhibit 5, 5:22 - 7:15.

**RESPONSE:**

104. Max delivered the original Quitclaim Deed to Mr. Goldstein's office.  He does recall that Mr. Goldstein mailed it back to Mr. Salas.  Exemption Trans. Vol. 3, 55:7 - 56:21.

**RESPONSE:**

105.  After seeking to record through Mr. Goldstein's office in 2011 and/or 2012 (See eMails attached as Exhibit 7) Max did not make any further attempts to record the Deed. Exemption Trans. Vol 3, 58:9-13

**RESPONSE:**

-23-

106.  In discussions with his newly hired bankruptcy counsel, Marc Albert (Stinson LLP) ("Albert"), Max learned that if the Property was owned by Len, it could not be exempted in bankruptcy and would be subject to attachment and sale to partially satisfy the eventual judgments.  D.C. Code § 15-501 (a)(14). These conversations took place in early 2018.  Exemption Trans. Vol. 3, Exhibit 6, 121:3 - 122:9; Albert-R Salas eMails, 2/14 - 3/7/18, Exhibit 19.

**RESPONSE:**

107.  Max also learned from Albert that if Max could claim he is the actual owner of the Property, he could claim the Property exempt in his subsequent bankruptcy proceeding and, due to D.C.'s generous homestead exemption, Max could then claim the entire equity in the Property as exempt from execution by the Plaintiffs.

**RESPONSE:**

108.  Mr. Albert confirmed that no original was found after 2010 at the Exemption Hearing through Ron Salas' "rebuttal" testimony on August 24, 2018. Rebuttal Testimony of Ron Salas, at the Exemption Evidentiary Hearing, August 24, 2018. Exemption Trans., Vol 3, 4:10 - 5:16.  See also, Exemption Trans. 5:19 - 6:3, 7:18 - 12:8, 13:17 - 15:24

**RESPONSE:**

108.  At the time of Ron Salas' conversation with Mr. Albert regarding copies of the trust documents, Ron Salas understood that Mr. Albert was representing Max regarding a potential

-24-

bankruptcy filing after the Superior Court trial.  Exemption Trans. 12:12 - 13:14

**RESPONSE:**


109. Max Salas valued the Property at $2.5 Million on his schedules in or about May 2018, and the Property was appraised for approximately $2.4 Million in or about August 2019. Stip. No. 50.

**RESPONSE:**


110.  Pursuant to an order of this Court dated June 12, 2019, the trustee in this case was authorized to sell the estate's interest in the Trustee's avoidance and recovery rights under 11 U.S.C. §§ 544 through 551.  Stip. No. 47

**RESPONSE:**


111.   On July 23, 2019, the trustee in Len Salas' case held an auction sale to sell the bankruptcy estate's interest in the avoidance and recovery actions pursuant to 11 U.S.C. §§ 544 through 553. Stip. No. 48

**RESPONSE:**


112. The Plaintiffs were the successful bidders at the Trustee's auction sale. Stip No. 49

**RESPONSE:**


113.   The D.C. Bankruptcy Court made no final determination of the effect of the trustee's

-25-

avoiding powers asserting that effect was up to Len Salas' bankruptcy estate. Stip. No. 44

> **RESPONSE:**

114. No deed was recorded naming Max Salas as trustee or owner of the Property prior to Len Salas' bankruptcy filing. Stip. No. 45

> **RESPONSE:**

115. Other than the original deed dated 2007 and the Confirmation Order, no deeds or other documents of title have been filed related to the Property as of June 6, 2022. Stip. No. 46

> **RESPONSE:**

116. From the time of the Fire until February or March 2018, no one resided in the Property. Stip. No. 35.

> **RESPONSE:**

117. During that time, and until November 2019, no payments were made on the SunTrust Loan with the exception of one payment made by Max Salas from the insurance proceeds he received as a result of the fire damage. Stip No. 36

> **RESPONSE:**

118. According to the schedules filed in Max Salas' bankruptcy, as of the commencement of his bankruptcy case, in April, 2018, the only lien creditors were the IRS

-26-

($6,768.66 claim) and SunTrust Mortgage ($1,030,825.86). Stip. No. 37

**RESPONSE:**

119. The balance of the SunTrust Loan as of October 26, 2018 was $1,141,021.14. Stip. No. 38

**RESPONSE:**

120. Max Salas has been making the required payments on the Property since November 2019, as of June 22, 2020. Stip. No. 39.

**RESPONSE:**

121. At all relevant times, Len Salas had limited income and assets, other than the Property. Stip. No. 28.

**RESPONSE:**

122. Max Salas intended to record the Quitclaim Deed in 2010 but had no money to pay the required recording and transfer taxes. Stip. No. 29.

**RESPONSE:**

123. The Quitclaim Deed has never been recorded. Stip. No. 30

**RESPONSE:**

-27-

124. As of June 17, 2011, Len and Max abandoned the Quitclaim Deed and no longer had any intent to use or record it. Emails dated June, 2011 through February, 2012, Exhibit 7.

**RESPONSE:**


125. While in Colorado, Len Salas and Max Salas executed a trust agreement which Ron Salas prepared using a Colorado form even though the purported trust property, the Property, was located in D.C. Stip. No. 25.

**RESPONSE:**


126. The Defendant's Second Amended Disclosure Statement and Third Amended Plan of Reorganization, as confirmed by the D.C. bankruptcy court, recognize that the Plaintiffs are the owners of, and have the right to pursue, the avoidance actions which are alleged in the Complaint, as amended. Exhibit 2, Complaint Exhibit B.

**RESPONSE:**


Respectfully submitted,

BUTCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

-28-

By:   /s/ Philip J. McNutt   
        Philip J. McNutt
        11921 Freedom Drive, Ste 584
        Reston, VA 20190
        703-904-4380
        202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS