UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

```
IN RE:                          .    Case No. 18-00260-smt
                                .
MAX E. SALAS,                   .
                                .    Washington, D.C.
           Debtor.              .    August 22, 2018
                                .
. . . . . . . . . . . . . . .
```

TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
VOLUME 1 OF 3
BEFORE THE HONORABLE S. MARTIN TEEL, JR.
TRANSCRIPT ORDERED BY: PHILIP J. McNUTT

APPEARANCES:

For the Debtor:          Stinson Leonard Street, LLP
                         By: MARC E. ALBERT
                             JOSHUA W. COX
                         1775 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C., 20036
                         (202) 728-3020

For the Creditors:       By: PHILIP J. McNUTT
                         11921 Freedom Drive
                         Suite 584
                         Reston, Virginia  20190
                         (703) 904-4380

Court Recorder:          THE CLERK

Transcribed By:          MS. KRISTEN SHANKLETON

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

TABLE OF CONTENTS

OPENING STATEMENTS:                                          PAGE:
By Mr. McNutt                                                10
By Mr. Albert                                                27


WITNESSES:                                                   PAGE:
MAX E. SALAS
Direct examination by Mr. McNutt                             37

LEN SALAS
Direct examination by Mr. Albert                             98
Cross-examination by Mr. McNutt                              116
Redirect examination by Mr. Albert                           187
Recross-examination by Mr. McNutt                            199

RON SALAS
Direct examination by Mr. Albert                             206
Cross-examination by Mr. McNutt                              219
Redirect examination by Mr. Albert                           245

EXHIBITS:                                          MARKED:  RECEIVED:

DEBTOR'S EXHIBITS:
A.  4/16/07 deed (M.Salas/L.Salas)                   *         9
B.  4/16/07 deed of trust                            *         9
    (L.Salas/SunTrust) with 7/8/15
    Corporate assignment of deed of trust
C.  7/6/10 irrevocable trust agreement               *         9
D.  7/6/10 L.King journal entries                    *         9
E.  Encomass insurance policy                        *         9
F.  1610 lease documents                             *         9
G   Email chain beginning 2/14/18                    *         --
    R.Salas to insurance counsel
H.  3/19/18 emergency motion for                     *         9
    summary judgment by L.Salas
I.  4/18/18 L.Salas petition and schedules           *         9
J.  M.Salas Answer to Interrogatories                *         9
    (Brekelmans case)
K.  M.Salas Answer to Interrogatories                *         9
    (McLoughlin case)

TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S | | |
| 1. Trial Transcript, 3/26/18, pp.1-19 | * | 8 |
| 2. Joint pretrial statement, 7/18/17 | * | 8 |
| 3. Pretrial order, 12/29/17 | * | 8 |
| 4. Amended joint pretrial statement, 2/15/18 | * | 8 |
| 5. McLoughlin Complaint, 10/20/15 | * | 8 |
| 6. Brekelmans Complaint, 10/20/15 | * | 8 |
| 7. L. Salas Answer (Brekelmans Complaint) 11/13/15 | * | 8 |
| 8. L. Salas Answer (McLoughlin Complaint) 11/13/15 | * | 8 |
| 9. M.Salas Answer (McLoughlin Complaint) | * | 8 |
| 10. M.Salas Answer (Brekelmans Complaint) | * | 8 |
| 11. Memorandum in support of L.Salas motion to dismiss | * | 8 |
| 12. M.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 13. L.Salas Answer to Interrogatories Case 15-CA-8061 B | * | 8 |
| 14. M.Salas Deposition Transcript dated 2/14/16 | * | -- |
| 15. L.Salas Deposition, 3/9/16 pages 117-120 | * | 54 |
| 16. 4/27/95 deed (Wilhelm/Bruff) | * | 8 |
| 17. 4/16/07 deed (Bruff/M.Salas) | * | 8 |
| 18. 4/16/07 deed (M.Salas/L.Salas) | * | 8 |
| 19. Deed of trust (L.Salas/Sun Mortgage) | * | 8 |
| 20. Property request report for 1610 Riggs Place Northwest | * | 8 |
| 21. D.C. notice of infraction | * | 8 |
| 22. DCRA notice of immediate abatement | * | 8 |
| 23. Memorandum in Support of L. Salas' Emergency Motion for Summary Judgment | * | 8 |
| 24 8/10/18 R.Salas deposition excerpts | * | -- |
| 25. Lease, 10/1/14 - Tamasco | * | 8 |
| 26. Lease, 6/2/14 (first page) | * | 8 |
| 27. Lease, 17th of 2014 to Brekelmans | * | 8 |
| 28. Lease, 8/17/14 to Brekelmans | * | 8 |
| 29. Lease, 11/1/14 to Mecham | * | 8 |

## TABLE OF CONTENTS
(Continued)

| EXHIBITS: | MARKED: | RECEIVED: |
|---|---|---|
| CREDITOR'S (continued) | | |
| 30. Irrevocable Trust, 7/6/10 | * | 8 |
| 31. Cornet letter, 5/19/17 | * | 8 |
| 32. Debtor's report, excerpts, 4/5/18 | * | 8 |
| 33. Debtor's report, excerpts, 6/8 | * | 8 |
| 34. Excerpts, L.Salas, first Meeting of creditors, 5/24/18 | * | -- |
| 35. M.Salas Answers to Interrogatories, 8/6/18 | * | 8 |
| 36. Debtor's schedules A/B, C-J, 5/2/18 | * | 8 |
| 37. Debtor's responses, 8/6/18 | * | 8 |
| 38. Debtor's statement of financial affairs(D-13), 5/2/18 | * | 8 |
| 39. Debtor's amended statement of financial affairs(D-50), 6/27/18 | * | 8 |
| 40. Debtor's amended petition | * | 8 |
| 41. R.Salas email (trust documents) | 231 | -- |

*Exhibit marked prior to the hearing.

**Transcriptionist's note: The notations of "(unintelligible)" in this transcript are due to the audio recording levels being turned up too high, or individuals speaking outside of the vocal capture range of the microphone.

    she signed it back over to me, right?
 2       Q.   I'm sorry?
 3       A.   She -- what do you mean?  Can you ask the question
 4  -- what does convey mean for sure?
 5            I'm -- she signed it back over to me?
 6       Q.   Did you understand that she signed the property
 7  back over to you, in your words, in April of 2007?
 8       A.   Yes.
 9       Q.   All right.
10            And the purpose of that was to allow you to live
11  in the property and to also obtain funds to pay her as part
12  of the divorce settlement, correct?
13       A.   Well, I lived in the property since 1995 when we
14  bought the property together.
15       Q.   I understand that, but what was the purpose -- let
16  me try it this way.
17            In April 2007 you conveyed the property to your
18  son, correct?
19       A.   What do you mean by convey?  Can you tell me that?
20       Q.   Did you sign a deed --
21       A.   Yes.
22       Q.   -- of the property to your son Len?
23       A.   Yes.
24       Q.   Okay.
25            And the purpose of that was so that he could

41

1  obtain a deed of trust on the property to pay your ex-wife,
2  correct?
3      A.   Well, I signed it over to him so we could get a
4  loan to pay my ex-wife for her half of the settlement in
5  the divorce.
6      Q.   Okay.
7           And you son agreed to do that, correct?
8      A.   Yes.
9      Q.   All right.
10          And when you say "we obtained a loan," were you on
11 the loan?
12     A.   I promised my son that I would pay for the loan,
13 yes.
14     Q.   Is that in writing?
15     A.   I promised my -- I know it was my word to my son.
16     Q.   What was that -- that wasn't my question.  My
17 question is was that promise in writing?
18     A.   No.
19     Q.   Okay.
20          Now, at the time in 2007 there was a deed of trust
21 taken out on the property through SunTrust Mortgage,
22 correct?
23     A.   Yes, sir.
24     Q.   And that deed of trust and the loan was taken out
25 by your son Len Salas, correct?

1  A. Yes, sir.
2  Q. And he was the only person obligated on that loan,
3 correct?
4  A. Technically, yes. Yes, sir.
5  Q. Technically, legally on paper, all of that,
6 correct?
7  A. Well, I promised him that he wouldn't have to pay
8 for the loan, that I would pay for the loan.
9  Q. I understand, but who was responsible for paying
10 the loan according to the loan documents as you understood
11 them?
12  A. I was responsible for paying the loan.
13  Q. Under the loan documents as you understood them
14 you were responsible to make the payments on the loan?
15  A. Yes. I've made every payment on every -- on that
16 loan since 1995 to today.
17  Q. Did you sign the promissory note to SunTrust?
18  A. I didn't sign a promissory note to SunTrust.
19  Q. Okay.
20      Now, during the course of -- let's go back to the
21 period subsequent to 2007 when these deeds transferring the
22 property from Ms. Bruff to you, and from you to your son,
23 were created. Do you remember that timeframe?
24  A. Yes, sir.
25  Q. All right.

```
 1            And it's true that shortly after that timeframe
 2   your son started asking you to undertake to get him off of
 3   the deed to the property, is that correct?
 4        A.   Yes.
 5        Q.   And that was something that he was consistently
 6   asking you to do even through 2018, correct?
 7        A.   Yes, every opportunity he could every -- yes.  He
 8   wanted off the loan.
 9        Q.   Okay.
10            And what efforts did you undertake to get him off
11   the loan between, well, let's start with the period between
12   2007 and July of 2010?
13            And the reason I'm using July of 2010 is because
14   that was the month in which the alleged trust -- and I'm
15   saying alleged trust, you might believe it's a trust I
16   understand, was created in Colorado -- during that period
17   of time, how many times would you say your son contacted
18   you with respect to getting his name off the property, the
19   Riggs Place Property?
20        A.   So let me make sure I understand your question.
21   From 2010 to 2007 -- from 2007 to 2010, three years?
22        Q.   Yes, sir.
23        A.   I would say at least three times or four times a
24   year, so that would be twelve times.
25        Q.   Okay.
```

1  Now, did your son talk to you about taking his
2  name off the deed after July of 2010?
3       A.   Yes.  Well -- yes.  No, he -- he talked to me
4  about taking his name off the loan.
5       Q.   Did he talk to you about taking his name off the
6  property?
7       A.   No, he'd already taken his name off the property.
8       Q.   When did he do that?
9       A.   He signed it over to me, he signed it over to my
10 trust on 2010, July 6th of 2010.
11      Q.   So after July of 2010 it's your position that your
12 son was no longer on the property, no longer an owner of
13 the property, is that correct?
14      A.   That's correct, sir.
15      Q.   Okay.
16           Now, during the course of the Superior Court
17 litigation in the District of Columbia, there were
18 depositions taken of you and your son in 2016.  Do you
19 remember that?
20      A.   Repeat the question, please.
21      Q.   Yes.
22           Do you remember the depositions that were taken of
23 you and your son in the Superior Court case, and when I say
24 Superior Court case I'm talking about the personal injury
25 and wrongful death litigation --

Case 3:20-ap-90027  Doc 73-10  Filed 07/29/22  Entered 07/29/22 18:53:45  Desc
Exhibit 20 Exemption Hearing (D.C.) Volume 1 Excerpts    Page 9 of 20

Apx 000103

```
 1            THE COURT:
 2            BY MR. McNUTT:
 3       Q.   Let me refer you to page 113 of the same
 4  deposition, Mr. Salas.
 5            MR. ALBERT:  Judge, did he -- you took the whole
 6  transcript into evidence, right?
 7            THE COURT:  I took pages 117 through 120.
 8            MR. ALBERT:  Not the whole thing.  Okay.
 9            THE COURT:  Into evidence.
10            BY MR. McNUTT:
11       Q.   Are you with me, Mr. Salas?  Page 113?
12       A.   Yes, sir.
13       Q.   All right.
14            Starting on line 7 of page 113, the question,
15  again I believe this is Mr. Curnonni?
16       A.   Yes, sir.
17       Q.       "Did you, after you got the mortgage
18            in the years prior to the fire, did you
19            ever have a discussion with your father
20            with regards to transferring ownership of
21            the property to him?"
22            Did I read that correctly?
23       A.   Yes, sir.
24       Q.   And his answer is, "Yes," on line 11, correct?
25       A.   Yes, sir.
```

```
1   think it's supposed to mean:
2              "Why did your wife want to transfer
3         ownership?
4              Answer:  Because she didn't want that
5         in my name.  Same thing for the reason I
6         guess."
7         That was your answer, correct?
8    A.   Uh-huh.  For the --
9    Q.   All right.
10        Would you turn then to page 116?  That's
11  on the same typed page, but transcript page 116.
12   A.   Yes, I have it.
13   Q.   All right.
14        Starting on line 13, the question is:
15             "How many conversations did you have
16        with your father about potentially
17        transferring ownership of the building to
18        him?
19             Answer:  Multiple.
20             Question:  When was the last time you
21        had such a conversation prior to the fire?
22             Answer:  That spring since we were in
23        that summer."
24        Did I read that correctly?
25   A.   You read it correctly, yes.
```

Case 3:20-ap-90027   Doc 73-10   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc
Exhibit 20 Exemption Hearing (D.C.) Volume 1 Excerpts   Page 11 of 20

Apx 000217

1      Q.   All right.

2         So in 2015, five years after you executed the

3 trust documents and five years after you believe that you

4 deeded the property to your father, you're still asking the

5 father to transfer ownership of the property to him?

6      A.   The mortgage is what I was talking about.

7      Q.   It doesn't say mortgage here, does it?

8      A.   Yeah, but that's what I was referring to.

9      Q.   Well, you were referring to ownership in the

10 property, weren't you?

11      A.   No, because it said the mortgage because I said I

12 want to buy my house. The reason I couldn't buy my, well,

13 the house that I live in that was currently my wife's, is

14 because I couldn't because of my credit that was on the

15 1610 Riggs Place. So I couldn't buy, I quote/unquote

16 "couldn't buy" my house or have my house, my name on my

17 house because my credit wasn't good enough to get, to have

18 two houses.

19      Q.   Okay, let's try this again.

20         If you look on page 113, please?

21      A.   Uh-huh.

22      Q.   The question is, starting in line 8:

23         "Did you ever have a discussion with

24         your father with regards to transferring

25         ownership of the property to him?"

Case 3:20-ap-90027   Doc 73-10   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc
Exhibit 20 Exemption Hearing (D.C.) Volume 1 Excerpts   Page 12 of 20

Apx 000218

```
 1              And your answer was:
 2                   "Yes."
 3       A.   Where does --
 4       Q.   It doesn't ask you --
 5       A.   -- it say that?
 6       Q.   -- about a mortgage.  It asks about transferring
 7  ownership of the property, right?
 8       A.   Line 7, "Do you...did you do...you got the
 9  mortgage in the years..."  So I thought when he said
10  mortgage, I assumed he was talking about the mortgage.
11  Line 7 on page 13.
12       Q.   So you read the:
13                 "Did you, after you got the mortgage
14            in the years prior to the fire, did you
15            ever have a discussion with your father
16            with regards to transferring ownership of
17            the property to him?"
18            You read that to mean transferring the mortgage to
19  him?
20       A.   Yes.
21       Q.   Okay.
22            And page 116, paragraph, starting on line 13 it
23  says:
24                 "How many conversations did you have
25            with your father about potentially
```

```
 1              transferring ownership of the building to
 2              him?"
 3         Doesn't say anything about a mortgage, does it?
 4    A.   Well, I guess I misunderstood the question because
 5  I mean, I thought he was speaking of mortgage, and I said
 6  multiple times.  I said multiple.
 7    Q.   Does it say mortgage there or note?
 8    A.   I thought he was referring to mortgage.
 9    Q.   All right.
10         Let's go to page 117 then.  I think we have to
11  start at the last page, 116 on line 22.  Do you see page
12  116 at the very end of the, Mr. Salas?
13    A.   Uh-huh.
14    Q.   All right.
15         It ways:
16              "What was the catalyst..."
17         And this is referring to the conversation that you
18  had in the spring or summer of 2015, okay?
19    A.   Uh-huh.
20    Q.         "What was the catalyst for that specific
21              conversation?
22              Answer:  I don't know.  It was always
23              in my mind to get it off of my name.
24              Question:  Do you remember why it
25              occurred that spring before the fire?  Was
```

```
1              there anything going on in your life or
2              your father's life which was the catalyst
3              for that conversation?
4                   Answer:  No, I don't think so.  Maybe
5              I knew that I was going to be a father
6              again and that prompted me.  I don't know."
7              Correct?
8     A.       Correct.
9     Q.       All right.
10                  "Okay.  What did your father say
11             during that conversation?
12                  Answer:  'I'm trying.'"
13             I read that correctly, didn't I?
14    A.       Correct.
15    Q.       All right.
16             And then the next question is:
17                  "And what did you understand that to
18             mean?
19                  Answer:  That he was looking to get
20             it repackaged or remortgaged or
21             something."
22    A.       Uh-huh.
23    Q.       I read that correctly, didn't I?
24    A.       Right.
25    Q.       So you were hoping that your father was trying to
```

Case 3:20-ap-90027   Doc 73-10   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc
Exhibit 20 Exemption Hearing (D.C.) Volume 1 Excerpts   Page 15 of 20

Apx 000221

```
 1  get the home refinanced so you could be taken off the
 2  mortgage?
 3       A.   Correct.
 4       Q.   Okay.
 5            And the question is:
 6                 "Who was he trying to get the house
 7            re-mortgaged with?
 8                 Answer:  SunTrust."
 9            Right?
10       A.   Correct.
11       Q.   Line 20?
12       A.   Yes.
13       Q.   All right.
14            And then I believe this is, I'm not sure who was
15  asking the questions here, but counsel for one of the
16  estates is asking you about whether you saw any documents
17  related to the refinancing that you were talking about.
18       A.   Uh-huh.
19       Q.   And on page 118 starting at line 20, the question
20  is:
21                 "What documents did you see that led
22            you to believe that that process had
23            started?
24                 Answer:  Refinancing documents."
25            Right?
```

Case 3:20-ap-90027   Doc 73-10   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc   Apx 000222
Exhibit 20 Exemption Hearing (D.C.) Volume 1 Excerpts   Page 16 of 20

1  A. When, at -- when I'm asking him to get --
2  Q. In 2015.
3  A. For, in 2007 in the original or?  Or in the --
4  Q. In the context of your answers here, which I
5  believe are in the spring or summer of 2015.
6  A. So what was the question again then?
7  Q. The question is why are you filling out
8  applications with your income and credit information if
9  your father is trying to refinance the property and get you
10 off the mortgage?
11 A. I -- I don't know.
12 Q. Are you aware of any refinancing that your father
13 requested that did not have your financial information and
14 credit information attached to it at any time?
15 A. Excuse me?
16 Q. At any time after 2007 are you aware of any
17 refinancing sought by your father in which your credit
18 information and income were not a part of the application?
19 A. I don't know.  I don't.
20 Q. So as we sit here today, your father has not been
21 able to refinance the property or take your name off the
22 property since 2007?  That's accurate, isn't it?
23 A. I don't know.
24 Q. Okay.
25    Are you aware of whether your father up until the

Case 3:20-ap-90027   Doc 73-10   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc
Exhibit 20 Exemption Hearing (D.C.) Volume 1 Excerpts   Page 17 of 20

Apx 000224

1  Q.  Who prepared these documents?
2  A.  I prepared them.
3  Q.  All right.
4      And did you have your brother and your father in
5  your office with respect to these documents?
6  A.  I did.
7  Q.  And what happened at that time?
8  A.  At that time myself, my father, my brother, and
9  his wife were present. We signed the trust documents. I
10 as a witness, my sister-in-law as a witness. It was a
11 notary present. We signed the trust agreement. We signed
12 the quit-claim -- well, I did not sign the quit-claim. The
13 quit-claim deed was signed by my brother Len and Max, and
14 the deed was given to, from Len to Max, the original to be
15 filed. And a copy was given to my brother for his records,
16 and I kept a copy.
17 Q.  Okay.
18     And these documents were notarized also, correct?
19 A.  They were, yes, that's correct.
20 Q.  And who notarized them?
21 A.  Lori King. She worked in my office at that point
22 for several years and she notarized -- well, it was a
23 shared office. She worked in the office as a receptionist.
24 She notarized documents for the attorneys in the office.
25 Q.  Okay.

Case 3:20-ap-90027  Doc 73-10  Filed 07/29/22  Entered 07/29/22 18:53:45  Desc
Exhibit 20 Exemption Hearing (D.C.) Volume 1 Excerpts  Page 18 of 20

Apx 000270

1  And you witnessed the other people, including the
2 notary signing, were appropriate?
3     A.   I did.
4     Q.   You saw your brother sign, you saw your father
5 sign?
6     A.   Yes.
7     Q.   Did you review these documents with them before
8 they signed them?
9     A.   Yes, I did.
10    Q.   And do you know whether these documents were ever
11 recorded?
12    A.   I know today that they were not recorded.  My
13 assumption was that they were, but as of today I knew they,
14 I know now that they were not.
15    Q.   Okay.
16         Did there come a time you knew your father and
17 brother were involved in litigation involving the deaths
18 that occurred from a fire in 2015?
19    A.   Yes.
20    Q.   What did you, who did you learn about this
21 litigation from and what did you learn?
22    A.   I learned that they were both named in a lawsuit.
23 I don't recall who contacted me first, whether it was my
24 brother or my father.  I know they both at some point did.
25 Both sent me copies of the summons or petition, summons I

Case 3:20-ap-90027   Doc 73-10   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc
Exhibit 20 Exemption Hearing (D.C.) Volume 1 Excerpts   Page 19 of 20

Apx 000271

250

1
2
3
4
5
6  I certify that the foregoing is a correct transcript from
7  the electronic sound recording of the proceedings in the
8  above-entitled matter.
9
10 /s/Kristen Shankleton, CER-6785        Dated: 10/27/18

Case 3:20-ap-90027   Doc 73-10   Filed 07/29/22   Entered 07/29/22 18:53:45   Desc   Apx 000309
Exhibit 20 Exemption Hearing (D.C.) Volume 1 Excerpts   Page 20 of 20