UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:                         .    Case No. 18-00260-smt
                               .
MAX E. SALAS,                  .
                               .    Washington, D.C.
            Debtor.            .    August 23, 2018
                               .
. . . . . . . . . . . . . . . .


       TRIAL ON THE OBJECTION TO HOMESTEAD EXEMPTION
                   VOLUME 2 OF 3
          BEFORE THE HONORABLE S. MARTIN TEEL, JR.
          TRANSCRIPT ORDERED BY:  PHILIP J. McNUTT


APPEARANCES:
For the Debtor:           Stinson Leonard Street, LLP
                          By: MARC E. ALBERT
                              JOSHUA W. COX
                          1775 Pennsylvania Avenue, NW
                          Suite 800
                          Washington, D.C., 20036
                          (202) 728-3020


For the Creditors:        By: PHILIP J. McNUTT
                          11921 Freedom Drive
                          Suite 584
                          Reston, Virginia  20190
                          (703) 904-4380


Court Recorder:           THE CLERK

Transcribed By:           MS. KRISTEN SHANKLETON


Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____
MODERN COURT REPORTING & VIDEO, LLC
101-A North Lewis Street
Saline, Michigan 48176
(734) 429-9143

TABLE OF CONTENTS

WITNESSES:                                              PAGE:

MAX E. SALAS
Direct examination continued by Mr. McNutt              4



EXHIBITS:                                    MARKED: RECEIVED:

CREDITOR'S
15. L. Salas Deposition (full deposition)    *        88
24. 8/10/18 R.Salas full deposition          *        88
34. Transcript: L.Salas, first meeting       *     Rejected-88
    of creditors
41. R.Salas 2/14/18 email                    *        87
42. IRS amended proof of claim               69       87
43. Transcript of hearing                    82       87

*Exhibits marked on first day of trial.

1  attorney involved in CLR?

2       A.   That's correct.

3       Q.   All right.

4            So did you contact him to determine if he had the

5  trust documents for the CLR Trust?

6       A.   I knew that -- I knew that Mr. Fernandez had not

7  put together the trust.

8       Q.   So --

9       A.   I knew that he had put together CLR, but not the

10 trust.

11      Q.   Okay.

12           CLR the entity --

13      A.   The corp.

14      Q.   -- that you acted as trustee for with respect to

15 all of the leases that were generated for the property at

16 1610 Riggs Place, right?

17      A.   Repeat the question.

18      Q.   CLR Trust was the entity that you acted as trustee

19 for with respect to all of the leases for the property at

20 1610 Riggs Place through January of 2015, right?

21      A.   Mr. McNutt, there is no CLR Trust.  There never

22 has been a CLR Trust.

23      Q.   All right.

24           So you're now saying that suddenly at some point

25 when you talked to Mr. Albert that you came up with this

Apx 000363

1  idea about the trust?

2      A.   It's not an idea, sir.   It was -- it's not an

3  idea.   It's not sudden, suddenly.   It didn't even cross my

4  mind.   I'd totally forgot about it.   Mr. Albert says, "I

5  read your testimony," or, "I read your transcript," and he

6  says, "You keep talking about a trust.   Who put together -

7  - do you have a copy of the trust?   Where is it?"   I said,

8  "It burned; all my documents burned in the fire."   He said,

9  "Who formed the trust for you?"   He said -- I told him, "My

10  son did."   And he says, "Does he have a copy of the trust?"

11  I said, "He must."   And I -- he said, "Can I talk to him?"

12  And I said, "Yes."   I says, "Call him."

13      Q.   So --

14      A.   And so I gave him my son's number, and he called

15  Ron for the trust and asked him about the trust.

16      Q.   So what's your --

17      A.   This was not sudden, sir.   This was -- it was not

18  suddenly.   It was not planned.   It was discovered by Mr.

19  Albert.   That's one thing that Mr. Barnes, these people

20  from Baltimore that were my insurance attorneys, did a poor

21  job of, and they never asked me for that.   They were at the

22  deposition.   They never asked me for it, "Who was this

23  trust -- who put it together?"   They should have, and --

24  they didn't prepare well and -- and they should have.   And

25  I should have known.   I've got an eighth grade education.

1    I look like I know what I'm doing, but I don't.  I look

2    like I know about corporations and I know about trusts and

3    I know about the law and I know about writing leases, and I

4    -- but I don't.

5        Q.   Mr. Salas, have you ever operated a business that

6    you owed?

7        A.   I did.  I did.

8        Q.   How many?

9        A.   Several.  Well, two.

10       Q.   For what period of time?

11       A.   So, from the time I was 15 years old 'til the time

12   I was -- to the time I was 45.  And I didn't do very good

13   at that.  I did good enough to have me underreport my

14   income, and have me put in jail for underreporting taxes.

15   So I am not very good.  I am good enough to get in trouble,

16   but I'm not good enough to stay out of trouble.

17       Q.   You ever sign business agreements on behalf of the

18   businesses that you represented and worked for and owned?

19       A.   I -- yes, I have.

20       Q.   You ever sign sales agreements on behalf of Cornet

21   Technologies?

22       A.   No, I haven't.

23       Q.   None?  Ever?

24       A.   Sales agreements?

25       Q.   Yes, sir.

1    A.   No.  I turned -- I got -- I'm a salesman.  That's

2   all I do.  I put people together.  I find deals.  I turn

3   them over to administrative, and they sign contracts.  I

4   never do.

5        Q.   What kind of deals did you put together for

6   Cornet?

7        A.   Federal contracts.

8        Q.   What kind of contracts?  For what services?

9        A.   IT services.

10       Q.   Okay.

11            You negotiated those with federal contract

12   officers?

13       A.   I didn't negotiate 'em.

14       Q.   You didn't?

15       A.   I've -- no.  I found the deals, I turned them over

16   to contracts, they put the deals together.

17       Q.   In order to find the deals you had to pursue

18   solicitations and requests for bids and those sorts of

19   things from federal agencies, correct?

20       A.   Right.

21       Q.   All right.

22            And you know how to read those and respond to

23   them, correct?

24       A.   Sir, I'm a salesman.  I am a business development.

25   I am good at being able to talk to people and put people

Apx 000366

1  together.  Once they start negotiations, once they start
2  really the doc -- the work, the best thing to do, for me,
3  is to get out of the way.  Because I can screw up a deal as
4  fast as I can get it.  I've learned that much.
5      Q.   Mr. Salas, you've now spent quite a bit of time
6  talking about the fact that the CLR Trust and the 1610
7  Salas Trust that you testified to in your deposition never
8  existed, and that the information that you set forth in
9  your Answers to Interrogatories and the deposition was
10  inaccurate.  That's what you've testified to, correct?
11      A.   I did the best I could; yes, sir, that's correct.
12      Q.   Okay.
13           And you never corrected that testimony, you never
14  corrected your Interrogatory Answers, you never provided
15  any documents relative to any trust to opposing counsel or
16  to the Brekelmans Estate or to the McLoughlin Estate until
17  sometime after you hired Mr. Albert, right?
18      A.   That's correct.
19      Q.   When did you hire Mr. Albert?
20           Was it in 2018?
21      A.   No, it was -- I think it was '17.  When I -- I
22  hired Mr. Albert when we started to do mediation for, with
23  the Brekelmans and the McLoughlins.  And it was clear that
24  the attorneys that were representing me in terms of the
25  insurance, for the insurance were representing the

1    insurance and they really weren't representing me, my best
2    interests I thought, and in fact the attorneys that were
3    representing the insurance said that I really should get my
4    personal attorney.  That's what they said.  And as I did in
5    sales and I did as -- and I did in my businesses, I knew
6    that I didn't know what I was doing, and I knew that I --
7    that I was way over my head.  So just like in a business
8    meeting when I know I can put a deal together, but when it
9    comes to details, I -- I don't know what I'm doing.  I --
10   and so I can cause more trouble than I can do good.  So I
11   knew I needed some help.
12       Q.   So you hired Mr. Albert to be your personal
13   attorney?
14       A.   Yes.
15       Q.   All right.
16            Representing you in the Superior Court case?
17       A.   To advise me through the mediation and through the
18   Spirit court case to help guide me and give me advice as to
19   what I should -- what I -- what I should do.
20       Q.   All right.
21            You were here when your son Ron testified
22   yesterday, correct?
23       A.   Yes.
24       Q.   You sat through all his testimony, right?
25       A.   Yes, sir.

1

2

3

4

5

6   I certify that the foregoing is a correct transcript from

7   the electronic sound recording of the proceedings in the

8   above-entitled matter.

9

10  /s/Kristen Shankleton, CER-6785      Dated: 10/28/18