IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
Nashville

| | | |
|---|---|---|
| In re: | : | |
| | | CHAPTER 11 |
| LEN SALAS | : | CASE No. 18-02662 |
| | | JUDGE: HARRISON |
| Debtor | : | |
| | | |
| NICOLAAS BREKELMANS AND GAIL | : | |
| GREGORY BREKELMANS, | | |
| CO-PERSONAL REPRESENTATIVES | : | |
| OF THE ESTATE OF NINA | | |
| BREKELMANS, et al | : | |
| | | |
| Plaintiffs | : | |
| | | |
| v. | : | Adversary Proceeding No. 3:20-ap-90027 |
| | | |
| MAX SALAS | : | |
| | | |
| Defendant | : | |

PLAINTIFFS' SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COME NOW the Plaintiffs herein, by and through their undersigned counsel and,

files this Second Supplemental Memorandum in accordance with the direction of the Court at the

hearing on the parties' Motions for Summary Judgment held herein on March 21, 2023.

This Memorandum is intended to respond to questions or issues raised by the Court at the

hearing on March 21, 2023 or to certain arguments asserted by the Defendant at that hearing.

This Memorandum is a supplement, and in addition, to the Plaintiffs' Motion for Summary

Judgment and Amended Memorandum in support, the Plaintiffs' Reply to the Defendant's

Opposition to the Plaintiffs' Motion for Summary Judgment, the Plaintiffs' Supplemental

Memorandum in Support of its Motion for Summary Judgment, Plaintiffs' Opposition to the Defendant's Motion for Summary Judgment and all of the Exhibits and attachments thereto.

## I.    ARGUMENT

### A.    The Debtor was the Owner of the Property for all Purposes After 2007

1.  The Defendant asserted, in support of his Motion, that he owned the subject property (1610 Riggs Place, NW, Washington, DC "the Property") and paid the mortgage.  However, those assertions are refuted by the following undisputed facts:

a.  After 2007 there was no deed created which purported to transfer the property to the Defendant.

b.  The 2010 Quitclaim Deed, even if effective, deeded the property to an invalid trust, not to the Defendant.  See Defendant's Motion for Summary Judgment, Exh. A (D-90-1).

c.  The Defendant has produced no documents showing that he was the owner of the Property at any time after 2007.  In fact, the leases produced by the Defendant show that he was acting as "trustee" for an entity named "the CLR Trust."  See Supplemental Memorandum, Exh. A, D-92-1. He did not declare the rental income on his 2015 tax return.

d.  The Defendant abandoned the Quitclaim Deed prior to June, 2011.  Plaintiffs' Amended Memorandum, Exh. 7 (D-74-8), Plaintiffs List of Undisputed Facts, D-74-1, ¶¶9, 10 - 13, 25 -30, Defendant's Responses to Plaintiffs' Requests for Admission, ¶¶ 3, 56, 57.

e.  The Defendant made only one mortgage payment after June, 2015. Amended Joint Pre-trial Statement, ¶ 39.

f.  The Defendant used essentially all of the insurance proceeds to upgrade and update the Property so he could get a license to rent.

g.  from June, 2015 through early, 2018, the Defendant did not live at the

property.

2. The above facts have been established as undisputed See Defendants responses to the Plaintiffs' Lists of Undisputed Facts (D-74-1), the Exhibits attached to the Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment (D-74-2 -74-22), the Exhibits attached to the Plaintiffs' Supplemental Memorandum (D-92-1 - 92-9) and the Plaintiffs' Statement of Undisputed Facts attached to its Opposition to the Defendant's Motion for Summary Judgment (D-95-1).

3. On the other hand, the Debtor was the open and notorious owner of the Property as evidenced by the Deed, Deed of Trust, Governmental Notices (Supplemental Memorandum, Exhs. G- I), the SunTrust Loss Mitigation Statement of February, 2016 (Supplemental Memorandum, Exh. F) and all other documents of ownership and title after 2007.

**B.      The Plaintiffs are Acting on Behalf of the Debtor's Estate**

4. The Defendant argued that collateral estoppel should apply to the Plaintiffs because they are acting in their own self interest.  There is no case law to support that finding and other courts, like the Western District of Pennsylvania (**_Kind_**) do not support such a finding, as discussed below.

5. The Defendant argued that by the Plaintiffs' exercising their right to purchase the Trustee's claims, but only after asking the Trustee to pursue them and the Trustee's refusal, they were acting in their own self-interest at least partly because the Plaintiffs represent the vast majority of creditors' claims.  That suggests that if the trustee acted on his own, under the same circumstances, that action would somehow be improper.  That scenario would yield a ridiculous result.  Moreover, it is axiomatic that when the trustee fails to pursue a cause of action and decides to sell it, the likely buyer is the creditor, or party, who is most likely to benefit.  The

purchase of that claim benefits the estate by the purchase price (here over $150,000) plus the result of any recovery.

6. Additionally, the Defendant bid at the auction and stated that his purpose was to buy the trustee's claims so that they would not be pursued, clearly acting in his own self-interest. It is true that the Defendant bid through his son, Ron. However, Ron was represented at the auction by the Defendant's counsel and, during the auction, Ron and Defendant's counsel had several private conversations among the Defendant, his counsel, and his son, Ron. Clearly, when it came to Ron's attempted purchase of the trustee's avoidance and recovery claims, the Defendant was the "real party in interest."

7. While the Defendant asserts that the Plaintiffs will largely benefit from any recovery and while the Plaintiffs represent the vast majority of the claims against the Debtor's estate, there are other creditors who will also benefit, including taxing authorities and unsecured creditors. Furthermore, the estate's additional administrative expenses and fees will be paid before any payments are made to the Plaintiffs from any recovery.

8. Additionally, the Plaintiffs paid good consideration for the claims they are pursuing on behalf of the estate and they have borne all risk of loss, shielding the estate from unnecessary expense. The trustee, the estate, and all creditors, along with the Debtor's counsel, have all benefitted from the payment made into the estate by the Plaintiffs to purchase the estate's rights to the trustee's recovery and avoidance actions.

9. Finally, the Defendant repeatedly acknowledged the Plaintiffs legitimate purchase of avoidance and recovery actions of the trustee subject only to the ordinary defenses available to parties defending those avoidance and recovery actions. The Defendant, as part of his agreement upon which the Plaintiffs relied, acknowledged and confirmed the right of the Plaintiffs to

pursue the claims set forth in the Complaint and are now estopped from changing his position as clearly set forth in the Debtor's approved disclosure statement and plan of reorganization in Case No.18-00260. In the Defendant's approved Disclosure Statement, the Defendant asserts that there is "pending litigation" including: avoidance action litigation to be brought by the Judgment Creditors in the U.S. Bankruptcy Court for the Middle District of Tennessee following the Judgment Creditors' purchase of those claims from the Len Salas Bankruptcy Estate (the "Tennessee Avoidance Actions"). Case No. 18-260, United States Bankruptcy Court for the District of Columbia ("Defendant's Bankruptcy"), (D-276), filed on December 5, 2019, p. 21.

10. In the Defendant's confirmed Plan of Reorganization dated, January 22, 2020, the Defendant defined the Plaintiffs causes of action as follows:

> 1.44 **Tennessee Avoidance Actions** means the avoidance actions previously purchased by the Judgment Creditors from the Len Salas Bankruptcy Case and includes each and every claim and recovery action to which the Len Salas Bankruptcy Case Trustee or the Len Salas Bankruptcy Case estate may have under the provisions of 11 U.S.C. § § 544 through 553, as applicable, related to the Property, and an resultant litigation thereto.

> In Section 3.6 of the confirmed Plan of Reorganization, the Defendant states:

> Judgment Creditor Claims are being given separate Class treatment based on the fact that they may also collect on the amounts owed to them from available Insurance Proceeds (See Motion for Relief from Stay Order; ECF Dkt. No. 74), and based on the fact that they possess the right to prosecute the Tennessee Avoidance Actions regarding the Property purchased from the Len Salas Bankruptcy Case. Upon Confirmation, the Debtor's listing of the Class 6 Claims as Disputed Claims shall be withdrawn without any further notice or order of the Court and the Class 6 Claims shall be treated as Allowed Claims to allow for distribution under the Plan as contemplated herein. Such withdrawal of the Class 6 Claims as disputed, however, shall in no way limit or otherwise affect any defenses the Debtor may have to the Tennessee Avoidance Actions...

The Plaintiffs' acceptance of the Defendant's Third Amended Plan of Reorganization was expressly made in reliance on the recognition of the Defendant that the Plaintiffs had the right to

pursue the trustee's claims in this estate. The Plaintiffs accepted the defenses available to the Defendant but their agreement with the Defendant required the Defendant to acknowledge the Plaintiffs were the rightful owners of this estate's claim and had standing to sue the Defendant in this case.

**C.      The D.C. Bankruptcy Court did not Determine Issues Related to the Trustee's Causes of Action and Neither the Trustee nor the Debtor's Estate Were Parties to the D.C. Exemption Hearing or Decision**

11. The Defendant also argued that the D.C. Bankruptcy Court specifically determined the issue of fraudulent conveyance. In support of his claim, the Defendant recited language in Exemption Decision that did not reference a fraudulent conveyance or Section 548 and clearly was not addressing or determining the rights of the Tennessee Trustee. On p. 59 of the D.C. Bankruptcy Court's Memorandum Opinion, the Court stated, under a section titled "AVOIDANCE UNDER SECTION 544": "...that is an issue of fact that must be decided by the U.S. Bankruptcy Court for the Middle District of Tennessee. How a judgment regarding the right of Len's estate to recover the Property under § 544 would affect Max's homestead exemption in this case is an issue for another day." Memorandum and Opinion in Case No. 18-00260, filed and entered on September 25, 2018 (D-108)("D.C. Memorandum") (Defendant's Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment, filed herein on February 21, 2023 (D-90-1).

12. 11 U.S.C. § 548 was neither mentioned, argued or determined in the D.C. Bankruptcy Case (18-00260). See, for example, D.C. Memorandum at *passim.* See also, Creditors' Opposition to the Debtor's Claim of Exemption and the Debtor's Response, in the D.C Bankruptcy Case, attached to the Plaintiffs' Supplemental Memorandum, D-92, as Exhibits D (D-92-4), and E (D-92-5), respectively.

13.   The D.C. Bankruptcy Court specifically deferred to this Court on all issues related to the interest of this Debtor's estate.  See, Memorandum and Opinion filed in Case No. 18-00260, pp. 48-59.  On the first day of the Exemption Hearing, August 22, 2018, the D.C. Bankruptcy Court (Teel, J.) stated: "It seems to me it's Len Salas' Chapter 7 Trustee who is going to have an incentive to avoid the transfers invoking Section 544."  See Exemption Hearing Transcript, Vol 1, August 22, 2018, pp. 24-26 ("August 22 Excerpt"), attached hereto as Exhibit 1 to this Second Supplemental Memorandum, at 24: 20-22.

14.   In a discussion with Plaintiffs' counsel at the commencement of the Exemption Hearing, Judge Teel stated:

> "So it seems to me we may be -- we may be wasting our time going through this exercise when – maybe I'm wrong, but it seems to me inevitable that if exemption is upheld in this case, it'll be taken away by the trustee in the Len Salas case."

Exhibit 1, August 22 Excerpt, at 26: 8-12.

15.   Judge Teel stated during the Exemption Trial in August, 2018, that the D.C. Court's ruling on the Exemption, if granted, would be mooted by the Tennessee trustee's avoidance and recovery powers.  While not determinative, the Court's statement is a clear indication that the D.C. Court did not think it could, and did not intend to, affect this Court's consideration of the trustee's avoidance and recovery powers.

**D.     The Plaintiffs' Derivative Status Precludes the Application of Issue Preclusion**

16.     Essentially all of the arguments raised by Defendant's counsel concerning issue preclusion are irrelevant to the undisputed facts of this case because this court has already determined that the Plaintiffs are acting in a derivative capacity and they stand in the shoes of the Trustee representing the Debtor's estate.  See, Memorandum and Opinion filed herein on February 11, 2021 (D-38). Furthermore, the Defendant cited no cases which countered the Plaintiffs' derivative status. There is no case which the Defendant did, or can, cite that holds the interests of this estate were determined, or protected, in the D.C. Case. The Plaintiffs stand in the shoes of the trustee, their claims are derivative of the Debtor's estate and neither the Debtor's estate nor the trustee were parties to the D.C. Exemption Decision.  Therefore, these Plaintiffs, in their current capacity, are not collaterally estopped and issue preclusion does not apply to the claims of the Debtor's estate, as set forth in the pending Complaint.  Furthermore, even if there were otherwise grounds for issue preclusion, the D.C. Bankruptcy Court specifically declined to rule on any issues before this court. The D.C. Bankruptcy Court simply lacked authority to decide issues relate to the claims of this Debtor's trustee and estate.

17.     Numerous bankruptcy courts, and appellate courts, have consistently ruled that, for all purposes, including issue preclusion, the real party in interest is "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery."  ***See, for example, Farrell Constr. Co. v. Jefferson Parish, La.***, 896 F.2d 136, 140 (5th Cir. 1990).  The person (or party) holding the substantive right in this case is the trustee, on behalf of the Debtor's estate. The claims asserted by the Plaintiffs' are claims belonging to the estate and they are claims unique to this bankruptcy case.

18.     This Court conclusively determined that the Plaintiffs met the 6th Circuit's "strict prerequisites for exercising derivative standing..."  See, Memorandum Opinion, February 11,

2021 (D-38), at pp. 5-16. Thus, the Plaintiffs "stand in the shoes of the trustee" in the pending

Complaint. Plaintiffs' List of Undisputed Facts, D-74-1, ¶¶ 5, 6.

19. Derivative standing, like that in the instant case, is a suit brought in the name of the

debtor, or the debtor's estate. The Plaintiff steps "into the shoes of the debtor or trustee."

***Gecker v. Marathon Fin. Ins. Co. (In re Auto. Prof'ls, Inc.)***, 389 B.R. 630, 634 (Bankr. N.D.

Ill. 2008).

20. Discussing the history of case law regarding suits brought by creditors and

committees of bankruptcy estates on behalf of the estate, ***Gecker*** explained that in cases where

derivative standing has been granted to creditors or committees, "a party is simply being

permitted to step into the shoes of the party with standing." ***Id.***, at 635. The court concluded:

"Thus, the committees or creditors given derivative standing were filling the empty shoes of the

trustee, who clearly had standing to pursue them [the trustee's causes of action]..."

21. In ***Gecker***, the Court declined to allow a committee to assist the Trustee in the

Trustee's cause of action asserting that to allow a party to be added along side the Trustee is

> to confer a type of "helper" or "buddy" standing upon a party who is not asserting
> his own right under substantive law but seeks merely to assist the rightful plaintiff
> in pursuing his case...
>
> Because the **trustee** is a **plaintiff** asserting her own rights as trustee, there is no
> unexercised right to sue that can be conveyed to the Committee on a derivative
> basis.

***Id.*** (emphasis in original)

22. ***Gecker*** emphasized that the status of a committee attempting to join the trustee's

cause of action, with the trustee as co-plaintiff, is far different from the situation, as in this case,

when a creditor pursues a cause of action when the trustee fails, or refuses to act. ***Id.***, at 634.

Moreover, the ***Gecker*** court suggested that, as to the "buddy system" which the trustee attempted to employ there are other means to accomplish the same result.  The trustee could hire the creditor's attorney, sell the trustee's claim, or otherwise gain assistance from the creditor without adding the creditor as another party to the trustee's cause of action.

23.  The court, in ***Modiri v. 1341 Rest. Grp., Inc.***, 904 A.2d 391, 394-97 (D.C. 2006), emphasized that "a privy is one so identified in interest with a party to the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case." internal citation omitted. The legal rights asserted in the instant case are those solely belonging to the Trustee or the Debtor's Estate.  The Trustee is not privy to the debtor or to the debtor's estate when pursuing recovery or avoidance actions.  ***In re Worldcom, Inc.***, 401 B.R. 637, 651 (Bankr. SD.N.Y.).  Because the Plaintiffs, as representatives of the Debtor's Estate, stand in the shoes of the Trustee, the real party in interest, they are not in privity with any party to the D.C. Exemption Decision.  Therefore, issue preclusion does not apply here even if the issues before this court were raised and/or decided in the D.C Exemption Decision, which, of course, they were not as discussed above.

> **E.**     ***Kind Operations*** **Supports the Plaintiffs' Motion for Summary Judgment on the Issue of Collateral Estoppel**

24.  The case of  ***Kind Operations, Inc. v. Cadence Bank (In re PA Co-Man, Inc.)***, 644 B.R. 553 (Bankr. W.D. Pa. 2022) is a recently reported decision from the bankruptcy court for the Western District of Pennsylvania.  While a much more complicated procedural background than the instant case, ***Kind Operations*** has remarkable similarities to this case and in many important respects.

25. In ***Kind Operations***  the Plaintiff, Kind Operations, Inc. ("Kind, Inc.") purchased the

Chapter 7 Trustee's Avoidance and Recovery Claims. The purchase was made as part of a settlement agreement Kind, Inc. reached with the trustee. The settlement included Kind, Inc. making a payment to the estate for the benefit of creditors and included an assignment of the estate's causes of action to Kind, Inc. so that Kind, Inc. could "investigate, prosecute, and fund the litigation of the estate's causes of action for the benefit of both the bankruptcy estate's creditors and Kind, Inc. pursuant to a sharing agreement. *Id.*, at 571-72. Kind, Inc. then filed, as assignee, three separate complaints against the secured lenders and the purchasers related to a pre-petition foreclosure sale of essentially all the Debtor's assets. *Id.*, at 572. The Court allowed the Plaintiff to file a single consolidated complaint, which Kind, Inc. did. In the consolidated complaint, Kind, Inc. added the Debtor's President and Chief Executive Officer as an additional defendant.

26. In response to motions to dismiss filed by the various defendants, the Plaintiff argued that "this case involves the principal of a debtor, [the] debtor's secured lenders and an eager, well-heeled purchaser conspiring to manufacture a fraudulent sale of all of the debtor's assets (and none of its liabilities) to the great detriment and harm of the debtor and its creditors." citation to the record omitted. The Plaintiff further argued that "[e]ach party to this secretive and improper arrangement had something to gain from it." Citation to the record omitted. *Id.*

27. In the Consolidated Amended Complaint, Kind, Inc. asserted seven causes of action which consist of (*inter alia*): a claim for civil conspiracy against the Debtor's President, the lenders and the purchasers; a claim for breach of fiduciary duty against the Debtor's President; a claim for fraudulent concealment against the Debtor's President; and a claim for avoidance of fraudulent transfers against Debtor's President, the lenders and the purchasers.

28.   In response to challenges by the Defendants, including the Debtor's president, Kind, Inc. asserted that it was not suing in the same capacity and, therefore, collateral estoppel did not apply. The court found Kind, Inc.'s argument persuasive noting that New York courts have looked to whether parties, though arguably the same, appeared in the same capacity in both actions. ***Juan C. v. Cortines***, 679 N.E.2d 1061, 1065 (N.Y. 1997).  The same analysis is applicable under both D.C. cases and those of the 6th Circuit.

29.   The ***Kind Operations*** Court discussed the requisites for the application of collateral estoppel (under New York law) as follows:

> In general, "a nonparty to a prior litigation may be collaterally estopped by a determination in that litigation by having a relationship with a party to the prior litigation such that his own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or derivative of, the rights of the party to the prior litigation[.]" ***Juan C. v. Cortines***, 679 N.E.2d 1061, 1065 (N.Y. 1997) (quoting ***D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.***,76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 564 N.E.2d 634 (N.Y. 1990); see also, ***People v. Roselle***, 84 N.Y.2d 350, 618 N.Y.S.2d 753, 643 N.E.2d 72 (N.Y. 1994)).

30.   The Court concluded:

> In due consideration of these standards, it is abundantly clear that the bankruptcy estate had no representation in the State Court Litigation. It is also clear that the bankruptcy estate's claims against the Defendants in this adversary proceeding are not derivative of those claims previously asserted by KIND in its individual capacity in the State Court Litigation. Thus, it is equally clear that KIND did not appear in the same capacity in both actions; here before this Court, KIND is acting in its capacity as the assignee of the Trustee's interests, and in the State Court Litigation KIND was pursuing its own self interest. Accordingly, the Court finds that neither res judicata nor collateral estoppel operate to bar the claims asserted in the instant pending adversary proceeding.

***Id.***, at 637.

31.   Analogous to the instant case, Kind, Inc.'s Complaint asserted, among other causes, three causes of action for fraud, namely, actual fraud, constructive fraud (lack of reasonable equivalent value, and a fraudulent transfer under state law. ***Kind Operations, supra***, at 604-05.

Also analogous to this case, Kind was a party to a previous case against the Debtor's principal and lost although the reasons are not clear in the record.

32.  The Plaintiffs assert that the long standing principles of collateral estoppel as consistently applied in D.C. and other jurisdictions prevent the use of issue preclusion in this case, as argued in the Plaintiffs' Motion, Supplemental Memorandum and Opposition to the Defendant's Motion.  The factual and procedural similarities between this case and **_Kind Operations_** give those principles a more direct application to the Plaintiffs' Complaint and explain clearly why issue preclusion must not be applied here.

 **F.** **The Actions and Interactions Between the Debtor and the Defendant Represent Substantially all of the Badges of Fraud Set Forth in the Uniform Fraudulent Transfer Act as Enacted in the District of Columbia**.

33.  D.C. has adopted the Uniform Fraudulent Transfer Act.  See D.C. Code § 28-3104.

34.  Under D.C. Code § 28-3101(12), a "transfer" includes any parting with an asset or an interest in an asset. **_Malone v. Iceberg Transp. S.A. (In re Gold & Appel Transfer S.A.)_**, Nos. 05-00775, 05-10022, 2013 Bankr. LEXIS 3695, at *1 (Bankr. D.D.C. Sep. 6, 2013).

35.  Judge Teel explained in **_Malone_** that the existence of the badges of fraud set forth in the UFTA (D.C. Code § 28-3101, *et seq*. present a compelling and **_prima facie_** case for a finding of fraudulent intent requiring the avoidance and recovery of the subject transfer.

> While it is often difficult for a claimant seeking to avoid a transfer as a fraudulent conveyance to present direct evidence to establish a debtor's actual intent to defraud creditors, **_Kelly v. Armstrong_**, 141 F.3d 799, 802 (8th Cir. 1998), summary judgment is appropriate "where all the facts 'point[] to a finding of intent with no inference of a pure motive possible.'" **_Consumers United Ins. Co. v. Smith_**, 644 A.2d 1328, 1358 (D.C. 1994) (quoting **_Jones v. Cent. Nat'l Bank of St. Johns_**, 547 N.E.2d 887, 891 (Ind. Ct. App. 1989)).  Accordingly, the law recognizes certain "badges of fraud," including the factors enumerated in § 28-3104(b), as "common indicia . . . which have frequently bespoken fraudulent intent in the past." **_Kelly v. Armstrong_**, 141 F.3d at 802.  Once a claimant "establishes a confluence of several badges of fraud, the [claimant] is entitled to a

presumption of fraudulent intent" and "[i]n such cases 'the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers at issue.'" *Id.* (quoting *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994)); see also *Schilling v. Heavrin (In re Triple S Rests., Inc.)*, 422 F.3d 405, 414-416 (6th Cir. 2005) ("Badges of fraud are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." (internal quotation marks and citation omitted)). "The presence of a single badge of fraud may spur mere suspicion . . . and the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991). Once a record contains only evidence establishing badges of fraud supporting an inference that the transfer was made with an actual intent to defraud a creditor, the transfer must be set aside as a fraudulent conveyance unless sufficient evidence is presented to explain or justify the circumstances constituting badges of fraud. *Leonardo v. Leonardo*, 251 F.2d 22, 26, 102 U.S. App. D.C. 119 (D.C. Cir. 1958).

*Malone v. Iceberg Transp. S.A. supra*,  at *65-67.

36.  The so-called "badges of fraud" to be considered are as follows:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer...was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made...;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.*, at 66.  D.C. Code § 28-3104(b).  See also, ***Kind Operations, supra***, at 608.

37.  Paragraphs (6) and (11) are not applicable to the facts of this case.  The other factors all support the finding of actual fraud:

(1) The transfer was made by the Debtor, Len, to an insider, his father, the Defendant;

(2) The Debtor retained ownership of the Deed and the SunTrust Deed of Trust obligation after the transfer (which took place on April 17, 2018); See, for example, Facts in Support of Plaintiffs' Opposition to the Defendant's Motion for Summary Judgment, D-95-1 ("Opposition Facts"), Section 1, pp. 2-3; Plaintiffs' List of Undisputed Facts, D-74-1, ¶¶14 -17.

(3) The transfer was concealed from the Defendant's creditors, D.C. agencies and the lender; See, for example, Opposition Facts, Section 1, pp. 2-4

(4) The Debtor had been sued in 2015 and judgments entered against him in April, 2018 just weeks before the transfer; See, Judgement Recording, Defendant's Motion for Summary Judgment, Defendant's Statement of Undisputed Facts, Exhibit B (D-90-2)

(5) The subject Property had estimated equity at the time of the debtor's bankruptcy of more than $1.2 Million. (Defendant's Schedules, Summary of Assets and Liabilities, Case No. 18-00260, D-12, p. 1 of 37). The Debtor's other assets totaled $53,373.38 on April 18, 2018 (Debtor's Schedules, Summary of Assets and Liabilities, Case No. 18-2662, D-1, p. 12 of 56);

(7) The Debtor aiding his father in concealing the fact that the Quitclaim Deed had been abandoned.  See Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment, Exhibit 7 (2011-12 eMails) (D-74-8),

(8)  the Debtor received no consideration for the transfer nor did the Debtor receive anything of value from his father from 2007 through 2018. See Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment, Exh. 4, (D-74-5) and  Exh. 5, (D-74-6).

(9) The Debtor's schedules, the parties stipulations, admissions and the Plaintiffs' Statement of Undisputed Facts establish, without dispute, that at all times from 2010 through April, 2018, the Debtor was insolvent.  Moreover, the attempted transfer of the Property by Quitclaim Deed transferred the Debtor's only substantial asset but left the Debtor with the SunTrust Deed of Trust Note obligation which was at least $870,000 at all times.  By April, 2018 the Note obligation exceeded $1 Million and by October, 2019, the Note obligation exceeded $1.2 Million.  See, Plaintiffs Amended List of Undisputed Facts, August 1, 2022 (D-74-1), ¶¶ 19, 20, 21 and Defendant's Responses, D-75-1, ¶¶ 19, 20, 21.

(10) by operation of law, both 11 U.S.C. 548 (d) and D.C.Code § 42-401 the transfer took place on April 17, 2018, just two weeks after judgments were entered against the Debtor and the Defendant totaling more than $15 Million.  See Defendant's Statement of Undisputed Facts in Support of Motion for Summary Judgment, Exh. 2, D-90-2, filed herein on February 21, 2023.

31.  In the Loss Mitigation Statement Len Salas signed, dated February 25, 2016 ("the Loss Mitigation"), Len signed "as borrower" on page 9 of the Loss Mitigation (D-92-6, p. 9 of 9).  On the same page, above Len's signature the Loss Mitigation states: "knowingly submitting false information may violate Federal or other applicable law."  On page 6 of the Loss

Mitigation (D-92-6, p. 6 of 9) Len stated "**I want to - Keep the Property**" and "The property is currently - **My Primary Residence**" and "The property is currently - **Owner Occupied**." Those statements directly contradict the Debtor's later position that he deeded the property to his father in 2010 or that he, Len, was not the owner in 2016. The date of the Loss Mitigation is also important because it is same time frame as the depositions of Len and Max taken in the Superior Court case in February and March, 2016. Len's deposition was March 9, 2016, just two weeks after the date of the Loss Mitigation. See Plaintiffs' Amended Memorandum, Exh. 11 (D-74-12).

32. Additionally, in his testimony in the Exemption Hearing in Case No. 18-00260, Len testified that he did not bring up the 2010 Quitclaim Deed because he "simply forgot about it" as did all of his family members that were present at the time of the execution of the Quitclaim deed. See Len Salas testimony, August 22, 2018, Case No. 18-00260, (Exemption Hearing Transcript, Vol 1 of 3), at pp. 135-139, attached hereto as Exhibit A.

33. He further testified that he did not know the Deed needed to be recorded even though Ron's email of June 17, 2011, addressed to both Len and Max, states clearly that a new deed "will then need to be filed with the District/City." Plaintiffs' Amended Memorandum, Exh. 7, D-74-8), filed herein on August 1, 2022.

34. This directly contradicts the emails which Len produced in this case, for the first time, in August, 2021 wherein he asks his father about getting his name off the deed in the time frame of June, 2011 through February, 2012, well after the signing of the 2010 Quitclaim Deed. See also, Plaintiffs List of Uncontested Facts, ¶31. And, in the same emails both Ron and Max reference the need to create a new, or different instrument, to remove Len's name from ownership of the Property. See Plaintiffs' Amended Memorandum in Support of their Motion for Summary Judgment, Filed herein on August 1, 2022, Exh. 7, (D-74-8), at pp. 1, 3, 5, 7, 11, 13.

On page 16 of Exh. 7, Max emailed his counsel, for the last time of which we have a record, stating quite clearly that no progress had been made as of February 27, 2012, over 19 months since the creation of the 2010 Quitclaim Deed.

35. In his testimony at the Exemption Hearing the Debtor also admitted that he made "multiple" attempts to get his name off the property through the Spring, 2015.  See, Exhibit B, Exemption Hearing Transcript, Vol. 1, pp. 111, 130, 156-64, at pp. 156-60. See also, Plaintiffs List of Uncontested Facts, ¶31.

36.  Len's testimony, when contrasted with the 2011-12 emails and the admission that he asked his father "multiple" times to get his name off the Property, plus other evidence, like the February, 2016 Loss Mitigation, Plaintiffs' Supplemental Memorandum, Exh. F (D-92-6), makes it clear that Len was simply not telling the truth about the Quitclaim Deed and that his family members only "remembered" the Deed after Marc Albert told Max he could exempt the Property if he was the owner, but not if Len was.  See discussion below.

37.  Len also testified at the Exemption Hearing, Len testified, as follows

"6 Q. All right.
7 Do you know what the reference to the 1610 Salas
8 Trust is?

9A. Oh, no, I mean, no. Uhm -- actually, no. Not
10 quite. See, it says not much. It's an account. I thought
11 it was an account.

12 Q. And what made you think it was an account?

13 A. Because he, when I got that call from SunTrust
14 saying that the mortgage hadn't been paid, I said what
15 happened. He says, "Well, I've set up this account for
16 1610 so all the rent checks go into there, and then I pay
17 that." And I guess one check didn't clear before they
18 pulled my check. I -- something. I got some kind of
19 answer like that. Something to that effect.

20  Q. And that's what your father told you?

21 A. So that's what I thought, that's what I referred
22 to.

23 Q. But that's what your father told you, right?

24 A. Correct."

See Exhibit A, Exemption Hearing Transcript, August 22, 2018, Vol. 1, p. 149.

38.   The above testimony is contradicted by the bank records produced by the Defendant.

See Supplemental Memorandum, Exhibit B (D-92-2), 1610 Riggs Property Trust Bank of

America account records for account ending in 3184.  That exhibit clearly shows that there was

no bank account opened for the alleged 1610 Riggs Property Trust until October, 2017, just a

few months after the Defendant hired bankruptcy counsel, Marc Albert.  See for example, the

Debtor's testimony at the Exemption Hearing

11 THE COURT: Do you remember signing the documents,
12 the two documents on July the 6th, 2010 now that you've
13 seen them?

14 THE WITNESS: Yes, I do remember that.

15 THE COURT: But you didn't recall that during the
16 litigation?

17 THE WITNESS: No, I don't. I wish I had.

18 THE COURT: Until at least as of the deposition on
19 March the 9th, 2016?

20 THE WITNESS: I didn't remember them until Max had
21 told me that Albert had discovered them in his research,
22 which was I don't know when. I'd totally forgotten about
23 it. And then I was like, "Oh, yeah. I totally forgot."

Exh. A, Exemption Hearing Transcript, August 22, 2018, Vol. 1, p. 154

39. The record is replete with references to testimony of the entire Salas family seeking to resurrect a Deed that had been abandoned and discarded, **no later than June, 2011**. See Supplemental Memorandum, Exh. 7 and Loss Mitigation, Plaintiffs' Supplemental Memorandum Exh. F.

### G. The Recorded Judgments on April 5, 2018, Even if Applicable to the Issue of Inquiry Notice, Do Not Show any Information Inconsistent with the Title Record

40. On the issue of Inquiry Notice, the Defendant asserted that the recorded judgment liens (recorded on April 5, 2018) would have put a purchaser on notice and would have required further inquiry. That does not follow the case law. See ***McKinley v. Crawford***, 58 F.2d 528 (D.C. Cir. 1932). Under facts as described by the Defendant, the judgment was recorded against Len Salas as Owner and Max Salas as Manager. There is nothing in the docketed judgment which is inconsistent with the public record. Moreover, a review of the Superior Court docket would show that the Superior Court specifically found that Len was the owner. As Mr. Young stated in his argument at the hearing on March 22nd, (from counsel's notes): "You don't have to run down the final answer" when doing the reasonable inquiry required in D.C.

41. The Defendant's so-called "ownership" of the Property was hidden and private. The only documents produced by the Defendant regarding the D.C. Property are the 2007 Deed from Max to Len, the 2010 Deed from Len to the Trust (a copy only, no original), the 2010 Trust (which due diligence would have determined was "*void ab initio*, and leases to the CLR Trust, with Max acting as trustee (Supplemental Memorandum, Exh. A (D-92-1)). He did produce an insurance policy but no other documents related to his alleged interest in the Property.

42. Len's ownership, however, is both open and notorious, recorded and otherwise of public record, including, but not limited to, the 2007 Deed, the 2007 Deed of Trust, the 2016 SunTrust Loss Mitigation Statement (prepared by the Defendant)(Supplemental Memorandum, Exh. F (D-92-6), all government and public records through December, 2019 (Plaintiffs' Supplemental Memorandum, Exhs G, H, and I (D-92-7, 92-8, 92-9, respectively).

43. The Defendant argued further that a purchaser would have had to make a call if for no other reason that "to obtain a pay off." That call would have been made to SunTrust which was Len's lender and recognized Len as the only obligor and only resident at the Property. See, for example, Plaintiffs' List of Uncontested Facts, ¶¶16, 17.

44. The Defendant also argued that supporting case law showed that the recordation of a judgment lien was sufficient notice of an interest requiring additional inquiry. However, the judgment lien, in this case, identified Len as the owner. Moreover, the cases cited by the Defendant only argue that a judgment lien which differs from the title record would require further inquiry. The judgment here was against the title owner of the Property, namely, the Debtor.

## II.    CONCLUSION

For the reasons stated herein, and those argued in the Plaintiffs' Motion for Summary Judgment, Supplemental Memorandum, the Plaintiffs' Opposition to the Defendant's Motion for Summary Judgment, the attached exhibits and the voluminous number of undisputed facts set forth in the Plaintiffs' Motion and Opposition, the Plaintiffs assert they are entitled to summary judgment as a matter of law on all Counts of the Complaint and there are no material facts in dispute which would prevent the entry of judgment in favor of the Plaintiffs.

Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC


By: /s/ Taylor A. Cates
130 North Court Avenue
Memphis, TN 38103
901-524-5165
901-524-5000 (fax)
Tacates@bpjlaw.com

LAW OFFICE OF PHILIP J. McNUTT, PLLC

By:   /s/ Philip J. McNutt
                        Philip J. McNutt
11921 Freedom Drive, Ste 584
Reston, VA 20190
703-904-4380
 202-379-9217 (fax)
Pmcnutt@mcnuttlawllc.com

COUNSEL FOR THE PLAINTIFFS

Certificate of Service

        I HEREBY CERTIFY THAT a copy of the foregoing Opposition, was delivered electronically, on the 26th day of March, 2023 through the Court's ecf noticing system to the following:

THOMPSON BURTON PLLC
Phillip Young
One Franklin Park
6100 Tower Circle, Ste 200
Franklin, TN 37067
615-465-6008
615-807-3048 (fax)
phillip@thompsonburton.com


 /s/ Philip J McNutt
Philip J. McNutt