UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

```
                                  .
IN RE:                            .  Case No. 18-02662
                                  .  Chapter 7
LEN SALAS,                        .
                                  .
            Debtor.               .
                                  .
. . . . . . . . . . . . . . . .   .
NICOLAAS BREKELMANS, et al.,      .  Adv. No. 20-90027
                                  .
            Plaintiffs,           .
                                  .
v.                                .
                                  .  701 Broadway
MAX SALAS,                        .  Nashville, TN 37203
                                  .
            Defendants.           .  Tuesday, August 15, 2023
. . . . . . . . . . . . . . . .   .  9:13 a.m.
```

TRANSCRIPT OF PLAINTIFFS' MOTION TO ALTER OR AMEND [104]
BEFORE THE HONORABLE MARIAN F. HARRISON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plaintiffs:        Law Office of Philip J. McNutt PLLC
                           BY:  PHILIP JAMES MCNUTT, ESQ.
                           11921 Freedom Drive, Suite 584
                           Reston, VA 20190
                           (703) 904-4380

For the Defendants:        Thompson Burton PLLC
                           By:  PHILLIP G. YOUNG, ESQ.
                           6100 Tower Circle, Suite 200
                           Franklin, TN 37067
                           (615) 465-6008

Audio Operator:            Autumn McNeese, ECR

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1      (Proceedings commence at 9:13 a.m.)

2      THE CLERK:  All rise.  The United States Bankruptcy

3  Court for the Middle District of Tennessee is now in session.

4  The Honorable Marian F. Harrison presiding.

5      THE COURT:  Good morning, folks.

6      MR. MCNUTT:  Good morning, Your Honor.

7      THE COURT:  One second.  I want to get situated here.

8      THE CLERK:  Sure.

9      THE COURT:  All right.  Mr. McNutt?

10      MR. MCNUTT:  Thank you, Your Honor.  First of all, I

11  apologize for the technical foul up.  I was actually at the

12  court site but some reason I didn't hit the right button to

13  join in to the hearing, and so I apologize for that.

14      THE COURT:  No problem.

15      MR. MCNUTT:  Your Honor, this is, obviously, a motion

16  to reconsider which is, you know, a delicate motion to present

17  to a judge who clearly is attempting to do the right thing and

18  I think you understand that I'm not -- certainly not quarreling

19  with the Court's abilities or the consciousness or anything

20  like that, but I do want to say that I think based on Your

21  Honor's decision that there are issues that were raised and are

22  not disputed.

23      And there is case law that -- there's controlling

24  case law that with respect to the two issues decided by

25  Your Honor, we, respectfully, assert should have required a

1 judgment in favor of the plaintiffs.

2          THE COURT:  Let me make one statement and maybe I

3 wasn't clear, but in Footnote 8 of our opinion we didn't grant

4 summary judgment in the plaintiff's claim of actual fraud

5 pursuant to 548(a)(1)(A).  So just so there's no confusion, we

6 didn't grant summary judgment as to actual fraud.

7          MR. MCNUTT:  Okay.  I think I understand, Your Honor.

8 And I'm glad you made that point because that did confuse me a

9 little bit, but, respectfully, Your Honor, I still don't think

10 that changes the gravamen of the motion that we filed.

11          THE COURT:  I understand.

12          MR. MCNUTT:  As Your Honor knows, motions to

13 reconsider are very strictly limited.  And I understand that in

14 our motion we cited several cases in the Sixth Circuit, but all

15 of which -- I believe all of which were District Court cases.

16 I'm not sure why they were limited to District Court cases, but

17 they're consistent so I think they're controlling.

18          And, essentially, the argument we're making,

19 Your Honor, is that with respect to the two main points in Your

20 Honor's memorandum that in effect did not decide the motions in

21 our favor that under the controlling law we believe there was

22 sufficient evidence and material facts not in dispute that were

23 asserted in our motion documents and our briefing.  And those

24 factors and law we believe under the -- under rulings of the

25 Sixth Circuit are controlling to the point where if there were

1  -- the phrasing of the cases is properly considered, and I'm

2  not suggesting that Your Honor improperly considered them, I

3  just am asserting that I don't believe they were given the

4  consideration that they should have been in light of the

5  factual background and the procedural background of this case.

6  And, Your Honor, it starts with this -- as Your Honor knows,

7  obviously, the circumstances of this adversary proceeding arose

8  when the trustee attempted to sell the estate's interest and

9  that the trustees avoiding any recovery claims to the

10 defendant, Mr. Salas.

11        Now, the actual party asserted was Mr. Ron Salas, the

12 defendant's son, but in all proceedings Mr. Ron Salas was

13 represented by Mr. Young, who, also, obviously, represented the

14 defendant, Max Salas.  And with respect to the actual auction

15 that occurred, it was Max Salas who was clearly in charge of

16 the bidding and telling his son, or at least consulting with

17 his son as to what the bid could be.  And that's necessarily

18 been my -- in my declaration which was attached to our motion

19 to alter or to mend --

20        THE COURT:  Amend.

21        MR. MCNUTT:  -- or amend.  That auction, again, was

22 not the result of any request by the plaintiffs; it was by the

23 request of the defendant or the defendant's son representing

24 the defendant, and the Court allowed the sale to go forward.

25 And, also, Your Honor ordered the procedures by which the

1  estate's asset was to be sold.  The result was that my clients,

2  the plaintiffs, paid $150,000 towards the estate's -- toward

3  the rights of the estate to pursue Mr. Max Salas under the

4  theories that are set forth in the complaint; the trustee's

5  avoiding powers, and the fraudulent advance actions that are

6  available under both bankruptcy and state law.

7            Your Honor -- in Your Honor's ruling, Your Honor

8  relied substantially on the decision of Judge Teel in the

9  United States Bankruptcy Court for the District of Columbia

10  which was a ruling on -- not on any avoiding powers or on

11  fraudulent advance, but was based upon a determination of

12  whether or not under D.C. law, Mr. Max Salas had a sufficient

13  interest in the property that he could claim an exemption.  And

14  as Your Honor probably knows that's important in the District

15  of Columbia if he has a homestead exemption to a residence in

16  which the debtor is presently residing at the time of the

17  bankruptcy case is unlimited.  Therefore, if the debtor

18  obtained his exemption, then he had an unlimited exemption and

19  the property remains outside the reach of creditors at least as

20  to -- as far as the estate of Max Salas is concerned.  What

21  Judge Teel did not determine is in the effect of his ruling

22  that Max Salas had an interest in the property on the trustee's

23  avoiding powers or, although not specifically mentioned,

24  clearly he did not say anything, state anything in his opinion

25  nor could he, I don't believe, Your Honor, regarding the

trustee's -- this trustee's ability to recover the property on
the basis of a fraudulent conveyance.

And the reason I think -- there's an important
distinction here, Your Honor, and the distinction is that with
respect to the debtor's residence in the Max Salas case that
was determined without reference to when the transfer occurred.
And you'll recall that in our papers, Your Honor, we cited
several statements made by Judge Teel both in the context of
the contested matter related to the debtor's exemption and the
actual evidentiary hearing where Judge Teel commented -- in his
actual decision, rather, where Judge Teel commented that this
all might be upended by the actions of the trustee in the
Tennessee case which was also pending at the time that's this
case where Ron Salas was the debtor.

And, most importantly, there's the date -- the
effective date that the transferred occurred.  And there's no
dispute that for purposes of Section 548 -- I always get these
mixed up, but I think it's 548, the (indiscernible) statute,
that for those purposes the transfer, even though it was
alleged to have occurred in 2010, for purposes of a fraudulent
conveyance was not perfected, and, therefore, was not in effect
until the day before the bankruptcy proceeding.

So while that didn't change necessarily the ability
of the debtor in that case, Max Salas, to claim the homestead
exemption, it did certainly open up his claim -- or open up his

interest to a claim of a fraudulent conveyance since there was
no perfection of a transfer until the eve of the bankruptcy
case.

Now, Mr. Young has argued previously that the
effective date of the transfer was as early as 2010, but there
is no factual support or case law support for that.  The
statute in D.C. and the statute -- and the federal statute both
make it very clear that the effective date for purposes of
determining whether a transfer took place is the date of the
transfer was perfected or if not perfected, then the day
immediately prior to the bankruptcy case so that was April 17,
2018.  And we contend, Your Honor, that that is an important
distinction that the counters which Your Honor has suggested is
the effect -- not suggested, sorry -- has determined is the
effect of Judge Teel's decision.

We also believe, Your Honor, that there are several
other important facts that should have been considered and we
don't believe, based on Your Honor's memorandum opinion, that
they were considered or at least, on the face of it, it doesn't
appear that they were reconsidered.  I've already stated that
--

THE COURT:  I'm sorry.  Go ahead.  Go ahead.

MR. MCNUTT:  I'm sorry.

THE COURT:  Go ahead.  Go ahead.

MR. MCNUTT:  I'm sorry, Your Honor.  First, Your

1   Honor, and this relates to the decision to Your Honor's ruling

2   that distinguishes the Kind Inc. -- Kind Operations Inc.

3   (indiscernible) case. That's the case out of Western District

4   of Pennsylvania in which the court determined that a creditor

5   that had previously lost in a state court proceeding could

6   pursue the same claim as a representative of the bankruptcy

7   estate after having been assigned a purchase -- I think it was

8   purchased, actually, or assigned the claim from the trustee in

9   bankruptcy.

10        And since I'm on that point, I will say, Your Honor,

11   that one the concerns that I think the parties have with

12   respect to the import of your decision is that it's hard to

13   determine where to draw the line. Your Honor was impressed, if

14   that's the right word, with the fact that my clients

15   represented, substantially, all of the unsecured claims in this

16   estate and that's accurate. My client's claims are over $15

17   million in total, but they represent not one creditor but two

18   creditors, Your Honor, and there's no -- and each of those

19   creditors represent less than 50 percent of the unsecured

20   claims in this case.

21        THE COURT: Well, but -- go ahead. Go ahead.

22        MR. MCNUTT: Secondly, Your Honor, they are not the

23   only claims in this estate. As I read the trustee's final

24   report, there were actually 12 claimants that received payments

25   of this estate including six administrative claims. The

1    Internal Revenue Service, all seven of which now were paid in

2    full.  So as a result of the payments of my clients into the

3    estate, the estate gained $150,000 fair consideration because

4    it was a bid -- fair consideration to the trustee's funds in a

5    circumstance where my clients did not even present the purchase

6    to the trustee, it was this defendant who did it.  We didn't

7    ask for the trustee to assign the claims to us.  My clients did

8    not ask for that.  It was asked by Mr. Salas or by his son,

9    Ron, who is an attorney in Colorado, as Your Honor probably

10   knew of this, but -- and it was a court process -- I'm sorry --

11   a sale process that Your Honor approved and ordered to go to go

12   forward which we complied with.  So we are the bona fide

13   purchasers of the trustee's on the estate's claims by virtue of

14   an open auction in which the competing party was the defendant.

15          And although Your Honor has made an important point

16   about the size of my client's claims, keep in mind that the

17   reason, as my declaration declares and as Mr. Young asserted in

18   open court, the purpose of Mr. Salas buying the claims was to

19   prevent any party from going after his assets, was to prevent

20   my clients or any other creditor from pursuing a claim or those

21   claims who -- the avoidance and recovery claims against

22   Mr. Max Salas.

23          So you have this situation where Your -- which Your

24   Honor was concerned about in your memorandum opinion, but my

25   clients represented substantially all of the unsecured claims

1  in the case and yet the Court ordered the purchase which was

2  authored by Mr. Max Salas or on his behalf where he represented

3  substantially all of the assets of the estate by virtue of

4  having a property that was worth, at the time that he filed his

5  bankruptcy, he said approximately $2.4 million with less than

6  half that in actual mortgage claims or other claims against the

7  property.

8         So we have a circumstance where my clients

9  represented substantially all of the unsecured debt where

10  Mr. Salas represented -- Mr. Max Salas represented all of the

11  assets of the estate, in fact, the only assets of the estate.

12         THE COURT:  I think you just froze.  Mr. McNutt, I

13  think you just froze.  You may want to -- if you can -- can you

14  hear me?  No.  You may want to go back out and come back in.  I

15  don't know what to do.

16         Jeremy, do you have an idea here?  You should call

17  him, I think.

18         THE CLERK:  I think he -- looks like he's --

19         THE COURT:  He's doing that.

20         THE CLERK:  Yep.  I think he's reentering.

21         THE COURT:  Sorry to call you Jeremy.  It just came

22  out.  I was befuzzled by the freezing.

23      (Pause)

24         THE CLERK:  I'm concerned.  (Indiscernible).

25         THE COURT:  Maybe you better call him.  Let's take a

1 | break.

2 | (Recess taken at 9:34 a.m.)

3 | (Proceedings resumed at 9:35 a.m.)

4 | THE COURT:  I hope he's not still talking thinking --

5 | (Pause)

6 | MR. YOUNG:  Judge, I tried to call Mr. McNutt just

7 | now but it went straight to his voicemail.  I just left a

8 | message telling him that we're in recess waiting for him to

9 | sign back on just so that -- to make sure he knew that he got

10 | kicked off.

11 | THE COURT:  Thank you.

12 | (Pause)

13 | THE CLERK:  It looks like he's back, Your Honor.

14 | THE COURT:  We lost you, Mr. McNutt.

15 | MR. MCNUTT:  Yeah.  I think, Your Honor, the server

16 | here at the office went down because I had no phone service or

17 | anything so I apologize.  I assure you it was not -- well,

18 | maybe it was my fault but nothing I did that I know of.

19 | THE COURT:  I understand totally.  I have similar

20 | frustrations from time to time.

21 | MR. MCNUTT:  Yes.  Technology is wonderful when it

22 | works but when it doesn't it gets frustrating especially when

23 | you're not in tune.  You got to be under 40 I think to be in

24 | good shape for that.  So, in any event, should I continue, Your

25 | Honor?  I --

1      THE COURT:  Yes, yes.

2      MR. MCNUTT:  -- again, I apologize.

3      I think I've, basically, gone through the discussion

4 regarding Judge Teel's decision.  When I was -- I was also

5 talking about the money that went into the estate and the

6 benefits of the estate, and, basically, the consideration that

7 was paid for those causes of action.

8      And the next point I wanted to make, Your Honor, is

9 that if you recall when Your Honor ruled on Mr. Young's motion

10 to dismiss -- or made the motions to dismiss, the final one,

11 the Court determined, among other things, that for purposes of

12 this complaint, the plaintiffs were standing in the shoes of

13 the trustee.  They were not acting on their own behalf; they

14 were acting through the trustee and for the benefit of the

15 estate.

16      And I had found no cases which indicate, Your Honor,

17 that in a circumstance like this or in any other circumstance

18 where the real party in interest is the trustee in bankruptcy

19 or the bankruptcy estate which is -- I think it's actually the

20 same thing -- that the status of the claims related to the

21 plaintiffs in this case by virtue of Judge Teel's decision

22 would be binding on the bankruptcy estate or the trustee in

23 bankruptcy whose position is in privity only with the debtor,

24 in certain cases -- instances, and not with any creditor.  And

25 we cited case law to that effect.  I don't actually have that

1  right in front of me but I can certainly find it as we go

2  through this.

3          And I believe, Your Honor, that -- I believe Your

4  Honor has put too much emphasis on the fact that my clients

5  have such large claims.  Would, Your Honor -- the question I

6  raise, I guess somewhat rhetorical is, would Your Honor's

7  decision had been the same if my clients represented -- if my

8  clients had two claims which were $10,000?  Let's say they were

9  $10,000 and having claims of $20,000 would have been more than

10 40 percent of the listed unsecured claims in the case.  Or

11 suppose their claims which totaled $100,000 that would have

12 been substantially the bulk of the claims against the estate.

13         The fact that my clients have substantial claims is a

14 result of the actions of the defendant and the debtor, not

15 anything that my clients have done.  It's not -- my clients

16 have not manufactured these claims.  These claims resulted from

17 a prolific debt that was caused by the negligence of the debtor

18 and the defendant.  My clients should not be punished for that,

19 Your Honor.  It's -- and I believe that's what your decision

20 does.  And I believe, with all due respect, Your Honor, and I

21 have the utmost respect for this Court, I think you understand

22 that, always have.  The fact that my clients have large claims

23 does not enter into whether they had the ability to assert

24 those claims on behalf of this estate.  And even though many of

25 the claims -- obviously, this estate have been paid by virtue

1  of the purchase of my clients -- by my clients over $150,000.

2  There are claims that still remain to be paid which would be

3  paid out of any judgment whether that results from this case.

4      When I said before, Your Honor, and I'll make this

5  point quickly, I believe that if this decision stands it will

6  create precedent for the next situation down the road where a

7  Kind-like -- a Kind Operations Inc.-like situation arises and a

8  creditor with a substantial claim against the estate that holds

9  the case decided in another court assumes for the benefit of

10  the estate.  It could be claims for the benefit of all of the

11  parties to the estate and that's exactly what you are doing.

12      It just so happens -- and I understand, it just so

13  happens that my clients represent the -- almost all of the

14  claims of the estate because of the extreme -- because of the

15  amount of the judgment that was entered in their favor.  But

16  the reason why the judgment was entered in that amount is

17  because my clients or the estates of the two youngsters that

18  were killed in that fire were only 24 years old.  So if they

19  were 40 or 45 years old, the claims wouldn't have been and the

20  judgment wouldn't have been nearly as high, but they were young

21  with their whole lives ahead of them.  Unfortunately, that --

22  their lives were snuffed out, but they had that earning power

23  and because of that earning power, the judgment claims were

24  substantially higher.  They were high.

25      Your Honor, with respect to the privity issues, hold

on -- in the Sixth Circuit in the case of <u>Sanders Confectionary</u>

<u>Products</u>, it states that a trustee stands in privy to the

debtor and not any creditors.  Therefore, my client's claims,

as asserted on behalf of the trustee in the bankruptcy estate,

are in privity only with the debtor, not with any creditor.

And if Your Honor needs that citation I believe I sent it

before but if not, it's 973 F.2d 474, and the specific language

is on Pages 480 and 481, and, as I said, that's a Sixth Circuit

case of 1992.

In the <u>Kind</u> case, the case that Your Honor did redo,

it states that the capacity of the plaintiff as assignee of the

trustee is different from its capacity as party to its prior

state court action.  That's what the <u>Kind</u> case states.  That's

the Western District of Pennsylvania.

And Your Honor distinguished that only because my

clients had such extensive claims and don't I think that's a

distinguishing factor.  I don't think that's an appropriate

distinguishing factor.  I understand that it's psychologically

important or at least psychologically considered important, but

it psychologically comes to mind, but that is not a legal basis

or a factual basis to change the rules regarding privity, real

party in interest, and the fact that these parties are standing

in the shoes of the estate and the trustee, not in the shoes of

any creditor including the plaintiffs in this case.

The <u>Kind</u> decision that I just mentioned, Your Honor,

1   is consistent with the substantial body of  case law which

2   asserts that in a derivative action like the instant case, and

3   I'm quoting now, "the person holding the substantive right

4   sought to be enforced and not necessarily the person who will

5   ultimately benefit from the recovery is the real party in

6   interest."  And that's actually from the Farrell Construction

7   Company v. Jefferson Parish, Louisiana, Fifth Circuit case,

8   1990, and that's cited at 896 F.2d 136, and, specifically, on

9   Page 140.  And the quote that is a real party in interest is,

10  "the person holding the substantive right sought to be enforced

11  and not necessarily the person who will ultimately benefit from

12  the recovery."

13          That, also, Your Honor, states quite clearly that

14  when determining the rights of the parties with respect to

15  items like res judicata and collateral estoppel that the real

16  party in interest is the party that the Court should focus on

17  and that is the trustee and the trustee's claims.  The trustee

18  was not a party to the exemption decision nor could it be, nor

19  could it have been.  Even if the trustee chose somehow to

20  intervene, the trustee would not intervening in the exemption

21  decision could it have, there was no trustee appointed at the

22  time that the exemption decision was determined.  The trustee

23  is not appointed until months later.

24          The next part of this, Your Honor, is the -- I want

25  to focus on -- and I'm almost done here.  I want to focus on

1    the McKinley case.  That's the case that was cited in my motion

2    papers.  It's McKinley v. Crawford, and that's a case cited at

3    58 F.2d 528 and specifically on Page 529 and 530 is where my

4    discussion comes from.  And this is a D.C. Court of Appeals

5    case from 1932, and I believe the reason that it's in the

6    federal court order is because of the jurisdiction -- federal

7    jurisdiction over the D.C. -- over D.C. and the D.C. Courts

8    back in 1932.  So I believe the D.C. -- the appellate

9    decisions, even though they were not from the United State

10   District Court or recorded in the federal court, I'm not

11   certain, but I believe that's correct.

12         The McKinley case wasn't cited in your memorandum

13   opinion, Your Honor, and I've been told that it was considered,

14   but we argue that with respect to the undisputed facts of the

15   case that it is clear that even if everything else -- well,

16   it's clear that in 2007 Max Salas deeded the property.  The

17   property was deed, if you recall, from Max Salas and his wife

18   to Max Salas, and then from Max Salas to his son, Ron Salas,

19   and Ron Salas remained the only title owner on the property and

20   the only owner of record without any intervening title

21   documents asserted.

22         So Your Honor cited the general rule in asking for

23   the hearing in March on the motions for summary judgment.

24   Your Honor cited the general rule that where there was -- and I

25   think I've got it here.  The general rule is that the actual

1   visible and unequivocal possession of real estate inconsistent

2   with the record title and under an apparent claim of ownership

3   is notice to purchasers of an adverse interest in the property

4   to be purchased.  That, as I understand it, is the basis of

5   Your Honor's decision or at least reluctance to grant summary

6   judgment to the plaintiffs on the issue of inquiry notice, and

7   that is the accepted general rule.  However, Your Honor,

8   McKinley and many other cases including the cases throughout

9   Tennessee --

10          THE COURT:  Wait just a second.  Wait one -- I'm

11   sorry.

12          MR. MCNUTT:  -- state that there is --

13          THE COURT:  I'm on mute.  Hang on a minute.

14          MR. MCNUTT:  -- an exception to the general rules.

15          THE COURT:  Wait just one second.

16          MR. MCNUTT:  I'll hang on.

17          THE COURT:  One second.  I'm assuming you're talking

18   about -- I didn't grant summary judgment on 544(a)(3) and

19   544(a)(1).

20          MR. MCNUTT:  You did not, Your Honor.  My -- and my

21   argument was that I believe you should have granted us summary

22   judgment, not that you granted summary judgment to the other

23   side --

24          THE COURT:  Okay.

25          MR. MCNUTT:  -- but that I -- you should have granted

1  summary judgment to us.  I'm being very selfish here but that's

2  what I believe.

3           THE COURT:  All right.  You can argue what you need.

4  It's no offense to me.

5           MR. MCNUTT:  I appreciate it, Your Honor.

6           Your Honor, my point of this is that Your Honor cited

7  in your memorandum of opinion, and, hopefully, I can find it

8  fairly quickly here.  You cited, basically, some competing

9  undisputed facts.  And the undisputed facts that you cited that

10 the plaintiffs asserted were that Len Salas was the named owner

11 under titles of the property, the mortgage on the property was

12 in Len Salas's name only, rental leases were signed by Max

13 Salas on behalf of CLR, rather than individually, and, I might

14 add, Your Honor, we're always in the name of trust.  Under the

15 name of CLR there was no indication of any entity other than

16 Mr. Max Salas acting as a trustee or a trust under the name of

17 CLR.

18          And two more important factors, one is that the

19 recorded judgment showed Len Salas was held liable as the owner

20 of the property and that Max Salas was held liable for

21 mismanagement, not owner of the property.

22          Those facts, Your Honor, I believe into the framework

23 of the McKinley decision which, as I said, is not only valid

24 law in the District of Columbia which is all that's really

25 important, but it is a recognized law in many jurisdictions.

1       At the time of the <u>Strong</u> decision which I cited in

2   support of <u>McKinley</u> there were -- let's see if I can find this

3   here.  And that case was decided in 1929.  At the time of the

4   <u>Strong</u> decision which is two years prior to <u>McKinley</u>, according

5   to the <u>Strong</u> decision, and that's again 159 Tenn. 337, which

6   is 1929, as I said, the Supreme Court of Tennessee, and it

7   relies heavily on two citations.  One was a Michigan case,

8   <u>Bloomer v. Henderson</u>, and that appears on Page 344 of the

9   <u>Strong</u> decision.  And <u>Curry v. Williams</u>, which is a Tennessee

10  case.

11      And I'm quoting here from -- this is a quote from the

12  <u>Curry v. Williams</u> case which is cited in <u>Strong</u> and it states:

13  "The propriety execution delivers to another a solemn deed or a

14  conveyance of the land itself and suffers bad seed to go upon

15  record.  He sends to rule the world," colon, quote: "Whatever

16  right I have or may claim to have in this land, I have conveyed

17  to my grantee and, though I am yet in possession, it is for a

18  temporary purpose without claim or right and merely as a tenant

19  at sufferance to my grantee."

20      Later, on the <u>Strong</u> court case, "all presumption of

21  right or claim of right is rebutted by his own act and deed

22  that is after the grantor."  One of the main objects of the

23  registry law would be disputed by any other rule.  And, again,

24  cites <u>Curry v. Williams</u> in support of that proposition.  I

25  believe that's the end of it.  There's a quote in there I

1  believe it's from -- it appears to be from <u>Curry v. Williams</u>.

2          In the <u>McKinley</u> case -- well, it says there's an

3  exception to the general rule where a vendor remains for a time

4  in possession after given a simple deed reconveyance since he

5  permits to be recorded.  And then the Court states, and I'm

6  emphasizing this, Your Honor, the object of the general rule is

7  to protect one in possession.  Remember, the general rule is if

8  you're in an active and open possession, then that's notice to

9  the world that you -- that you have to require further as to

10 ownership.

11         This exception is referenced as follows:  "The object

12 of the general rule is to protect one in possession from acts

13 of others who do not derive their title from him, from the

14 grantor, not to protect the grantor against his own acts and

15 especially against his own deed."  And that's cited at Page 530

16 of the <u>McKinley</u> decision.

17         Let me see if I have overlooked anything that I

18 outlined.  I think that's my argument.

19         And the point of that is, Your Honor, while I believe

20 there are -- none of it is determined back -- this is an issue

21 not right for summary judgment and I assert that based on the

22 undisputed facts of the title of the property being in the name

23 of Len Salas at the hand of Max Salas that the <u>McKinley</u> case

24 controls and the <u>McKinley</u> case is the law in the District of

25 Columbia, and it is, apparently, the law in many other

1  jurisdictions including Tennessee.

2       Your Honor, I stated in our motion the law here with

3  respect in motions for your consideration, and I won't go over

4  that any more except to say that in the case of Harris v. Perry

5  which is in the Western District of Tennessee.  It's a Lexus

6  cite as 13 -- it's a 2016 Lexus -- U.S. District Lexus 139942,

7  26 -- 2016 Westlaw 5396701.  Essentially, this emphasizes I

8  think what is consistent with the law cited and in these other

9  cases, but it says basically that relief Rule 5090, that's the

10 federal rule that is part of Rule 9023, I think it is, the

11 bankruptcy court rule, the relief Rule 5090 is available and

12 appropriate in those cases in which the movant has set forth

13 facts or law of a strongly convincing nature that show the

14 Court's prior ruling should be reversed.

15      Your Honor, that's my argument.  Thank you very much.

16      THE COURT:  All right.  Just -- Mr. McNutt, just so

17 you know it doesn't bother me that somebody asks to reconsider

18 because I've been wrong and I may be wrong in this case, but

19 I've been wrong before so just so you know.

20      Mr. Young --

21      MR. MCNUTT:  I say this by all due respect, Your

22 Honor, nothing more.

23      THE COURT:  I agree wholeheartedly.

24      Mr. Young?

25      MR. YOUNG:  Good morning, Your Honor.  Phillip Young

1   on behalf of the Defendant, Max Salas.  I'm going to try to be

2   very brief.

3          The plaintiff's motion is not really a motion to

4   alter or amend at all.  It's, essentially, an appeal without

5   filing a notice of appeal, but this is filed as a Rule 59

6   motion which is disfavored and has to be considered as such.

7   To succeed on a Rule 59 motion, a movant must show that there

8   is one of the following:  A clear error of law, newly

9   discovered evidence, a change in controlling law, a need

10  prevent manifest injustice, the court clearly overlooked

11  material facts, the court clearly overlooked controlling law.

12  The plaintiffs have shown none of this.

13         The courts have noticed that Rule 59 is an exacting

14  standard and an extraordinary remedy restricted to those

15  circumstances of which the moving party has set forth specific

16  facts or specific law of a -- and this is the word that's used

17  -- strongly convincing nature that indicate that the court's

18  prior ruling should be reversed.  The plaintiffs, respectfully,

19  have not come close to meeting this standard.  Rather they

20  simply restated their entire argument on every single issue.

21  This Court has already considered all of these arguments

22  ad nauseam and reached its conclusion.

23         If the plaintiffs disagree with this Court's

24  conclusion, and they're certainly entitled to, they should seek

25  permission to file an interlocutory appeal, otherwise, we need

1   to set this matter for trial.

2          And, Judge, I'm going to resist the urge to restate

3   my client's position on every single issue, but I do find it

4   necessary to at least clarify a few things that were said this

5   morning.

6          I think this Court found preclusion as to a

7   conclusion by the D.C. Court.  For a conclusion -- for a

8   preclusion to apply, and this is an important point, it doesn't

9   have to be the exact same party; it just has to be a party that

10  somehow is standing in privity with the former party.  And we

11  cited to a number of cases in our briefs, plural, where a

12  subsequent party was precluded even though they weren't the

13  same party.  We understand that it's not the exact same party.

14  I represent trustees all the time.  I understand the difference

15  between a trustee and a creditor.  But there are lots of cases

16  that say if the former party appropriately represented the same

17  interest as the current party then preclusion applies.  That's

18  definitely the case here.

19         As the courts -- as Mr. McNutt has talked about this

20  morning, the dollar amount is one indicia of that.  They

21  represent -- I don't remember the number, 98 percent, 99

22  percent of the client pool.  They had the exact same interest

23  in this matter as they did in the prior matter.  They're even

24  represented by the same counsel in this case and the same

25  decision maker.  That's what makes this different than other

1 cases.  It is in that degree -- that full degree of alignment

2 means that they are in privity.

3          And I'd be remiss if I didn't point out that

4 Mr. McNutt said that the Court is punishing his client.  This

5 isn't a matter of punishment.  I think the Court understands

6 that.  It's a matter of whether these issues have already been

7 fully tried and decided and they have, and now maybe two times

8 and working on three times.  They've been fully tried and

9 decided.

10          I said I was going to be brief.  I'm going to stop

11 there unless the Court has other questions for me.

12          THE COURT:  I don't.

13          Mr. McNutt, do you want to say anything else?

14          MR. MCNUTT:  Yeah.  I don't want to revisit

15 everything I've said.  I'm sure Your Honor understands my

16 position.

17          I'm a little troubled by this assertion by Mr. Young

18 that privity stands in the way of my clients -- of the estate's

19 ability to -- of my clients ability to cover for the estate.

20 My recollection is that none of the cases cited by Mr. Young

21 involve an assertion of a trustee having privity for a creditor

22 in a case in which the trustee was not even appointed at the

23 time that the original case was argued -- was presented and

24 decided.  I don't believe any of the cases were trustee cases

25 but I could be wrong on that, but I'm sure they do not fit the

1 | facts of this case.

2 | And I do agree with Mr. Young on one other thing that

3 | if Your Honor does not agree with us and determines not to

4 | reconsider your decision, then I think we do have -- I think

5 | it's necessary, and I hope that Your Honor agrees, I don't want

6 | to have two trials.  I don't want to be in court twice, once on

7 | the issues that Your Honor has not yet decided, and again on

8 | the issues that have been decided in this motion, so I believe

9 | that this is a matter that's right for an interlocutory appeal

10 | so that we don't have the issue of having potentially two

11 | trials in the event that we loss on the issues that are left

12 | after Your Honor's decision.  So I don't want to have to try

13 | this case twice.

14 | And almost all of the facts and all of the witnesses

15 | would be the same if Your Honor decides not to reconsider and

16 | that decision is overturned on appeal so we would literally be

17 | having two trials on the same -- on, essentially, the same

18 | issues of the same parties just very technical arguments that

19 | may be decided on appeal.

20 | THE COURT:  Just so you know, Mr. McNutt, it's not my

21 | decision whether you have an opportunity to appeal assuming

22 | what -- I do want to take a break in a minute, but I don't have

23 | a dog in that fight.  So let me take about a five-minute break.

24 | THE CLERK:  All rise.

25 | (Recess taken at 10:08 a.m.)

1        (Proceedings resume at 10:16 a.m.)

2              THE CLERK:  All rise.

3              THE COURT:  All right.  I appreciate your position,

4    Mr. McNutt.  This is a hard case and it was a hard case from

5    the very beginning when you were in state court, and I do have

6    sympathy for those folks.  It's not my intention to punish

7    anybody.  But I don't believe, based on your papers and the

8    argument, that you met the standard under rule -- Bankruptcy

9    Rule 9023, and Federal Rule Civil Procedure 59 for a motion to

10   alter or amend.

11             The arguments made here today were the same arguments

12   made previously before we entered our lengthy opinion.  And I

13   agree with you that leave to appeal is something you should

14   strongly consider.  Just bear in mind that you have 14 days

15   from the date of whatever order comes down on this denying the

16   motion to alter or amend.

17             I call your attention to Rule 8004 which is how you

18   do it.  Bankruptcy Rule 8004 and Bankruptcy Rule 8005.  They're

19   two different steps.  If you want to appeal you got to -- from

20   an interlocutory order you got to file it in time and be

21   accompanied by a motion for a leave to appeal prepared in

22   accordance with that rule and the contents of the motion have

23   to be looked at and in accordance with Rule 8004.

24             If you want to appeal to the District Court in

25   addition to whatever you do under 8004, you have to make an

1  election to have it heard by the District Court rather than our

2  Bankruptcy Appellate Panel and that's under Rule 8005.  I don't

3  know what you want but just be aware of Rule 8004 and 8005,

4  and, again, 14 days to appeal from the date of the order.

5        And I'm going to deny the motion.  I'm interested in

6  what happens after if you do file a motion for leave to appeal

7  either for the District Court or the Bankruptcy Appellate

8  Panel.  And I will await a decision in that matter before we

9  set this case for trial.

10        Is that what you want, Mr. McNutt?

11        MR. MCNUTT:  It is, Your Honor.  And I appreciate

12  your patience and consideration particularly with my

13  technological issues -- technology issue this morning.

14        THE COURT:  No problem at all.  By the way --

15        MR. MCNUTT:  And that --

16        THE COURT:  -- after September the 15th or so, we're

17  going to have to go to -- in arguments and in trials,

18  obviously, we're going to have to go to in person, so luckily

19  you got this under the Covid rules but we've got to change

20  these -- the judicial conference in D.C. has said we got to go

21  back to in person for the most part.

22        MR. MCNUTT:  I was hoping that was a major

23  consideration, your granting my motion today so you wouldn't

24  have to see me anymore, but I guess -- I guess that's not going

25  to work.

1          THE COURT:  You are welcomed here anytime,

2    Mr. McNutt.

3          Mr. Young, will you draw the order?

4          MR. YOUNG:  Yes, Judge.  I just wanted to add just as

5    a housekeeping matter.  If 14 days passes and no appeal is

6    filed, I'll file a motion to set a pre-trial conference to

7    bring that to the Court's attention, otherwise, I think we'll

8    just wait, you know, until the conclusion of the appeal if an

9    appeal is granted.

10          THE COURT:  All right.  Let me -- Mr. McNutt, I just

11    want to make sure and imprint upon your brain, Rule 8004 and

12    Rule 8005 of the Bankruptcy Rules of Civil Procedure.

13          All right.  We'll be adjourned.

14          THE CLERK:  All rise.

15          THE COURT:  Take care.

16          MR. MCNUTT:  Thank you, Your Honor.

17          MR. YOUNG:  Thank you, Your Honor.

18        (Proceedings concluded at 10:20 a.m.)

19                        * * * * *

20

21

22

23

24

25

## **C E R T I F I C A T I O N**

      I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

ALICIA JARRETT, AAERT NO. 428    DATE: November 7, 2023

ACCESS TRANSCRIPTS, LLC